# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities, | |
| Plaintiff, | Civil Action No. |
| v. | Complaint |
| 3M Company; Daikin America, Inc.; EIDP, Inc. f/k/a E.I. DuPont de Nemours and Company; The Chemours Company; INV Performance Surfaces, LLC; Aladdin Manufacturing Corporation; Shaw Industries Group, Inc.; Shaw Industries, Inc.; and DOES 1-10, | TRIAL BY JURY DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a/ Dalton Utilities ("Dalton Utilities") hereby files this Complaint against Defendants 3M Company; EIDP, Inc. f/k/a E.I. DuPont de Nemours and Company; The Chemours Company; Daikin America, Inc.; and INV Performance Surfaces, LLC (collectively, the "PFAS Manufacturing Defendants") and Defendants Aladdin Manufacturing Corporation; Shaw Industries

Group, Inc.; and Shaw Industries, Inc. (collectively, the "Carpet Manufacturing Defendants") (all defendants together, the "Defendants") and alleges as follows:

## STATEMENT OF THE CASE

1.     Plaintiff Dalton Utilities brings this action against Defendants for harms sustained as a result of Defendants' acts that caused long-running contamination of Dalton Utilities' wastewater treatment operations through the sale, purchase, use, and disposal of per- and polyfluoroalkyl substances ("PFAS"), including without limitation perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), perfluorohexanesulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide-dimer acid (HFPO-DA, known as "GenX chemicals"), and perfluorobutanesulfonic acid ("PFBS").

2.     The City of Dalton, Georgia is known as the carpet and flooring capital of the world, and since the 1970s it has been home to hundreds of carpet and flooring manufacturers.  Dalton Utilities is a municipal utility that owns and operates a wastewater treatment system that collects and treats wastewater from household, commercial, and industrial users (including carpet and flooring manufacturers) in and around Dalton, Georgia.  Today, the system includes three wastewater treatment plants that process wastewater before it is land-applied to the Riverbend Land Application System (the "LAS") for further processing and disposal (collectively, the "POTW").

2

3.     The POTW is a complicated operation that is subject to extensive regulation, permitting, and oversight by the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources.  The POTW is governed by the terms and conditions of Land Application System Permit No. GAJ020056 (the "LAS Permit") and the terms and conditions of the General Stormwater Permit – National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit No. GAR050000 (the "General Stormwater Permit").

4.     For decades, the PFAS Manufacturing Defendants knowingly and willfully sold PFAS and PFAS-containing products to carpet and flooring manufacturers in and around Dalton, Georgia, including without limitation the Carpet Manufacturing Defendants, who then used those products in their manufacturing facilities to impart water and stain resistance to carpet, flooring, and other textile products.

5.     PFAS Manufacturing Defendants arranged for the disposal of the PFAS-laden industrial wastewater generated through this process at the POTW without any meaningful disclosure or warning to Dalton Utilities or the public.

6.     The PFAS Manufacturing Defendants sold PFAS and PFAS-containing products to the Carpet Manufacturing Defendants, and the Carpet Manufacturing Defendants used those products in their manufacturing processes, knowing that it would generate industrial wastewater with concentrations of PFAS that cannot be

treated through traditional wastewater treatment operations (like those at the POTW) and that resist degradation in the environment.

7.    Carpet Manufacturing Defendants arranged for the disposal of the PFAS-laden industrial wastewater generated through this process at the POTW without any meaningful disclosure or warning to Dalton Utilities or the public.

8.    As a result of Defendants' actions, PFAS has been detected in the influent, effluent, biosolids, soils, groundwater, and surface water at and surrounding the LAS, as well as in areas further downstream from the LAS.

9.    The sale and use of these PFAS and PFAS-containing products generated significant profits for all Defendants.

10.    On April 10, 2024, the United States Environmental Protection Agency ("EPA") finalized a National Primary Drinking Water Regulation establishing Maximum Contaminant Levels ("MCLs") for six PFAS compounds: PFOS, PFOA, PFHxS, PFNA, HFPO-DA, and PFBS.  That regulation became effective on June 25, 2024.

11.    The LAS Permit includes a provision that groundwater leaving the LAS boundaries must not exceed MCLs for drinking water.

12.    On May 8, 2024, EPA also finalized a regulation designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental

Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq* ("CERCLA").

That regulation became effective on July 8, 2024.

13.    As a result of these regulations, Dalton Utilities must make significant and costly changes to the POTW to remedy the existing PFAS contamination caused by Defendants and to prevent future PFAS contamination caused by Defendants. In addition, Dalton Utilities must incur significant ongoing costs to operate and maintain the POTW with those upgrades.

14.    Defendants were, or reasonably should have been, aware that their acts and omissions directly and proximately caused PFAS contamination at the POTW and releases therefrom, and that Dalton Utilities' POTW was not designed to treat or remove PFAS.

15.    Nevertheless, the PFAS Manufacturing Defendants continued to manufacture, sell, and arrange for the disposal of PFAS and PFAS-containing products in Dalton, Georgia, for decades, and the Carpet Manufacturing Defendants continued to utilize those products in their industrial processes and to dispose of the PFAS-containing wastes from those products at Dalton Utilities' POTW.

16.    The costs of remedying the contamination that has resulted from Defendants' long-running manufacturing and waste disposal activities are substantial, and absent a remedy from this Court, those costs will be borne disproportionately by Dalton Utilities and the residents of Dalton, Georgia.

5

17.    The total amount of cleanup costs resulting from Defendants' PFAS contamination is not yet known but is likely to be in the hundreds of millions of dollars, if not more.

18.    Dalton Utilities brings this action against Defendants in an effort to hold Defendants accountable for the significant harms done to Dalton Utilities and the surrounding community and environment as a result of PFAS contamination from Defendants' manufacturing and waste disposal activities.  Dalton Utilities further brings this action to ensure that it has the funds and resources necessary to remedy these harms and to continue to provide an essential public service—wastewater treatment—to the residents and businesses of Dalton, Georgia.

## **PARTIES**

19.    Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a/ Dalton Utilities is a municipal corporation organized under the laws of the State of Georgia.

20.    Defendant 3M Company ("3M") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

21.    Defendant Daikin America, Inc. ("Daikin") is a foreign profit corporation that, at all relevant times, has conducted business in this District.

6

22.    Defendant EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("DuPont") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

23.    Defendant The Chemours Company ("Chemours") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

24.    Defendant INV Performance Surfaces, LLC ("Invista") is a foreign limited liability company authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

25.    Defendant Aladdin Manufacturing Corporation ("Aladdin") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

26.    Defendant Shaw Industries Group, Inc. is a domestic profit corporation and, at all relevant times, has conducted business in this District.

27.    Defendant Shaw Industries, Inc. is a domestic profit corporation and wholly owned subsidiary of Shaw Industries Group, Inc. (Shaw Industries, Inc. and Shaw Industries Group, Inc. together, "Shaw") and, at all relevant times, has conducted business in this District.

28.    Defendants DOES 1 through 10 are individuals or entities who may have an interest in the outcome of the present action.  Dalton Utilities does not know

7

the true names and capacities of defendants named herein as DOES 1 through 10, and brings this action against those defendants under such fictitious names. Dalton Utilities will amend the Complaint to identify the true names and capacities of DOES 1 through 10 when ascertained.

## JURISDICTION AND VENUE

29.    This Court has federal question subject matter jurisdiction over the CERCLA claims pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

30.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

31.    This Court has personal jurisdiction over Defendants because Defendants transact business within this state, O.C.G.A. § 9-10-91(1); committed tortious acts or omissions within this state, O.C.G.A. § 9-10-91(2); own, use, or possesses real property situated within this state, O.C.G.A. § 9-10-91(4); and Dalton Utilities' claims arise from such acts, omissions, ownership, or use.

32.    Venue is proper in this district because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is subject to the action is situated, including without limitation the purchase and sale of PFAS, the use of PFAS in manufacturing processes, the disposal of PFAS, and the contamination of Dalton Utilities' property with PFAS.

8

## FACTUAL ALLEGATIONS

### History of PFAS and the Carpet Industry

33.    PFAS are a group of manufactured fluorinated organic chemicals that are incorporated into a wide variety of industrial and commercial products.

34.    Due to their unique properties that resist heat, oil, stains, grease, and water, PFAS have played a central role in the manufacture and development of many consumer products since the introduction of PFAS in the 1940s.  Notably, and as relevant here, PFAS have been used in the manufacturing of carpet, flooring, and related textile products.

35.    For decades, the City of Dalton, Georgia has been home to hundreds of carpet and flooring manufacturing facilities.

36.    Beginning in the 1970s, the Defendants began marketing a highly successful and profitable category of products: stain- and soil-resistant carpets and flooring.  These stain- and soil-resistant carpets and floors were made possible by PFAS.

37.    The Carpet Manufacturing Defendants used PFAS and PFAS-containing products that were purchased from the PFAS Manufacturing Defendants in their industrial processes, which generated wastewater.

38.    The Defendants arranged for the disposal of this wastewater at the POTW.

9

39.     Once present in the environment, PFAS are extremely persistent and often have degradation periods of years, decades, or longer.  PFAS are incredibly stable and persistent, meaning they are highly resistant to natural degradation in the environment.

40.     Because of their persistence in the environment, PFAS have been called "forever chemicals."

41.     In addition to being highly persistent, PFAS are soluble and mobile in water, meaning that they can be transported through groundwater and surface water far from where they initially enter the environment.  Once PFAS are released into the environment, they are extremely difficult to remove and even more difficult to contain.

42.     PFAS was an important and highly profitable product for the PFAS Manufacturing Defendants, and for decades it was an integral part of the carpet and flooring industry allowing the Carpet Manufacturing Defendants to sell highly profitable stain- and soil-resistant carpets, flooring, and other textile products.

43.     Unlike the PFAS Manufacturing Defendants and the Carpet Manufacturing Defendants, Dalton Utilities never sold, purchased, or profited from PFAS.  Nevertheless, in its efforts to provide wastewater treatment services to the residents and businesses of Dalton, Georgia, Dalton Utilities has been burdened for

decades with wastewater laden with PFAS that caused substantial contamination of the POTW.

### The PFAS Manufacturing Defendants' Knowledge of the Inherent Dangers of PFAS

44.     3M was the first company to develop the group of chemical products that became PFAS. In the late 1940s, 3M patented the scientific process for producing PFAS on a commercial scale.

45.     DuPont was shortly behind 3M, and quickly recognized the commercial potential of PFAS.  DuPont began developing its own version the compounds that would become PFAS in the 1950s.

46.     Daikin's parent company began producing PFAS in the 1940s in Japan.

47.     In 2004, DuPont sold a segment of its PFAS business which became Invista.

48.     Over the course of decades, PFAS proved to be highly useful and commercially valuable for 3M, DuPont, Daikin, Invista, and other chemical manufacturers.

49.     The PFAS Manufacturing Defendants were aware of the persistence, mobility, and other environmental risks associated with PFAS long before Dalton Utilities, the PFAS Manufacturing Defendants' customers, government regulators, and the public.

50.     For example, in the 1960s, through its own experience in disposing of PFAS-containing waste, 3M knew that PFAS was mobile and could contaminate groundwater.

51.     Specifically, 3M knew that PFAS had reached groundwater at one of its waste disposal sites in Woodbury, Minnesota.

52.     As early as 1978, 3M was aware that PFAS could not be treated or removed through conventional wastewater treatment processes.

53.     By the 1980s, internal 3M memoranda described "concern for environmental safety" of PFAS given the "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

54.     Despite this knowledge, 3M did not disclose these environmental risks of PFAS to its customers, government regulators, Dalton Utilities, or the public.

55.     To the contrary, 3M took active steps to conceal the environmental risks associated with PFAS.

56.     In 1975, academic researchers Dr. William Guy and Dr. Donald Taves contacted 3M regarding their finding of PFAS compounds in human blood at blood banks around the country.  In response, 3M instructed Dr. Guy "not to speculate" about whether 3M's PFAS products were the source.  Later that year, 3M had confirmed that its PFOS was the compound found by Dr. Guy and Dr. Taves in

human blood. But 3M did not inform the researchers, the public, or regulators of their findings for nearly 20 years.

57.    An internal 3M document from 1988 confirmed that 3M was "perpetuat[ing] the myth that" its fluorochemical products were "biodegradable." A myth that 3M scientists believed would "eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."

58.    In March 1999, a 3M toxicologist, Dr. Richard Purdy, was so concerned by 3M's failures to disclose the environmental risks of PFAS to EPA and others that he resigned from 3M and copied EPA on his letter of resignation. In his resignation letter, Dr. Purdy explained that he was quitting 3M because of his "profound disappointment in 3M's handling of environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS)."

59.    Dr. Purdy went on to say: "3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment. We knew before May of 1998, yet 3M did not start telling customers until January of 1999. . . . I kept waiting for 3M to do its duty, as I was continually assured that it would. . . . 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that [PFOS] is biomagnifying in the food chain and harming sea mammals."

60.    According to Dr. Purdy, "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions."

61.    Likewise, by the early 1960s, DuPont had identified potential environmental risks of PFOA specifically in the context of disposing of PFAS-containing waste without pretreatment.

62.    In a 1966 memorandum titled "Disposal of Solid 'Teflon' Wastes Containing C-8 [PFOA]" DuPont researchers determined that, "without a pretreatment," disposal of solid wastes containing PFOA could cause a "small amount" of PFAS to "be leached into the ground water."

63.    In a 1975 internal memorandum entitled "Investigation of Current Teflon Waste Disposal," DuPont acknowledged that underground water supplies near waste disposal facilities "could be contaminated by 'Teflon scrap,'" and admitted that the "possibility of small amounts of undesirable materials such as 'Triton' and C-8 [i.e., PFOA] being present does exist."

64.    Accordingly, DuPont "elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

14

65.     By the early 1980s, DuPont was aware that PFOA could enter the environment during the manufacture, use, and conventional disposal (e.g., through municipal wastewater treatment plants and landfills) of PFOA and PFOA-containing products and materials.

66.     For example, in an internal 1986 memorandum, DuPont's "management [was] concerned about the possible liability resulting from long term C8 [PFAS] exposure to our employees and to the population in surrounding communities and those downriver from" DuPont's manufacturing plant. Accordingly, DuPont determined that, because "the potential liability resulting from C8 exposure is large, it seems prudent to minimize the release of C8 to the environment."

67.     In the same 1986 memorandum, DuPont determined that "biological waste treatment" was not worth considering for PFAS compounds because it was "not aware of nor do we expect to find a micro-organism that can 'detoxify' a perfluoro-carbon chain."

68.     In May 2000, 3M publicly announced that it would "phase out and find substitutes for PFOS chemistry used to produce a range of products, including some of [its] Scotchgard lines."

69.     The stated reason for the phase out was "3M data supplied to EPA indicat[ing] that these chemicals are very persistent in the environment, have a

15

strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

70.    In 2002, EPA acted under the Toxic Substance Control Act, 15 U.S.C. § 2607(e) ("TSCA"), to limit the future manufacture of PFOA and PFOS.

71.    Under TSCA, 3M was required to disclose to EPA any information that supported the finding that its chemicals posed a substantial risk to the environment.

72.    3M failed to do so and, as a result, in 2006, EPA fined 3M more than $1 million for violations of TSCA, including violations specifically related to PFAS.

73.    Instead of ceasing manufacture of PFAS altogether, the PFAS Manufacturing Defendants began to develop and produce what became known as "short chain" or "C-6" PFAS.

74.    Daikin continued to produce PFAS products under the Unidyne brand that contained PFOA until 2003, when it removed those products from the market as a result of their PFOA levels.

75.    But even after 2003, Daikin continued to find PFOA in its products until 2008.

76.    Beginning in approximately 2004, Invista, which was founded as a spin-off from DuPont and employed DuPont's former employees, began supplying carpet fibers and DuPont-branded PFAS products to certain Carpet Manufacturing Defendants.  Then, in approximately 2008, Invista began supplying carpet fibers and

PFAS products manufactured by DuPont, Chemours, and Daikin to certain Carpet Manufacturing Defendants.

77.    In December 2022, 3M announced that it would completely "exit" PFAS manufacturing by the end of 2025 in order to move "toward a world less dependent upon PFAS."

## The Carpet Manufacturing Defendants' Use of PFAS

78.    Shaw has been operating carpet and flooring manufacturing facilities in the Dalton, Georgia, area since 1967 and continuing today.

79.    Aladdin has been operating carpet and flooring manufacturing facilities in the Dalton, Georgia, area since the 1950s and continuing today.

80.    Upon information and belief, for their Dalton-area production plants, Shaw purchased PFAS products, including products containing PFOA and PFOS, from 3M, Daikin, DuPont, and Invista.

81.    Upon information and belief, for their Dalton-area production plants, Aladdin purchased PFAS products, including products containing PFOA and PFOS, from 3M, Daikin, DuPont, and Invista.

82.    At their production plants in the Dalton area, Shaw and Aladdin have applied products containing PFAS, including PFOA and PFOS, to carpet and flooring.

83.    The manufacturing processes used by Shaw and Aladdin to apply PFAS to carpet and flooring products generates wastewater that contains PFAS, including PFOA and PFOS.

84.    Shaw is or was the owner of the following production plants (together, the "Shaw Plants") which generated wastewater that was discharged to the POTW for disposal:

     a.  Shaw 1: 501 East Franklin St., Dalton, Georgia 30721

     b.  Shaw 2: 2207 South Hamilton Extension, Dalton, Georgia 30722

     c.  Shaw 3: 500 East Franklin St., Dalton, Georgia 30722

     d.  Shaw 4: 2225 South Hamilton St., Dalton, Georgia 30721

     e.  Shaw 6: 1529 Waring Rd., Dalton, Georgia 30722

     f.  Shaw 19: 1010 VD Parrott Jr. Pkwy., Dalton, Georgia 30721

     g.  Shaw 20: 1020 Riverbend Rd., Dalton, Georgia 30721

     h.  Shaw 23: 2603 Lakeland Rd. SE, Dalton, Georgia 30721

     i.  Shaw 63: 1401 Underwood St., Dalton, Georgia 30721

     j.  Shaw 80: 2230 South Hamilton St., Dalton, Georgia 30721

     k.  Shaw 81: 201 Springdale Rd., Dalton, Georgia 30721

     l.  Shaw WD: 2305 Lakeland Rd. SE, Dalton, Georgia 30721

85.    Shaw has discharged wastewater from the Shaw Plants to the POTW for disposal since at least the 1970s.

86.    Sampling shows that the wastewater discharged to Dalton Utilities' POTW from all of the Shaw Plants except for Shaw 2 contained PFAS, including PFOA and PFOS, in 2009, 2010, 2011, 2012, 2013, and/or 2016.

87.    Upon information and belief, the wastewater discharged from all of the Shaw Plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, beginning in at least 1986.

88.    Aladdin is or was the owner and/or operator of the following production plants (together, the "Aladdin Plants") which generated wastewater that was discharged to the POTW for disposal:

> a.  Antioch: 2001 Antioch Rd., Dalton, Georgia 30721 ("Aladdin")
>
> b.  Goodwill Drive: 121 Goodwill Dr., Dalton, Georgia 30721
>
> c.  Industrial Park: 2100 S. Hamilton St., Dalton, Georgia 30721 ("World")
>
> d.  Virgil Drive: 406 Virgil Dr., Dalton, Georgia 30721 ("Durkan")
>
> e.  Green Street: 431 S. Green St., Dalton, Georgia 30721

89.    Aladdin has discharged wastewater from some or all of the Aladdin Plants to Dalton Utilities' POTW for disposal since approximately 1954.

90.    Sampling shows that the wastewater discharged from Aladdin's Aladdin, Durkan, and World plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, in 2009, 2010, 2011, 2013, 2014, and 2016.

91.    Upon information and belief, the wastewater discharged from some or all of the Aladdin Plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, beginning in at least the 1970s.

92.    DuPont was the owner and/or operator of the following laboratory in Dalton, Georgia (the "DuPont Lab") which generated wastewater that was discharged to the POTW for disposal:

    a.  403 Holiday Ave., Dalton, GA 30720[1]

93.    Upon information and belief, the wastewater discharged from the DuPont Lab to Dalton Utilities' POTW for disposal contained PFAS, including PFOA, beginning in at least 1987.

94.    Invista also operated the DuPont Lab, including testing PFAS materials.  Through its operation of the DuPont lab, Invista was an industrial user of the Dalton Utilities POTW.

95.    3M was the owner and/or operator of the following laboratory in Dalton, Georgia (the "3M Lab") which generated wastewater that was discharged to the POTW for disposal:

    a.  1410 Chattanooga Ave., Dalton, GA 30720

---

[1] This address is now known as 745 College Dr., Dalton, GA 30720.

96.    Upon information and belief, the wastewater discharged from the 3M Lab to Dalton Utilities' POTW for disposal contained PFAS, including PFOS, beginning in at least 1989.

97.    The PFAS Manufacturing Defendants knew that the PFAS they manufactured and sold to Shaw and Aladdin would be used at the Shaw Plants and the Aladdin Plants for manufacturing carpet and flooring products in the Dalton, Georgia, area.

98.    The PFAS Manufacturing Defendants were aware of the manufacturing processes used at the Shaw Plants and the Aladdin Plants to apply PFAS to Shaw's and Aladdin's products.

99.    The PFAS Manufacturing Defendants advised Shaw and Aladdin regarding the manufacturing processes used by Shaw and Aladdin to apply PFAS to Shaw's and Aladdin's products.

100.    The PFAS Manufacturing Defendants advised their customers, including Shaw and Aladdin, regarding disposal of PFAS.

101.    For example, a Materials Safety Data Sheet ("MSDS") that 3M provided to its customers in 1986 warned that PFOA should be disposed of through incineration or at landfills capable of handling hazardous chemicals, not discharged into water bodies.

102.   Likewise, an MSDS that DuPont issued to its customers in 2001 told customers to "prevent [PFAS] material from entering sewers, waterways, or low areas."

103.   The PFAS Manufacturing Defendants knew that the manufacturing processes used at the Shaw Plants and the Aladdin Plants would result in PFAS entering Shaw's and Aladdin's wastewater.

104.   The PFAS Manufacturing Defendants knew that wastewater from the Shaw Plants and the Aladdin Plants would be discharged to the Dalton Utilities POTW for disposal.

105.   The PFAS Manufacturing Defendants knew that the Dalton Utilities POTW was not designed to remove, and in fact would not remove, PFAS.

**The Dalton Utilities Publicly Owned Treatment Works**

106.   Dalton Utilities operates one of the largest land application waste treatment systems in the United States.

107.   The LAS works together with three wastewater treatment plants, which together form the Dalton Utilities' POTW.

108.   The POTW collects and treats wastewater from household, commercial, and industrial users in and around Dalton, Georgia.

109.   Wastewater is discharged by households, commercial business, and industrial users (like the carpet and flooring manufacturers) through the sewer system, after which it is processed at one of the three wastewater treatment plants.

110.   After the wastewater is processed at the wastewater treatment plants, it is pumped to the LAS, where it is sprayed through some combination of a total of approximately 19,000 sprayheads (e.g., "land-applied") for further processing and disposal.

111.   As a POTW, Dalton Utilities is subject to numerous regulatory programs.

112.   First, Dalton Utilities' treatment operations are governed by the LAS Permit – Land Application System Permit No. GAJ020056 – issued to Dalton Utilities by EPD.  The LAS Permit is a non-point source permit issued under state law.

113.   Second, the LAS is governed by the General Stormwater Permit – National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit GAR050000 – issued to Dalton Utilities by EPD through its delegated authority from EPA under the Clean Water Act.

114.   The LAS permit governs Dalton Utilities' operation of the LAS, as well as the three wastewater treatment plants.  The General Stormwater Permit governs

stormwater discharges from portions of Dalton Utilities' property not governed by the LAS Permit (e.g., roads and buildings).

115.   The LAS Permit requires Dalton Utilities to pretreat and monitor wastewater for specific constituents—biochemical oxygen demand, total suspended solids, pH, chemical oxygen demand, total Kjeldahl nitrogen, ammonia nitrogen, nitrate plus nitrite, total phosphorous, and ortho-phosphate.

116.   After pretreatment, the LAS Permit requires Dalton Utilities to monitor for additional constituents—biochemical oxygen demand, total suspended solids, pH, Nitrate-Nitrogen, and fecal coliform bacteria.

117.   The LAS Permit does not reference or impose any requirements relating to PFAS.

118.   Additionally, the LAS Permit dictates how Dalton Utilities can operate the LAS.  For example, Dalton Utilities can only land-apply pretreated wastewater at an annual average of 33.0 million gallons a day, 2.5 inches per week, and 0.13 inches per hour.

119.   The LAS Permit also requires Dalton Utilities to maintain the LAS in good working order, such as by maintaining a vegetative cover on the areas of the LAS where pretreated wastewater is land-applied and by not land-applying when the site is frozen, flooded, or snow covered.

120.   Finally, the LAS Permit states: "Groundwater leaving the land application system boundaries must not exceed maximum contaminant levels for drinking water.  If groundwater samples indicate contamination, the permittee will be required to develop a plan which will ensure that the primary maximum contaminant levels for drinking water are not exceeded.   The plan will be implemented by the permittee immediately upon [EPD] approval."

121.   In addition to the permits applicable to Dalton Utilities' operation of the POTW, Dalton Utilities is required by law to issue and enforce Sewer User Rules and Regulations ("SURR").  *See* C.F.R. Ga. Comp. R. & Regs. § 391-3-6-.08 and 40 C.F.R. § 403.1, *et seq.*

122.   Any user of the POTW is subject to Dalton Utilities' SURR.

123.   Among other things, the SURR prohibits any user, including Shaw, Aladdin, 3M, DuPont, and Invista, from discharging waste to the Dalton Utilities POTW that causes "Interference"—any discharge which inhibits or disrupts the POTW or its operations—or "Pass Through"—any discharge that will cause a violation of the Dalton Utilities' LAS Permit.

## PFAS at the POTW

124.   Dalton Utilities was unaware that PFAS was in the wastewater entering its POTW until 2009, when EPA asked Dalton Utilities to conduct sampling for PFAS.

125.   As EPA requested, Dalton Utilities conducted sampling at various locations within the POTW—pump stations, spray heads on the LAS, surface waters on the LAS, soil, sludge, and compost.

126.   Dalton Utilities shared that sampling data with EPA and EPD.

127.   The 2009 sampling demonstrated that there were elevated levels of PFAS at the POTW, including in the pump stations, spray heads on the LAS, surface waters on the LAS, soil, sludge, and compost.

128.   Although elevated, the presence of PFAS at the POTW did not violate any of Dalton Utilities' permit conditions or other regulatory requirements at the time.

129.   Neither EPA nor EPD took any action with respect to PFAS at the LAS.

130.   After 2009, additional sampling has been conducted at the POTW, on the LAS, and in surrounding waters, including the Conasauga River, all of which has demonstrated elevated levels of PFAS.

131.   All PFAS data collected by Dalton Utilities was shared with EPA and EPD, neither of which has taken any action with respect to PFAS at the LAS.

**Dalton Utilities Has Incurred Significant Costs as a
Result of Defendants' PFAS Contamination of the POTW**

132.   As a result of the elevated levels of PFAS at the POTW, and in anticipation of the federal regulations finalized by EPA in April and May 2024

(including MCLs and CERCLA hazardous substance designations), Dalton Utilities engaged technical consultants to investigate the POTW and potential remedial options.

133.    Specifically, Dalton Utilities engaged consultants to conduct PFAS sampling at the LAS, to design and execute a first-of-its-kind pilot study for treating PFAS in wastewater, to assess the viability of installing PFAS treatment at the existing wastewater treatment plants, to assess options associated with converting to a direct discharge system (in addition to or in lieu of the LAS); and to evaluate various engineering measures that could be implemented at the LAS to collect and treat PFAS at the LAS.

134.    These are only a fraction of the significant costs that Dalton Utilities has incurred and will continue to incur as a result of Defendants' PFAS contamination.

<u>**CAUSES OF ACTION**</u>

**COUNT I**
**42 U.S.C. § 9607 – CERCLA Cost Recovery**
**(All Defendants)**

135.    Dalton Utilities realleges and incorporates by reference paragraphs 1 through 134 as if fully set forth herein.

136.    Each Defendant is jointly and severally liable under CERCLA Section 107, 42 U.S.C. § 9607, for the response costs Dalton Utilities has incurred and will

incur as a consequence of each Defendant's disposal, arrangement for disposal, or transport for disposal of hazardous substances released into and from Dalton Utilities' POTW.

137. Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA Section 601(21), 42 U.S.C. § 9601(21), who arranged for disposal, treatment, and/or transport for disposal or treatment at the Dalton Utilities POTW of hazardous substances the Defendants owned or possessed, from which there was a release or threatened release of hazardous substances.

138. Dalton Utilities' POTW is a facility as defined by CERCLA Section 601(9), 42 U.S.C. § 9601(9).

139. Each release or threatened release of hazardous substances described above has caused and will continue to cause Dalton Utilities to incur necessary response costs to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

140. Dalton Utilities' response costs are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 400, *et seq.*, ("NCP").

141. Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), Dalton Utilities is entitled to cost recovery from each defendant for its necessary

response costs consistent with the NCP that Dalton Utilities has incurred or will incur.

## COUNT II
## 42 U.S.C. § 9613(G)(2) – CERCLA DECLARATORY JUDGMENT
### (All Defendants)

142.    Dalton Utilities realleges and incorporates by reference paragraphs 1 through 141 as if fully set forth herein.

143.    Each Defendant is jointly and severally liable under CERCLA Section 107, 42 U.S.C. § 9607, for the response costs Dalton Utilities has incurred and will incur as a consequence of each Defendant's disposal, arrangement for disposal, and/or transport for disposal of hazardous substances released into and from Dalton Utilities' POTW.

144.    Defendants    are    liable    under    CERCLA    Section    107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA Section 601(21), 42 U.S.C. § 9601(21), who arranged for disposal, treatment, or transport for disposal or treatment at the Dalton Utilities POTW of hazardous substances the Defendants owned or possessed, from which there was a release or threatened release of hazardous substances.

145.    Dalton Utilities' POTW is a facility as defined by CERCLA Section 601(9), 42 U.S.C. § 9601(9).

29

146.    Each release or threatened release of hazardous substances described above has caused and will continue to cause Dalton Utilities to incur necessary response costs to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

147.    Dalton Utilities' response costs are consistent with the NCP.

148.    An actual controversy exists within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2) between Dalton Utilities and Defendants regarding their respective rights and responsibilities for necessary response costs incurred and to be incurred by Dalton Utilities consistent with the NCP.

149.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202, Dalton Utilities is entitled to a declaratory judgment regarding liability for response costs and damages under CERCLA Section 107(a), 42 U.S.C. § 9607(a), that will be binding in any subsequent action or actions to recover further response costs.

### COUNT III
### NEGLIGENCE
### (All Defendants)

150.    Dalton Utilities realleges and incorporates by reference paragraphs 1 through 149 as if fully set forth herein.

151.    As users of PFAS and the Dalton Utilities' POTW, the Carpet Manufacturing Defendants, 3M, DuPont, and Invista owed a duty to Dalton Utilities

30

to exercise due and reasonable care in their use and disposal of PFAS and wastewater containing PFAS.

152.   The Carpet Manufacturing Defendants, 3M, DuPont, and Invista owed Dalton Utilities a duty not to contribute any pollutant or wastewater to the POTW that inhibits or disrupts the POTW, its treatment processes or operations, or causes a violation of the LAS Permit.

153.   The PFAS Manufacturing Defendants owed Dalton Utilities a duty not to supply products containing PFAS to manufacturers that they knew would discharge wastewater containing PFAS to a POTW that they knew would receive the wastewater and was incapable of treating for PFAS and preventing environmental contamination which the PFAS Manufacturing Defendants knew or should have known would occur.

154.   Pursuant to O.C.G.A. § 12-5-51, Defendants owed Dalton Utilities a duty not to intentionally or negligently cause or permit any industrial waste or other substance to be discharged into the water of the state resulting in a condition of pollution.

155.   The Carpet Manufacturing Defendants, 3M, DuPont, and Invista breached their duties by discharging wastewater containing PFAS to the Dalton Utilities POTW without disclosing the presence of PFAS and with knowledge that the POTW could not treat or remove PFAS.

31

156.    The PFAS Manufacturing Defendants breached their duties to Dalton Utilities by continuing to sell and supply PFAS to the Carpet Manufacturing Defendants with knowledge that the PFAS would be discharged to the Dalton Utilities' POTW, which the PFAS Manufacturing Defendants knew was not and is not capable of treating or removing PFAS; failing to disclose the environmental risks associated with their PFAS; and covering up the environmental risks associated with their PFAS from regulators and the public.

157.    As a direct, proximate result of Defendants' conduct, actions, and inactions, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

158.    As a direct, proximate result of Defendants' conduct, actions, and inactions, Dalton Utilities' real property has been damaged by PFAS contamination.

## COUNT IV
## NUISANCE
### (All Defendants)

159.    Dalton Utilities realleges and incorporates by reference paragraphs 1 through 158 as if fully set forth herein.

160.    Dalton Utilities owns property located at 1200 V. D. Parrott, Jr. Pkwy., Dalton, GA 30721.

161.   The Carpet Manufacturing Defendants have created a continuous, private nuisance at Dalton Utilities' property by their discharge of PFAS from the Shaw Plants and Aladdin Plants to the Dalton Utilities POTW for disposal.

162.   The PFAS Manufacturing Defendants have created a continuous, private nuisance at Dalton Utilities' property by selling and supplying PFAS to the Carpet Manufacturing Defendants while knowing that the Carpet Manufacturing Defendants' use of PFAS posed environmental risks and that Dalton Utilities' POTW could not treat for PFAS.

163.   Defendants' actions caused Dalton Utilities' property to become contaminated with PFAS, which has substantially interfered with Dalton Utilities' use of its property.

164.   The PFAS contamination at the Dalton Utilities' POTW has threatened the environmental safety of the property and surrounding properties.

165.   The PFAS contamination at the Dalton Utilities' POTW has required (and will continue to require) Dalton Utilities to incur significant damages to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

33

## COUNT V
## TRESPASS
### (All Defendants)

166.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 165 as if fully set forth herein.

167.   Dalton Utilities owns property located at 1200 V. D. Parrott, Jr. Pkwy., Dalton, GA 30721.

168.   The Carpet Manufacturing Defendants' intentional acts of discharging wastewater containing PFAS to the Dalton Utilities POTW caused an invasion of Dalton Utilities' property.

169.   The PFAS Manufacturing Defendants' intentional acts of selling and supplying PFAS to the Carpet Manufacturing Defendants while knowing that the PFAS posed environmental risks and that Dalton Utilities' POTW could not treat for PFAS caused an invasion of Dalton Utilities' property.

170.   Defendants' discharge of wastewater containing PFAS and supply of PFAS has directly caused a substantial contamination of Dalton Utilities' property.

171.   Dalton Utilities did not consent to the discharges of PFAS on its property.

172.   Defendants' trespasses are continuing and will continue until Dalton Utilities' property is remediated by removing PFAS and preventing PFAS from leaving the boundaries of the LAS, to the extent possible.

173.    Defendants' trespasses have required (and will continue to require) Dalton Utilities to incur significant damages to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

## COUNT VI
## WANTONNESS AND PUNITIVE DAMAGES
### (All Defendants)

174.    Dalton Utilities realleges and incorporates by reference paragraphs 1 through 173 as if fully set forth herein.

175.    The PFAS Manufacturing Defendants' conduct demonstrated willful misconduct, malice, wantons, oppression, and/or the entire want of care which would raise the presumption of conscious indifference to the consequences of their actions with respect to the manufacture and sale of PFAS to the carpet industry in Dalton, Georgia.

176.    The PFAS Manufacturing Defendants were aware of significant environmental dangers associated with their PFAS long before disclosing those dangers to Dalton Utilities, the PFAS Manufacturing Defendants' customers, government regulators, or the public.

177.    The PFAS Manufacturing Defendants took specific actions to suppress knowledge of these environmental dangers.

178.   The Carpet Manufacturing Defendants were aware that traditional wastewater treatment operations would not treat for PFAS.

179.   The Defendants were aware that the Carpet Manufacturing Defendants would discharge wastewater containing PFAS to the Dalton Utilities POTW, and that the Dalton Utilities POTW would not be able to treat or remove the PFAS.

180.   Pursuant to O.C.G.A. § 12-5-51(a), Defendants owed a duty to Dalton Utilities to avoid intentionally or negligently causing or permitting industrial wastes to be discharged to the Dalton Utilities POTW in a manner that would result in a condition of pollution.

181.   The Defendants' conduct evidences their reckless disregard for Dalton Utilities' property and the surrounding environment.

**COUNT VII**
**VIOLATION OF GEORGIA WATER QUALITY CONTROL ACT –**
**O.C.G.A. § 12-5-20, *ET SEQ.***
**(All Defendants)**

182.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 181 as if fully set forth herein.

183.   Pursuant to O.C.G.A. § 12-5-51(a), "[a]ny person who intentionally or negligently causes or permits any sewage, industrial wastes, or other wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, or deposited in the waters of the state, resulting in a condition of pollution as defined

36

by this article, shall be liable in damages to the state and any political subdivision thereof for any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits."

184.   Pursuant to O.C.G.A. § 12-5-22(8), "pollution" means "the manmade or man-induced alteration of the chemical, physical, biological, and radiological integrity of water."

185.   The presence of PFAS in the state waters on and surrounding the Dalton Utilities LAS is "pollution" within the meaning of O.C.G.A. § 12-5-22(8).

186.   Defendants are persons within the meaning of O.C.G.A. § 12-5-51.

187.   Defendants intentionally or negligently caused or permitted PFAS to be discharged or deposited into waters of the state by discharging PFAS to the Dalton Utilities POTW.

188.   Defendants caused these discharges with knowledge that Dalton Utilities' POTW was incapable of treating or removing PFAS and that PFAS presented significant environmental risks because of its persistence, mobility, and potential to bioaccumulate.

189.   Pursuant to O.C.G.A. § 12-5-51(a), "[t]he amount of the damages assessed pursuant to this Code section shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or

deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits. . . . Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

190.  Dalton Utilities is a political subdivision of the State of Georgia.

191.  As a result of Defendants' actions, Dalton Utilities has incurred and will continue to incur damages to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

## COUNT VIII
## VIOLATION OF SEWER USE RULES AND REGULATIONS
### (Shaw, Aladdin, 3M, DuPont, and Invista)

192.  Dalton Utilities realleges and incorporates by reference paragraphs 1 through 191 as if fully set forth herein.

193.  Pursuant to Ga. Comp. R. & Regs. § 391-3-6-.08 and 40 C.F.R. § 403.1, *et seq.*, Dalton Utilities is authorized and required to issue SURR applicable to all users of the POTW.

194.  Under the SURR, any "user" of the POTW is prohibited from contributing, directly or indirectly, "into the POTW any Pollutant or Wastewater that causes Pass Through or Interference."

195.  Additionally, users are prohibited from discharging "Pollutants, released in a discharge at a flow rate and/or Pollutant concentration which either

singly or by interaction with other Pollutants will cause Interference with the POTW."

196.  "Interference" is defined as "a discharge, which alone or in conjunction with a discharge or discharges from other sources, inhibits or disrupts the POTW, its treatment processes or operations, or its sludge process, or which causes, in whole or in part, a violation of any requirements of Dalton Utilities' LAS permit[.]"

197.  "Pass Through" is defined as a discharge from the POTW to a water of the State that "causes a violation of any requirement of Dalton Utilities' LAS permit."

198.  "Pollutant" is defined as "dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, Medical Wastes, chemical wastes, biological materials, radioactive materials, heat, wrecked or discharged equipment, rock, sand, dirt, municipal, agricultural and industrial wastes, and certain characteristics of wastewater (e.g., pH, temperature, suspended solids, turbidity, color, toxicity, or odor)."

199.  Shaw, Aladdin, 3M, DuPont, and Invista discharged wastewater to the Dalton Utilities POTW.

200.  By discharging wastewater to the POTW, Shaw, Aladdin, 3M, DuPont, and Invista were subject to the SURR.

201. Shaw, Aladdin, 3M, DuPont, and Invista violated the SURR by discharging Pollutants that were likely to and did cause Interference with and Pass Through of the POTW.

202. The Pass Through and Interference caused Dalton Utilities to incur costs and expenses to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

203. The Pass Through and Interference will continue to cause Dalton Utilities to incur costs and expenses.

## COUNT IX
## STRICT LIABILITY—DEFECTIVE DESIGN
## (3M, DuPont, Daikin, Invista)

204. Dalton Utilities realleges and incorporates by reference paragraphs 1 through 203 as if fully set forth herein.

205. The PFAS Manufacturing Defendants designed, manufactured, sold, licensed, and/or distributed PFAS products to the Carpet Manufacturing Defendants for use in the Shaw Plants and/or Aladdin Plants.

206. The PFAS products manufactured by the PFAS Manufacturing Defendants were not merchantable and reasonably suited for their intended use because, through their normal use consistent with their design, the PFAS products resulted in pollution, contamination, trespass, and/or nuisance.

40

207.   The PFAS Manufacturing Defendants knew or should have known that the PFAS products they designed, manufactured, sold, licensed, and/or distributed were harmful to the environment, and that, once introduced into the environment, their PFAS products would spread and resist conventional wastewater treatment processes.

208.   The PFAS Manufacturing Defendants further knew or should have known that PFAS were released during the normal use and disposal of the Carpet Manufacturing Defendants' wastewater from the Shaw Plants and the Aladdin Plants to Dalton Utilities' POTW.

209.   The environmental risks inherent with the manufacture, use, sale, license, and/or disposal of PFAS outweigh any possible utility of the PFAS products manufactured by the PFAS Manufacturing Defendants.

210.   As a direct and proximate result of the PFAS Manufacturing Defendants' defective design of PFAS and PFAS products, Dalton Utilities' property has been contaminated, polluted, and trespassed upon.

211.   As a direct and proximate result of the PFAS Manufacturing Defendants' defective design of PFAS and PFAS products, Dalton Utilities has been forced and will continue to incur costs and expenses to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

41

## COUNT X
## STRICT LIABILITY – FAILURE TO WARN
### (3M, DuPont, Daikin, Invista)

212.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 211 as if fully set forth herein.

213.   The PFAS Manufacturing Defendants designed, manufactured, sold, licensed, and/or distributed PFAS products to the Carpet Manufacturing Defendants for use in the Shaw Plants and/or Aladdin Plants.

214.   The PFAS products manufactured by the PFAS Manufacturing Defendants were not merchantable and reasonably suited for their intended use because, through their normal use consistent with their design, the PFAS products resulted in pollution, contamination, trespass, and/or nuisance.

215.   The PFAS Manufacturing Defendants knew or should have known that the PFAS products they designed, manufactured, sold, licensed, and/or distributed were harmful to the environment, and that, once introduced into the environment, their PFAS products would spread and resist natural or normal wastewater treatment processes.

216.   The PFAS Manufacturing Defendants further knew or should have known that PFAS were released during the normal use and disposal of the Carpet Manufacturing Defendants' wastewater from the Shaw Plants and the Aladdin Plants to Dalton Utilities' POTW.

217.  The PFAS Manufacturing Defendants failed, and continue to fail, to provide any warnings or precautionary instructions sufficient to notify the reasonably foreseeable users of their PFAS products and solutions of such dangers.

218.  In particular, the PFAS Manufacturing Defendants failed to describe the known or reasonably foreseeable environmental hazards inherent in the normal use and disposal of their PFAS products, or to provide any precautionary statements regarding such hazards on the labeling of their products.

219.  The PFAS Manufacturing Defendants' failure to provide warnings or precautionary instructions regarding the reasonably foreseeable environmental dangers inherent with the use and disposal of their PFAS and PFAS products have rendered their products unreasonably dangerous for their intended or reasonably foreseeable purposes at the time that they left the PFAS Manufacturing Defendants' control or possession.

220.  The PFAS products that the PFAS Manufacturing Defendants sold to the Carpet Manufacturing Defendants were used and ultimately disposed of in a reasonably foreseeable manner and without substantial change in the environmentally hazardous condition of the products.

221.  As a direct and proximate result of the PFAS Manufacturing Defendants' failure to warn users of PFAS and PFAS products of the inherent

dangers of the use and disposal of their products, Dalton Utilities' property has been contaminated, polluted, and trespassed upon.

222. As a direct and proximate result of the PFAS Manufacturing Defendants' failure to warn users of PFAS and PFAS products of the inherent dangers of the use and disposal of their products, Dalton Utilities has been forced and will continue to incur costs and expenses to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

## COUNT XI
## EXPENSES OF LITIGATION – O.C.G.A. § 13-6-11
### (All Defendants)

223. Dalton Utilities realleges and incorporates by reference paragraphs 1 through 222 as if fully set forth herein.

224. Defendants knew or reasonably should have known that their sales, marketing, use and disposal of PFAS, products containing PFAS, and wastewater containing PFAS would cause Dalton Utilities to incur significant expense and trouble.

225. In breaching their duties to Dalton Utilities and by committing the tortious acts described above, Defendants have acted in bad faith and caused Dalton Utilities unnecessary trouble and expense.

226. Defendants have acted in bad faith, have been stubbornly litigious, and have caused Dalton Utilities unnecessary trouble and expense such that Dalton Utilities is entitled to recover its attorney's fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Dalton Utilities requests that the Court enter a judgment in its favor and against each Defendant as follows:

a)     declaring that Defendants are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred or to be incurred by Dalton Utilities as a result of releases or threatened releases of hazardous substances at or from the Dalton Utilities POTW;

b)     awarding Dalton Utilities an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Dalton Utilities, including such costs incurred to remediate Defendants' PFAS contamination and otherwise remove, contain, or address Defendants' PFAS from wastewater and, more generally, from the POTW;

c)     declaring that Defendants are liable, jointly and severally, for response costs incurred and to be incurred by Dalton Utilities resulting from Defendants' disposals, arrangement for disposals, and/or transport for disposals of hazardous substances at and from the Dalton Utilities POTW;

45

d)     declaring that the Court's judgment on each Defendant's liability for response costs is binding on any subsequent action or actions to recover further response costs or damages;

e)     awarding Dalton Utilities compensatory damages against Defendants in an amount to be determined at trial by a jury;

f)     awarding Dalton Utilities punitive damages against Defendants in an amount to be determined at trial by a jury;

g)     awarding Dalton Utilities all costs and expenses reasonably incurred in cleaning up and abating PFAS at the POTW;

h)     awarding Dalton Utilities prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

i)     awarding such other and further relief as the Court deems just and appropriate.

Respectfully submitted, this 9th day of December 2024.

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

*/s/ Lindsey B. Mann*

Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com
E. Fitzgerald Veira (GA Bar No. 726726)
fitzgerald.veira@troutman.com
T. Scott Mills (GA Bar No. 757063)
scott.mills@troutman.com
Anaid Reyes Kipp (GA Bar No. 703283)

46

anaid.reyes-kipp@troutman.com
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
404-885-3000

Brooks M. Smith (*pro hac vice*
forthcoming)
brooks.smith@troutman.com
1001 Haxall Point, Suite 1500
Richmond, VA 23219
804-697-1200

James Beers (*pro hac vice* forthcoming)
james.beers@troutman.com
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
202-274-2950

**Counsel for Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities**

47