# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>3M Company; Daikin America, Inc.; EIDP, Inc. f/k/a E.I. DuPont de Nemours and Company; The Chemours Company; INV Performance Surfaces, LLC; Aladdin Manufacturing Corporation; Shaw Industries Group, Inc.; Shaw Industries, Inc.; and DOES 1-10,<br><br>　　　　　　Defendants. | Civil Action No. 4:24-cv-00293-WMR<br><br>TRIAL BY JURY DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a/ Dalton Utilities ("Dalton Utilities") hereby files this First Amended Complaint against Defendants 3M Company ("3M"); EIDP, Inc. f/k/a E.I. DuPont de Nemours and Company ("EIDP"); The Chemours Company ("Chemours," together with EIDP collectively, "DuPont"); Daikin America, Inc. ("Daikin") (3M, DuPont, and Daikin collectively, the "PFAS Manufacturing Defendants"); Defendant INV Performance Surfaces, LLC

("Invista"); and Defendants Aladdin Manufacturing Corporation ("Aladdin"); Shaw Industries Group, Inc.; and Shaw Industries, Inc. (Shaw Industries, Inc. and Shaw Industries Group, Inc. together, "Shaw") (Aladdin and Shaw collectively, the "Carpet Manufacturing Defendants") (all defendants together, the "Defendants") and alleges as follows:

## STATEMENT OF THE CASE

1.     Plaintiff Dalton Utilities brings this action against Defendants for harms sustained as a result of Defendants' acts that caused long-running contamination of Dalton Utilities' wastewater treatment operations through the sale, purchase, use, and disposal of per- and polyfluoroalkyl substances ("PFAS"), including without limitation perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), perfluorohexanesulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide-dimer acid (HFPO-DA, known as "GenX chemicals"), and perfluorobutanesulfonic acid ("PFBS").

2.     The City of Dalton, Georgia is known as the carpet and flooring capital of the world, and since the 1970s it has been home to hundreds of carpet and flooring manufacturers.  Dalton Utilities is a municipal utility that owns and operates a wastewater treatment system that collects and treats wastewater from household, commercial, and industrial users (including carpet and flooring manufacturers) in and around Dalton, Georgia.  Today, the system includes three wastewater treatment

plants that process wastewater before it is land-applied to the Riverbend Land Application System (the "LAS") for further processing and disposal (collectively, the "POTW").

3. The POTW is a complicated operation that is subject to extensive regulation, permitting, and oversight by the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources. The POTW is governed by the terms and conditions of Land Application System Permit No. GAJ020056 (the "LAS Permit") and the terms and conditions of the General Stormwater Permit – National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit No. GAR050000 (the "General Stormwater Permit").

4. For decades, the PFAS Manufacturing Defendants and Invista knowingly and willfully sold PFAS and PFAS-containing products to carpet and flooring manufacturers in and around Dalton, Georgia, including without limitation the Carpet Manufacturing Defendants, who then used those products in their manufacturing facilities to impart water and stain resistance to carpet, flooring, and other textile products.

5. The PFAS Manufacturing Defendants and Invista arranged for the disposal of the PFAS-laden industrial wastewater generated through this process at the POTW for decades, without disclosing to Dalton Utilities the presence of PFAS or the environmental risks associated with PFAS.

6.    The PFAS Manufacturing Defendants and Invista sold PFAS and PFAS-containing products to the Carpet Manufacturing Defendants for use in their manufacturing processes, knowing that it would generate industrial wastewater containing PFAS that could not be treated through traditional wastewater treatment operations (like those at the POTW) and that resist degradation in the environment. Indeed, at the time the PFAS Manufacturing Defendants and Invista sold their PFAS-containing products to the Carpet Manufacturing Defendants, the PFAS Manufacturing Defendants and Invista knew that a significant portion—3M estimated 25%—of their PFAS and PFAS-containing products would be discarded in the wastewater as a result of normal manufacturing operations.

7.    The PFAS Manufacturing Defendants and Invista exercised control over the Carpet Manufacturing Defendants' operations and arranged for disposal of PFAS-laden wastewater at the Dalton Utilities POTW.  For example, certain PFAS Manufacturing Defendants and Invista sold their PFAS-containing products to the Carpet Manufacturing Defendants subject to licensing agreements that gave them control over the specific methods of manufacturing used, and the carpet products produced, by the Carpet Manufacturing Defendants.  Moreover, certain PFAS Manufacturing Defendants and Invista owned equipment used by the Carpet Manufacturing Defendants to apply PFAS-containing products to carpets.

8.    As described below, PFAS Manufacturing Defendants used their superior knowledge of their products to advise the Carpet Manufacturing Defendants regarding disposal of wastewater containing their products.

9.    The Carpet Manufacturing Defendants also arranged for the disposal of the PFAS-laden industrial wastewater at the Dalton Utilities POTW for decades, without disclosing to Dalton Utilities the presence of PFAS or the environmental risks associated with PFAS.

10.    Defendants did not disclose the presence of PFAS in wastewater being discharged to Dalton Utilities for decades, and Defendants did not advise Dalton Utilities of the environmental risks associated with PFAS.  Dalton Utilities did not know about the presence of PFAS in wastewater being discharged to Dalton Utilities or about the environmental risks inherent in the PFAS-laden wastewater until much later than the Defendants.

11.    As a result of Defendants' actions, PFAS have been detected in the influent, effluent, biosolids, soils, groundwater, and surface water at and surrounding the LAS, as well as in areas further downstream from the LAS.

12.    The sale, use, and disposal of these PFAS and PFAS-containing products generated significant profits for all Defendants.

13.    On April 10, 2024, the United States Environmental Protection Agency ("EPA") finalized a National Primary Drinking Water Regulation establishing

Maximum Contaminant Levels ("MCLs") for six PFAS compounds: PFOS, PFOA, PFHxS, PFNA, HFPO-DA, and mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS. That regulation became effective on June 25, 2024.

14.    The LAS Permit includes a provision that groundwater leaving the LAS boundaries must not exceed MCLs for drinking water. Sampling near the boundaries of the LAS has demonstrated levels far exceeding the MCLs for, at a minimum, PFOS, PFOA, PFHxS, and PFNA.

15.    On May 8, 2024, EPA also finalized a regulation designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA"). That regulation became effective on July 8, 2024.

16.    As a result of these regulations, Dalton Utilities must make significant and costly changes to the POTW to remedy the existing PFAS contamination caused by Defendants and to prevent future PFAS contamination caused by Defendants. In addition, Dalton Utilities must incur significant ongoing costs to operate and maintain the POTW with those changes.

17.    Defendants were, or reasonably should have been, aware that their acts and omissions directly and proximately caused PFAS contamination at the POTW and releases therefrom, and that Dalton Utilities' POTW was not designed to treat or remove PFAS.

18.     Nevertheless, the PFAS Manufacturing Defendants and Invista continued to manufacture, sell, and arrange for the disposal of PFAS and PFAS-containing products in Dalton, Georgia, for decades, and the Carpet Manufacturing Defendants continued to utilize those products in their industrial processes and to dispose of the PFAS-containing wastes from those products at Dalton Utilities' POTW.

19.     The costs of remedying the contamination that has resulted from Defendants' long-running manufacturing, sale, use, and waste disposal activities are substantial, and absent a remedy from this Court, those costs will be borne disproportionately by Dalton Utilities and the residents of Dalton, Georgia.

20.     The total amount of cleanup costs resulting from Defendants' PFAS contamination is not yet known but is likely to total hundreds of millions of dollars, if not more.

21.     Dalton Utilities brings this action against Defendants in an effort to hold Defendants accountable for the significant harms done to Dalton Utilities and the surrounding community and environment as a result of PFAS contamination from Defendants' manufacturing, sale, use, and waste disposal activities. Dalton Utilities further brings this action to ensure that it has the funds and resources necessary to remedy these harms and to continue to provide an essential public service—wastewater treatment—to the residents and businesses of Dalton, Georgia.

7

## PARTIES

22.    Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a/ Dalton Utilities is a municipal corporation organized under the laws of the State of Georgia.

23.    Defendant 3M Company ("3M") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

24.    Defendant Daikin America, Inc. ("Daikin") is a foreign profit corporation and, at all relevant times, has conducted business in this District.

25.    Defendant EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("EIDP") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

26.    Defendant The Chemours Company ("Chemours," together with EIDP collectively, "DuPont") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

27.    Defendant INV Performance Surfaces, LLC ("Invista") is a foreign limited liability company authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

28.    Defendant Aladdin Manufacturing Corporation ("Aladdin") is a foreign profit corporation authorized to do business in the State of Georgia and, at all relevant times, has conducted business in this District.

29.    Defendant Shaw Industries Group, Inc. is a domestic profit corporation and, at all relevant times, has conducted business in this District.

30.    Defendant Shaw Industries, Inc. is a domestic profit corporation and wholly owned subsidiary of Shaw Industries Group, Inc. (Shaw Industries, Inc. and Shaw Industries Group, Inc. together, "Shaw") and, at all relevant times, has conducted business in this District.

31.    Defendants DOES 1 through 10 are individuals or entities who may have an interest in the outcome of the present action.  Dalton Utilities does not know the true names and capacities of defendants named herein as DOES 1 through 10, and brings this action against those defendants under such fictitious names.  Dalton Utilities will amend the Complaint to identify the true names and capacities of DOES 1 through 10 when ascertained.

## JURISDICTION AND VENUE

32.    This Court has federal question subject matter jurisdiction over the CERCLA claims pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

33.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

34.     This Court has personal jurisdiction over Defendants because Defendants transact business within this state, O.C.G.A. § 9-10-91(1); committed tortious acts or omissions within this state, O.C.G.A. § 9-10-91(2); own, use, or possess real property situated within this state, O.C.G.A. § 9-10-91(4); and Dalton Utilities' claims arise from such acts, omissions, ownership, or use.

35.     Venue is proper in this District because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is subject to the action is situated, including without limitation the purchase and sale of PFAS-containing products, the use of PFAS in manufacturing processes, the disposal of PFAS and PFAS-containing products, and the contamination of Dalton Utilities' property with PFAS.

## FACTUAL ALLEGATIONS

### History of PFAS and the Carpet Industry

36.     PFAS are a group of manufactured fluorinated organic chemicals that are incorporated into a wide variety of industrial and commercial products.

37.     Due to their unique properties that resist heat, oil, stains, grease, and water, PFAS have played a central role in the manufacture and development of many consumer products since the introduction of PFAS in the 1940s.  Notably, and as relevant here, PFAS have been used in the manufacturing of carpet, flooring, and related textile products.

38.    For decades, the City of Dalton, Georgia has been home to hundreds of carpet and flooring manufacturing facilities.

39.    Beginning in the 1970s, the Defendants began marketing a highly successful and profitable category of products: stain- and soil-resistant carpets and flooring.  These stain- and soil-resistant carpets and floors were made possible by PFAS.

40.    The Carpet Manufacturing Defendants used PFAS and PFAS-containing products that were purchased from the PFAS Manufacturing Defendants and Invista in their industrial processes, which generated PFAS-laden wastewater.

41.    The Defendants arranged for the disposal of this PFAS-laden wastewater at the POTW.

42.    Once present in the environment, PFAS are extremely persistent and often have degradation periods of years, decades, or longer.  PFAS are incredibly stable and persistent, meaning they are highly resistant to natural degradation in the environment.

43.    Because of their persistence in the environment, PFAS have been called "forever chemicals."

44.    In addition to being highly persistent, PFAS are soluble and mobile in water, meaning they can be transported through groundwater and surface water far

from where they initially enter the environment. Once PFAS are released into the environment, they are extremely difficult to remove and contain.

45.    PFAS and PFAS-containing products are important and highly profitable for the PFAS Manufacturing Defendants and Invista, and for decades they were an integral part of the carpet and flooring industry, allowing the Carpet Manufacturing Defendants to sell highly profitable stain- and soil-resistant carpets, flooring, and other textile products.

46.    Unlike the Defendants, Dalton Utilities never sold, purchased, used, or profited from PFAS or PFAS-containing products. As a result, Dalton Utilities had far less knowledge of the chemical composition of PFAS, its implications for the environment, or appropriate methods to dispose of PFAS and PFAS-containing products.

47.    Nevertheless, as a result of providing wastewater treatment services to the residents and businesses of Dalton, Georgia, Dalton Utilities has been burdened for decades with wastewater laden with PFAS that caused substantial contamination of the POTW.

### The PFAS Manufacturing Defendants' and Invista's Knowledge of the Inherent Dangers of PFAS

48.    3M was the first company to develop the group of chemical products that became PFAS. In the late 1940s, 3M patented the scientific process for producing PFAS on a commercial scale.

12

49.    DuPont was shortly behind 3M, and quickly recognized the commercial potential of PFAS. DuPont began developing its own version of the compounds that would become PFAS in the 1950s.

50.    Daikin's parent company began producing PFAS in the 1940s in Japan.

51.    In 2004, DuPont spun off a segment of its textiles business which became Invista.

52.    PFOS and PFOA, two of the earliest and most-widely used types of PFAS, are known as "long-chain" or C-8 PFAS because they contain eight fluorinated carbon atoms.

53.    Over the course of decades, PFAS proved to be highly useful and commercially valuable for 3M, DuPont, Daikin, Invista, and other chemical manufacturers.

54.    As such, the PFAS Manufacturing Defendants and Invista took many steps to facilitate the adoption and continued use of PFAS and PFAS-containing products by the carpet industry, including by, *inter alia*, owning the machinery used in carpet mills to apply PFAS and PFAS-containing products to carpet products, and advising carpet companies how to apply PFAS and PFAS-containing products.

55.    The PFAS Manufacturing Defendants were aware of the persistence, mobility, and other environmental risks associated with PFAS long before their

customers, Dalton Utilities, government regulators, and the public had any comparable knowledge.

56.    For example, in the 1960s, through its own experience in disposing of PFAS-containing waste, 3M knew that PFAS was mobile and could contaminate groundwater.

57.    Specifically, 3M knew that PFAS had reached groundwater at one of its waste disposal sites in Woodbury, Minnesota.

58.    As early as 1978, 3M was aware that PFAS could not be treated or removed through conventional wastewater treatment processes.

59.    By the 1980s, internal 3M memoranda described "concern for environmental safety" of PFAS given the "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

60.    Despite this knowledge, 3M did not disclose these environmental risks of PFAS to its customers, government regulators, Dalton Utilities, or the public.

61.    To the contrary, 3M took active steps to conceal the environmental risks associated with PFAS.

62.    In 1975, academic researchers Dr. William Guy and Dr. Donald Taves contacted 3M regarding their finding of PFAS compounds in human blood at blood banks around the country.  In response, 3M instructed Dr. Guy "not to speculate"

about whether 3M's PFAS was the source.  Later that year, 3M had confirmed that its PFOS was the compound found by Dr. Guy and Dr. Taves in human blood.  But 3M did not inform the researchers, the public, or regulators of their findings for nearly 20 years.

63.    An internal 3M document from 1988 confirmed that 3M was "perpetuat[ing] the myth that" its fluorochemical products were "biodegradable."  A myth that 3M scientists believed would "eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."

64.    In March 1999, a 3M toxicologist, Dr. Richard Purdy, was so concerned by 3M's failure to disclose the environmental risks of PFAS to EPA and others that he resigned from 3M and copied EPA on his letter of resignation.  In his resignation letter, Dr. Purdy explained that he was quitting 3M because of his "profound disappointment in 3M's handling of environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS)."

65.    Dr. Purdy went on to say: "3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment.  We knew before May of 1998, yet 3M did not start telling customers until January of 1999. . . . I kept waiting for 3M to do its duty, as I was continually assured that it would. . . . 3M continues to make and sell these chemicals, though the company knows of an

ecological risk assessment I did that indicates there is a better than 100% probability that [PFOS] is biomagnifying in the food chain and harming sea mammals."

66.    According to Dr. Purdy, "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions."

67.    Likewise, by the early 1960s, DuPont had identified potential environmental risks of PFOA specifically in the context of disposing of PFAS-containing waste without pretreatment.

68.    In a 1966 memorandum titled "Disposal of Solid 'Teflon' Wastes Containing C-8 [PFOA]" DuPont researchers determined that, "without a pretreatment," disposal of solid wastes containing PFOA could cause a "small amount" of PFAS to "be leached into the ground water."

69.    In a 1975 internal memorandum entitled "Investigation of Current Teflon Waste Disposal," DuPont acknowledged that underground water supplies near waste disposal facilities "could be contaminated by 'Teflon scrap,'" and admitted that the "possibility of small amounts of undesirable materials such as 'Triton' and C-8 [i.e., PFOA] being present does exist."

70.     Accordingly, DuPont "elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

71.     By the early 1980s, DuPont was aware that PFOA could enter the environment during the manufacture, use, and conventional disposal (e.g., through municipal wastewater treatment plants and landfills) of PFOA and PFOA-containing products and materials.

72.     For example, in an internal 1986 memorandum, DuPont's "management [was] concerned about the possible liability resulting from long term C8 [PFAS] exposure to our employees and to the population in surrounding communities and those downriver from" DuPont's manufacturing plant. Accordingly, DuPont determined that, because "the potential liability resulting from C8 exposure is large, it seems prudent to minimize the release of C8 to the environment."

73.     In the same 1986 memorandum, DuPont determined that "biological waste treatment" was not worth considering for PFAS compounds because it was "not aware of nor do we expect to find a micro-organism that can 'detoxify' a perfluoro-carbon chain."

74.    In May 2000, 3M publicly announced that it would "phase out and find substitutes for PFOS chemistry used to produce a range of products, including some of [its] Scotchgard lines."

75.    The stated reason for the phase out was "3M data supplied to EPA indicat[ing] that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

76.    Also in 2000, 3M announced that it would phase out manufacturing of PFOA.

77.    In 2002, EPA acted under the Toxic Substance Control Act, 15 U.S.C. § 2607(e) ("TSCA"), to limit the future manufacture of PFOA and PFOS.

78.    Under TSCA, the PFAS Manufacturing Defendants and Invista were required to disclose to EPA any information that supported the finding that their chemicals posed a substantial risk to the environment.

79.    3M failed to do so and, as a result, in 2006, EPA fined 3M more than $1 million for violations of TSCA, including violations specifically related to PFAS.

80.    Even after 3M publicly announced that it would phase out production of PFOS and PFOA, Daikin continued to produce, and actively sought to expand its market share of, PFAS-containing products under the Unidyne brand that contained PFOA.

81.     According to Daikin, it did not cease manufacturing and use of PFOA and related substances until the end of 2015.

82.     Beginning in approximately 2004, Invista, which was founded as a spin-off from DuPont and employed DuPont's former employees, began supplying carpet fibers and DuPont-branded PFAS products to certain Carpet Manufacturing Defendants.  Then, in approximately 2008, Invista began supplying carpet fibers and PFAS products manufactured by DuPont, Chemours, and Daikin to certain Carpet Manufacturing Defendants.

83.     Beginning in approximately 2008, Invista sold chemical solutions created by Invista to the Carpet Manufacturing Defendants.   These chemical solutions blended various chemical treatments, including PFAS, that Invista purchased from other sources.   The blended chemical solutions were sold with Material Safety Data Sheets ("MSDS") authored by Invista.

84.     Instead of ceasing the manufacture of PFAS and PFAS-containing products altogether, the PFAS Manufacturing Defendants began to develop and produce what became known as "short chain" or "C-6" PFAS.  DuPont also began developing GenX chemicals, a short chain PFAS, in approximately 1980.

### The Carpet Manufacturing Defendants' Use of PFAS

85.     Shaw has been operating carpet and flooring manufacturing facilities in the Dalton, Georgia area since 1967 and continuing today.

86.    Aladdin has been operating carpet and flooring manufacturing facilities in the Dalton, Georgia area since the 1950s and continuing today.

87.    For its Dalton-area production plants, Shaw purchased PFAS and PFAS-containing products from 3M, Daikin, DuPont, and Invista. Some or all of those PFAS and PFAS-containing products included PFOA and PFOS.

88.    For its Dalton-area production plants, Aladdin purchased PFAS and PFAS-containing products from 3M, Daikin, DuPont, and Invista. Some or all of those PFAS and PFAS-containing products included PFOA and PFOS.

89.    At their production plants in the Dalton area, Shaw and Aladdin have applied PFAS and PFAS-containing products, including PFOA and PFOS, to carpet and flooring.

90.    The manufacturing processes used by Shaw and Aladdin to apply PFAS and PFAS-containing products to carpet and flooring products generates wastewater that contains PFAS, including PFOA and PFOS.

91.    The Carpet Manufacturing Defendants utilized multiple different methods to apply PFAS and PFAS-containing products to their carpets during the manufacturing process. All Defendants understood that a significant portion of the PFAS and PFAS-containing products would be discarded in the Carpet Manufacturing Defendants' wastewater as a necessary result of the manufacturing processes.

92.    Depending on the specific application method and PFAS-containing product, 3M estimated that up to 25% of its PFAS and PFAS-containing products were lost to wastewater during the Carpet Manufacturing Defendants' normal operations.

93.    Shaw is or was the owner of the following production plants (together, the "Shaw Plants") which generated wastewater that Shaw discharged to the POTW for disposal:

    a.  Shaw 1: 501 East Franklin St., Dalton, Georgia 30721

    b.  Shaw 2: 2207 South Hamilton Extension, Dalton, Georgia 30722

    c.  Shaw 3: 500 East Franklin St., Dalton, Georgia 30722

    d.  Shaw 4: 2225 South Hamilton St., Dalton, Georgia 30721

    e.  Shaw 6: 1529 Waring Rd., Dalton, Georgia 30722

    f.  Shaw 19: 1010 VD Parrott Jr. Pkwy., Dalton, Georgia 30721

    g.  Shaw 20: 1020 Riverbend Rd., Dalton, Georgia 30721

    h.  Shaw 23: 2603 Lakeland Rd. SE, Dalton, Georgia 30721

    i.  Shaw 63: 1401 Underwood St., Dalton, Georgia 30721

    j.  Shaw 80: 2230 South Hamilton St., Dalton, Georgia 30721

    k.  Shaw 81: 201 Springdale Rd., Dalton, Georgia 30721

    l.  Shaw WD: 2305 Lakeland Rd. SE, Dalton, Georgia 30721

94.    Shaw has discharged wastewater from the Shaw Plants to the POTW for disposal since at least the 1970s.

95.    Sampling shows that the wastewater Shaw discharged to Dalton Utilities' POTW from all of the Shaw Plants except for Shaw 2 contained PFAS, including PFOA and PFOS, in 2009, 2010, 2011, 2012, 2013, and/or 2016.

96.    The wastewater Shaw discharged from all of the Shaw Plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, upon information and belief, beginning in at least 1986.

97.    Aladdin is or was the owner and/or operator of the following production plants (together, the "Aladdin Plants") which generated wastewater that Aladdin discharged to the POTW for disposal:

      a.  Antioch: 2001 Antioch Rd., Dalton, Georgia 30721 ("Aladdin")

      b.  Goodwill Drive: 121 Goodwill Dr., Dalton, Georgia 30721

      c.  Industrial Park: 2100 S. Hamilton St., Dalton, Georgia 30721 ("World")

      d.  Virgil Drive: 406 Virgil Dr., Dalton, Georgia 30721 ("Durkan")

      e.  Green Street: 431 S. Green St., Dalton, Georgia 30721

98.    Aladdin has discharged wastewater from some or all of the Aladdin Plants to Dalton Utilities' POTW for disposal since approximately 1954.

99.    Sampling shows that the wastewater Aladdin discharged from its Aladdin, Durkan, and World plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, in 2009, 2010, 2011, 2013, 2014, and 2016.

100.    The wastewater Aladdin discharged from some or all of the Aladdin Plants to Dalton Utilities' POTW for disposal contained PFAS, including PFOA and PFOS, upon information and belief, beginning in at least the 1970s.

101.    DuPont was the owner and/or operator of the following laboratory in Dalton, Georgia (the "DuPont Lab") which generated wastewater that DuPont discharged to the POTW for disposal:

   a.    403 Holiday Ave., Dalton, Georgia 30720[1]

102.    DuPont used the DuPont Lab to replicate the manufacturing processes used by its customers, the Carpet Manufacturing Defendants, and produce carpet at the lab.  Specifically, DuPont would receive material from the Carpet Manufacturing Defendants for testing and troubleshooting at the DuPont Lab, and DuPont would invite representatives of the Carpet Manufacturing Defendants to the DuPont Lab for product demonstrations.

103.    The DuPont Lab had carpet manufacturing equipment that DuPont used to manufacture carpet and test products, including PFAS and PFAS-containing products.

_____

[1] This address is now known as 745 College Dr., Dalton, Georgia 30720.

23

104.   In the ordinary course of its operation of the DuPont Lab, DuPont generated wastewater and arranged for disposal of that wastewater by discharging it to the Dalton Utilities POTW.

105.   When Invista purchased DuPont's textile operations, it acquired the DuPont Lab and operated the DuPont Lab in the same manner in which DuPont did before it—including using the Lab for research and development to test fibers with PFAS and PFAS-containing products.

106.   The wastewater that DuPont and Invista discharged from the DuPont Lab to Dalton Utilities' POTW for disposal contained PFAS, including PFOA, upon information and belief, beginning in at least 1987.

107.   3M was the owner and/or operator of the following laboratory in Dalton, Georgia (the "3M Lab") which generated wastewater that was discharged to the POTW for disposal:

     a.   1410 Chattanooga Ave., Dalton, Georgia 30720

108.   3M used the 3M Lab to replicate the manufacturing processes used by its customers, the Carpet Manufacturing Defendants, and to produce carpet at the lab.   Specifically, 3M would test new products, study application standards and quality standards required by their licensing agreements, and troubleshoot problems that their customers had with application of PFAS and PFAS-containing products.

109.   The 3M Lab had carpet manufacturing equipment that 3M used to manufacture carpet and test products, including PFAS and PFAS-containing products.

110.   In the ordinary course of its operation of the 3M Lab, 3M generated wastewater and arranged for disposal of that wastewater by discharging it to the Dalton Utilities POTW.

111.   The wastewater that 3M discharged from the 3M Lab to Dalton Utilities' POTW for disposal contained PFAS, including PFOS, upon information and belief, beginning in at least 1989.

112.   The PFAS Manufacturing Defendants conveyed to the Carpet Manufacturing Defendants the environmental risks regarding PFAS—specifically, their persistence and bioaccumulation—by at least 1999, if not earlier.

113.   Both Mohawk and Shaw had meetings with 3M in 1999 in which 3M disclosed to both companies the environmental risks associated with PFOS chemicals that the Carpet Manufacturing Defendants had been using in their manufacturing processes.

114.   3M offered to conduct industrial hygiene surveys of Shaw's and Mohawk's production facilities to assess potential employee exposure to PFAS.

115.   3M told the Carpet Manufacturing Defendants that it was working to reduce the presence of PFOS in 3M's wastewater in light of the environmental risks associated with the product.

116.   The Carpet Manufacturing Defendants continued to use C-8 PFAS, including PFOA-based products, until at least 2008, when they attempted to convert to C-6-based products.

117.   The PFAS Manufacturing Defendants and Invista knew that the PFAS and PFAS-containing products they sold to Shaw and Aladdin would be used at the Shaw Plants and the Aladdin Plants for manufacturing carpet and flooring products in the Dalton, Georgia area.

118.   Defendants were aware of the manufacturing processes used at the Shaw Plants and the Aladdin Plants to apply PFAS and PFAS-containing products to Shaw's and Aladdin's products.

119.   The PFAS Manufacturing Defendants and Invista advised Shaw and Aladdin regarding the manufacturing processes used by Shaw and Aladdin to apply PFAS and PFAS-containing products to Shaw's and Aladdin's products.

120.   Defendants knew that the manufacturing processes used at the Shaw Plants and the Aladdin Plants would result in PFAS and PFAS-containing products being discarded in Shaw's and Aladdin's wastewater.

121.   Defendants knew that PFAS-laden wastewater from the Shaw Plants and the Aladdin Plants would be discharged to the Dalton Utilities POTW for disposal.

122.   Defendants knew that the Dalton Utilities POTW was not designed to remove, and in fact would not remove, PFAS.

### The PFAS Manufacturing Defendants' and Invista's Involvement in and Control of the Carpet Manufacturing Defendants' Operations

123.   The PFAS Manufacturing Defendants and Invista were closely involved in and exercised control over the Carpet Manufacturing Defendants' plant operations, including the application of their PFAS and PFAS-containing products to carpets.

124.   3M, DuPont, and Invista entered into licensing agreements with the Carpet Manufacturing Defendants that imposed obligations on the Carpet Manufacturing Defendants' use of the PFAS and PFAS-containing products.

125.   These agreements included terms that provided specific standards that the Carpet Manufacturing Defendants had to follow when applying PFAS and PFAS-containing products to carpets.

126.   The agreements also included terms that governed specific standards the Carpet Manufacturing Defendants' carpet products had to meet after they were treated with PFAS and PFAS-containing products.

27

127.   Among other things, 3M, DuPont, and Invista had contractual rights governing the Carpet Manufacturing Defendants' manufacturing processes.

128.   3M, DuPont, and Invista also had contractual rights to audit or inspect the Carpet Manufacturing Defendants' products and operations.

129.   Additionally, all PFAS Manufacturing Defendants and Invista had employee(s) assigned to manage relationships with the various Carpet Manufacturing Defendants as technical and/or sales representatives.

130.   These representatives spent significant time in the Carpet Manufacturing Defendants' plants in Dalton, Georgia and understood their businesses and operations.

131.   After it was spun off from DuPont, Invista continued to employ former DuPont employees who had been responsible for managing the customer relationships with the Carpet Manufacturing Defendants.  These former DuPont, then Invista employees were present in the Carpet Manufacturing Defendants' mills and provided advice and instruction to the Carpet Manufacturing Defendants regarding their operations.

132.   For example, the PFAS Manufacturing Defendants' and Invista's representatives studied the Carpet Manufacturing Defendants' plant operations; how the Carpet Manufacturing Defendants made their products; how the Carpet Manufacturing Defendants applied PFAS and PFAS-containing products to their

carpets; how the Carpet Manufacturing Defendants disposed of PFAS-containing wastewater; and much more.

133.   With this detailed understanding of the Carpet Manufacturing Defendants' operations, the PFAS Manufacturing Defendants and Invista provided advice, instruction, and guidance to the Carpet Manufacturing Defendants regarding their operations, including disposal.

134.   3M and DuPont owned, installed, and maintained, and Invista owned and maintained, equipment used by the Carpet Manufacturing Defendants to apply PFAS-containing products to carpet products.

135.   When the Carpet Manufacturing Defendants experienced operational problems, they often called their representatives from the PFAS Manufacturing Defendants and Invista.  In response, the PFAS Manufacturing Defendants' and Invista's representatives would give advice and instruction to the Carpet Manufacturing Defendants regarding their manufacturing processes and operations, specifically relating to their use and application of their PFAS and PFAS-containing products.

136.   On multiple occasions, employees from 3M's environmental engineering and pollution control department provided advice and instruction directly to Dalton Utilities regarding treatment of wastewater containing 3M's products.   However, when 3M's experts advised Dalton Utilities regarding

wastewater treatment, they did not disclose the presence or environmental risks of 3M's PFAS and PFAS-containing products.

137.  Likewise, DuPont's engineering department, and specifically the wastewater and water treatment group, provided advice and instructions to its customers, including the Carpet Manufacturing Defendants, regarding issues related to wastewater disposal.

138.  Like 3M, on multiple occasions, employees from DuPont's engineering department, including experts in water pollution control, provided advice and instruction directly to Dalton Utilities regarding treatment of wastewater containing DuPont's products.   However, when DuPont's experts advised Dalton Utilities regarding wastewater treatment, they did not disclose the presence or environmental risks of DuPont's PFAS-containing products.

139.  Similarly, upon information and belief, Daikin advised the Carpet Manufacturing Defendants regarding the potential impact of Daikin products on their customers' wastewater processes.

140.  The PFAS Manufacturing Defendants leveraged their superior knowledge of wastewater processing and treatment to assist the Carpet Manufacturing Defendants and ensure that their sales of PFAS and PFAS-containing products continued.

**The Dalton Utilities Publicly Owned Treatment Works**

141.   Dalton Utilities operates one of the largest land application waste treatment systems in the United States.

142.   The LAS works together with three wastewater treatment plants, which together form the Dalton Utilities' POTW.

143.   The POTW collects and treats wastewater from household, commercial, and industrial users in and around Dalton, Georgia.

144.   Wastewater is discharged by households, commercial businesses, and industrial users (like the carpet and flooring manufacturers) through the sewer system, after which it is processed at one of the three wastewater treatment plants.

145.   After the wastewater is processed at the wastewater treatment plants, it is pumped to the LAS, where it is sprayed through some combination of a total of approximately 19,000 sprayheads (e.g., "land-applied") for further processing and disposal.

146.   As a POTW, Dalton Utilities is subject to numerous regulatory programs.

147.   Dalton Utilities' treatment operations are governed by the LAS Permit—Land Application System Permit No. GAJ020056—issued to Dalton Utilities by EPD.  The LAS Permit is a non-point source permit issued under state law.

31

148.   The LAS is also governed by the General Stormwater Permit—National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit GAR050000—issued to Dalton Utilities by EPD through its delegated authority from EPA under the Clean Water Act.

149.   The LAS permit governs Dalton Utilities' operation of the LAS, as well as the three wastewater treatment plants.  The General Stormwater Permit governs stormwater discharges from portions of Dalton Utilities' property not governed by the LAS Permit (e.g., roads and buildings).

150.   The LAS Permit requires Dalton Utilities to pretreat and monitor wastewater for specific constituents—biochemical oxygen demand, total suspended solids, pH, chemical oxygen demand, total Kjeldahl nitrogen, ammonia nitrogen, nitrate plus nitrite, total phosphorous, and ortho-phosphate.

151.   After pretreatment, the LAS Permit requires Dalton Utilities to monitor for additional constituents—biochemical oxygen demand, total suspended solids, pH, Nitrate-Nitrogen, and fecal coliform bacteria.

152.   The LAS Permit does not specifically reference or impose any requirements relating to PFAS.

153.   However, the LAS Permit states: "Groundwater leaving the land application system boundaries must not exceed maximum contaminant levels for drinking water.  If groundwater samples indicate contamination, the permittee will

32

be required to develop a plan which will ensure that the primary maximum contaminant levels for drinking water are not exceeded. The plan will be implemented by the permittee immediately upon [EPD] approval."

154.  Accordingly, EPA's adoption of MCLs governing PFAS in June 2024 was the first time that Dalton Utilities' permits implicated PFAS in any way.

155.  In addition to the permits applicable to Dalton Utilities' operation of the POTW, Dalton Utilities is required by law to issue and enforce Sewer User Rules and Regulations ("SURR"). *See* Ga. Comp. R. & Regs. § 391-3-6-.08 and 40 C.F.R. § 403.1 *et seq.*[2]

156.  Any user of the POTW is subject to Dalton Utilities' SURR.

157.  Among other things, the SURR prohibits any user from discharging waste to the Dalton Utilities POTW that causes "Interference"—any discharge which inhibits or disrupts the POTW or its operations—or "Pass Through"—any discharge that will cause a violation of the Dalton Utilities' LAS Permit.

### PFAS at the POTW

158.  Dalton Utilities was unaware that PFAS was in the wastewater entering its POTW until 2009, when EPA asked Dalton Utilities to conduct sampling for PFAS.

---

[2] A true and correct copy of the SURR is attached hereto as Exhibit 1.

159.   As EPA requested, Dalton Utilities conducted sampling at various locations within the POTW—pump stations, spray heads on the LAS, surface waters on the LAS, soil, sludge, and compost.

160.   Dalton Utilities shared that sampling data with EPA and EPD.

161.   The 2009 sampling demonstrated that there were elevated levels of PFAS at the POTW, including in the pump stations, spray heads on the LAS, surface waters on the LAS, soil, sludge, and compost.

162.   Although elevated, the presence of PFAS at the POTW did not violate any of Dalton Utilities' permit conditions or other regulatory requirements at the time.

163.   Neither EPA nor EPD took any action with respect to PFAS at the LAS.

164.   After 2009, additional sampling has been conducted at the POTW, on the LAS, and in surrounding waters, including the Conasauga River, all of which has demonstrated elevated levels of PFAS, including at the boundaries of the LAS.

165.   As discussed above, Dalton Utilities' LAS Permit provides that groundwater leaving the boundaries of the LAS must not exceed MCLs.

166.   Before 2024, there were no MCLs governing PFAS.  However, once the MCLs for PFOS, PFOA, PFHxS, PFNA, HFPO-DA, and mixtures went into effect on June 25, 2024, for the first time, Dalton Utilities was subject to compliance

obligations related to PFAS in the incoming wastewater as well as PFAS already disposed of in the LAS.

167.  Specifically, sampling of surface water and groundwater near the boundaries of the LAS demonstrated levels far exceeding the MCLs for, at a minimum, PFOS, PFOA, PFHxS, and PFNA.

168.  PFAS resides at the LAS for many years after it is land applied. Experts who have studied the LAS believe that PFAS migrates within and through the LAS.

169.  Accordingly, to this day, PFAS that was land applied at the LAS long ago continues to reside at the LAS, as well as migrate within and through the LAS, and will continue to do so into the foreseeable future.

## Dalton Utilities Has Incurred Significant Costs as a Result of Defendants' PFAS Contamination of the POTW

170.  As a result of the elevated levels of PFAS at the POTW, and in anticipation of the federal regulations finalized by EPA in 2024 (including MCLs and CERCLA hazardous substance designations), Dalton Utilities engaged technical consultants to investigate the POTW and potential remedial options.

171.  Specifically, Dalton Utilities engaged consultants to conduct PFAS sampling at the LAS, to design and execute a first-of-its-kind pilot study for treating PFAS in wastewater, to assess the viability of installing PFAS treatment at the existing wastewater treatment plants, to assess options associated with converting to a direct discharge system (in addition to or in lieu of the LAS); and to evaluate

various engineering measures that could be implemented at the LAS to collect and treat PFAS at the LAS.

172.   To date, Dalton Utilities already has paid significant costs to assess and characterize the extent and location of the PFAS contamination in soil, groundwater, and surface water at the LAS, and to explore treatment options.

173.   These are only a fraction of the significant costs that Dalton Utilities has incurred and will continue to incur as a result of Defendants' PFAS contamination.

**CAUSES OF ACTION**

**COUNT I**
**42 U.S.C. § 9607 – CERCLA Cost Recovery**
**(All Defendants)**

174.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 173 as if fully set forth herein.

175.   Each Defendant is jointly and severally liable under CERCLA Section 107, 42 U.S.C. § 9607, for the response costs Dalton Utilities has incurred and will incur as a consequence of each Defendant's disposal, arrangement for disposal, and/or transport for disposal of hazardous substances released into and from Dalton Utilities' POTW.

176.   Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA

36

Section 601(21), 42 U.S.C. § 9601(21), who arranged for disposal, treatment, and/or transport for disposal or treatment at the Dalton Utilities POTW of hazardous substances the Defendants owned, possessed, or controlled, from which there was a release or threatened release of hazardous substances.

177. Dalton Utilities' POTW is a facility as defined by CERCLA Section 601(9), 42 U.S.C. § 9601(9).

178. Each release or threatened release of hazardous substances described above has caused and will continue to cause Dalton Utilities to incur necessary response costs to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

179. Dalton Utilities' response costs are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 400 *et seq.*, ("NCP").

180. Under CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), Dalton Utilities is entitled to cost recovery from each Defendant for its necessary response costs consistent with the NCP that Dalton Utilities has incurred or will incur.

## COUNT II
## 42 U.S.C. § 9613(G)(2) – CERCLA DECLARATORY JUDGMENT
### (All Defendants)

181.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 180 as if fully set forth herein.

182.   Each Defendant is jointly and severally liable under CERCLA Section 107, 42 U.S.C. § 9607, for the response costs Dalton Utilities has incurred and will incur as a consequence of each Defendant's disposal, arrangement for disposal, and/or transport for disposal of hazardous substances released into and from Dalton Utilities' POTW.

183.   Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA Section 601(21), 42 U.S.C. § 9601(21), who arranged for disposal, treatment, and/or transport for disposal or treatment at the Dalton Utilities POTW of hazardous substances the Defendants owned, possessed, or controlled, from which there was a release or threatened release of hazardous substances.

184.   Dalton Utilities' POTW is a facility as defined by CERCLA Section 601(9), 42 U.S.C. § 9601(9).

185.   Each release or threatened release of hazardous substances described above has caused and will continue to cause Dalton Utilities to incur necessary

response costs to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

186.   Dalton Utilities' response costs are consistent with the NCP.

187.   An actual controversy exists within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2) between Dalton Utilities and Defendants regarding their respective rights and responsibilities for necessary response costs incurred and to be incurred by Dalton Utilities consistent with the NCP.

188.   Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202, Dalton Utilities is entitled to a declaratory judgment regarding liability for response costs and damages under CERCLA Section 107(a), 42 U.S.C. § 9607(a), that will be binding in any subsequent action or actions to recover further response costs.

## COUNT III
## NEGLIGENCE
### (All Defendants)

189.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 188 as if fully set forth herein.

190.   As users and/or handlers of PFAS and PFAS-containing products, and as disposers of waste containing and/or degrading into PFAS into the Dalton Utilities' POTW, the Carpet Manufacturing Defendants, 3M, DuPont, and Invista owed a duty to Dalton Utilities to exercise due and reasonable care in their use,

handling, and disposal of PFAS-containing products and wastewater containing PFAS to avoid the foreseeable contamination of Dalton Utilities' property.

191.   The Carpet Manufacturing Defendants, 3M, DuPont, and Invista owed Dalton Utilities a duty not to contribute any pollutant or wastewater to the POTW that inhibits or disrupts the POTW, its treatment processes or operations, or causes a violation of the LAS Permit.

192.   The PFAS Manufacturing Defendants and Invista owed Dalton Utilities a duty not to supply PFAS and PFAS-containing products to manufacturers with knowledge that the PFAS and PFAS-containing products were unlikely to be made reasonably safe in their regular use and with knowledge that manufacturers would foreseeably discharge wastewater containing PFAS to a POTW that they knew was incapable of treating for PFAS and preventing environmental contamination which the PFAS Manufacturing Defendants and Invista knew or should have known would occur.

193.   Pursuant to O.C.G.A. § 12-5-51, Defendants owed Dalton Utilities a duty not to intentionally or negligently cause or permit any industrial waste or other substance to be discharged into the waters of the state resulting in a condition of pollution.

194.   Defendants were aware of the persistence and toxicity of PFAS in the environment and knew or should have known that their use, handling, and disposal

of industrial wastewater containing PFAS into Dalton Utilities' POTW, and their control over and instruction regarding the same, would result in the ongoing contamination of Dalton Utilities' property.

195.   Notwithstanding the known risks of harm, the PFAS Manufacturing Defendants and Invista continuously supplied PFAS and PFAS-containing products to the Carpet Manufacturing Defendants and instructed the Carpet Manufacturing Defendants regarding their use and application of PFAS and PFAS-containing products, without taking necessary precautions to prevent PFAS from foreseeably contaminating Dalton Utilities' property.

196.   Notwithstanding the known risks of harm, the Carpet Manufacturing Defendants continuously used PFAS and PFAS-containing products in their manufacturing operations and disposed of wastewater containing PFAS and PFAS-containing products by discharging their wastewater to Dalton Utilities, without taking necessary precautions to prevent PFAS from foreseeably contaminating Dalton Utilities' property.

197.   The Carpet Manufacturing Defendants, 3M, DuPont, and Invista breached their duties by discharging wastewater containing PFAS to Dalton Utilities' POTW without disclosing the presence of PFAS and with knowledge that the POTW could not treat or remove PFAS.

198.    The PFAS Manufacturing Defendants and Invista breached their duties to Dalton Utilities by continuing to sell and supply PFAS and PFAS-containing products to the Carpet Manufacturing Defendants; instructing the Carpet Manufacturing Defendants regarding their use and application of PFAS and PFAS-containing products, with knowledge that the PFAS and PFAS-containing products would be discharged to Dalton Utilities' POTW, which the PFAS Manufacturing Defendants and Invista knew was not and is not capable of treating or removing PFAS; failing to disclose the environmental risks associated with their PFAS and PFAS-containing products; and covering up the environmental risks associated with PFAS and their PFAS-containing products from regulators and the public.

199.    Dalton Utilities could not and did not consent to the PFAS contamination of its property because, for many years, Dalton Utilities did not know that PFAS was a constituent in wastewater disposed of at the POTW, and even after it learned that PFAS was present in the waste streams coming to the POTW, Dalton Utilities lacked knowledge of the environmental risks regarding PFAS.  Dalton Utilities knew far less about the properties of PFAS than the Defendants, and did not know about the specific environmental risks of PFAS that caused its injuries.

200.    Defendants' breaches of their duties to Dalton Utilities constitute negligent, willful, and/or reckless conduct.

201.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

202.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities' real property has been damaged by PFAS contamination.

203.   The harms caused to Dalton Utilities' property by Defendants' negligence are continuing in nature as PFAS chemicals continue to migrate within and through the LAS.

## COUNT IV
## NUISANCE
### (All Defendants)

204.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 203 as if fully set forth herein.

205.   Dalton Utilities owns property located at 1200 V. D. Parrott, Jr. Pkwy., Dalton, Georgia 30721.

206.   The Carpet Manufacturing Defendants have created a continuous, private nuisance at Dalton Utilities' property by their discharge of PFAS and PFAS-containing products from the Shaw Plants and Aladdin Plants to the Dalton Utilities POTW for disposal with knowledge of the toxicity and persistence of the chemicals and that Dalton Utilities' POTW is incapable of treating for PFAS.

207.   3M, DuPont, and Invista have created a continuous, private nuisance at Dalton Utilities' property by their discharge of PFAS and PFAS-containing products from the 3M Lab and DuPont Lab to the Dalton Utilities POTW for disposal with knowledge of the toxicity and persistence of the chemicals and that Dalton Utilities' POTW is incapable of treating for PFAS.

208.   The PFAS Manufacturing Defendants and Invista have created a continuous, private nuisance at Dalton Utilities' property by selling and supplying PFAS and PFAS-containing products to the Carpet Manufacturing Defendants, and instructing the Carpet Manufacturing Defendants regarding their use and application of PFAS and PFAS-containing products, while knowing that the Carpet Manufacturing Defendants' use of the PFAS and PFAS-containing products posed environmental risks and that Dalton Utilities' POTW could not treat for PFAS.

209.   It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate and continue to contaminate Dalton Utilities' property.

210.   Defendants' actions directly and proximately caused Dalton Utilities' property to become contaminated with PFAS, which has substantially interfered with Dalton Utilities' use and enjoyment of its property.

211.   Despite their knowledge of the environmental risks associated with PFAS and their control of the cause of the harm, Defendants have failed to take

appropriate remedial steps to prevent PFAS from contaminating Dalton Utilities' property.

212. Dalton Utilities could not and did not consent to the PFAS contamination of its property because, for many years, Dalton Utilities did not know that PFAS was a constituent in wastewater disposed of at the POTW, and even after it learned that PFAS was present in the waste streams coming to the POTW, Dalton Utilities lacked knowledge of the environmental risks regarding PFAS. Dalton Utilities knew far less about the properties of PFAS than the Defendants, and did not know about the specific environmental risks of PFAS that caused its injuries.

213. The PFAS contamination at Dalton Utilities' POTW has threatened the environmental safety of the property and surrounding properties.

214. The PFAS contamination at Dalton Utilities' POTW has required (and will continue to require) Dalton Utilities to incur significant damages to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

215. As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

216.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities' real property has been damaged by PFAS contamination.

217.   The nuisance caused by Defendants' actions is ongoing as PFAS chemicals continue to migrate within and through the LAS.

**COUNT V**
**TRESPASS**
**(All Defendants)**

218.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 217 as if fully set forth herein.

219.   Under O.C.G.A. § 51-9-4 a "person having title to lands, if no one is in actual possession under the same title with him, may bring an action for a trespass thereon."

220.   Dalton Utilities is a person under the law and privately owns property located at 1200 V. D. Parrott, Jr. Pkwy., Dalton, Georgia 30721.

221.   The Carpet Manufacturing Defendants' intentional acts of using, handling, disposing and discharging wastewater containing PFAS to the Dalton Utilities POTW caused an invasion of Dalton Utilities' property.

222.   3M, DuPont, and Invista's intentional acts of using, handling, disposing and discharging wastewater containing PFAS to the Dalton Utilities POTW caused an invasion of Dalton Utilities' property.

223.   The PFAS Manufacturing Defendants' and Invista's intentional acts of manufacturing, selling, and/or supplying PFAS and PFAS-containing products to the Carpet Manufacturing Defendants, as well as instructing the Carpet Manufacturing Defendants regarding their use and application of PFAS and PFAS-containing products, with full knowledge that PFAS posed environmental risks and that Dalton Utilities' POTW could not treat for PFAS caused an invasion of Dalton Utilities' property, which affected and is continuing to affect Dalton Utilities' interests in the exclusive possession of its property.

224.   Defendants' discharge of wastewater containing PFAS and supply of PFAS-containing products has directly caused a substantial contamination of Dalton Utilities' property.

225.   Defendants knew or should have known that their manufacture, sale, distribution, monitoring, marketing, use, supply, handling, purchase, disposal and/or discharges of PFAS and PFAS-containing products would contaminate Dalton Utilities' property and result in an invasion of its possessory interests.

226.  Dalton Utilities could not and did not consent to the PFAS contamination of its property because, for many years, Dalton Utilities did not know that PFAS was a constituent in wastewater disposed of at the POTW, and even after it learned that PFAS was present in the waste streams coming to the POTW, Dalton Utilities lacked knowledge of the environmental risks regarding PFAS.  Dalton

Utilities knew far less about the properties of PFAS than the Defendants, and did not know about the specific environmental risks of PFAS that caused its injuries.

227.   Defendants' trespasses are continuing and will continue until Dalton Utilities' property is remediated by removing PFAS and preventing PFAS from leaving the boundaries of the LAS, to the extent possible.  PFAS chemicals continue to migrate within and through the LAS.

228.   Defendants' trespasses have required (and will continue to require) Dalton Utilities to incur significant damages to remediate Defendants' PFAS contamination and otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

229.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

230.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Dalton Utilities' real property has been damaged by PFAS contamination.

### COUNT VI
### WANTONNESS AND PUNITIVE DAMAGES
### (All Defendants)

231.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 230 as if fully set forth herein.

232.   The PFAS Manufacturing Defendants' and Invista's conduct demonstrated willful misconduct, malice, wantonness, oppression, and/or the entire want of care which would raise the presumption of conscious indifference to the consequences of their actions with respect to the manufacture and sale of PFAS and PFAS-containing products to the carpet industry in Dalton, Georgia.

233.   The PFAS Manufacturing Defendants and Invista were aware of significant environmental risks associated with their PFAS and PFAS-containing products long before disclosing those dangers to Dalton Utilities, the PFAS Manufacturing Defendants' and Invista's customers, government regulators, or the public.

234.   The PFAS Manufacturing Defendants and Invista took specific actions to suppress information about these environmental risks.

235.   The Carpet Manufacturing Defendants were aware of the significant environmental risks associated with PFAS and PFAS-containing products, including that traditional wastewater treatment operations would not treat for PFAS, long before disclosing those risks to Dalton Utilities.

236.   Defendants were aware that the Carpet Manufacturing Defendants would discharge wastewater containing PFAS to the Dalton Utilities POTW, and that the Dalton Utilities POTW would not be able to treat or remove the PFAS.

237.    Pursuant to O.C.G.A. § 12-5-51(a), Defendants owed a duty to Dalton

Utilities to avoid intentionally or negligently causing or permitting industrial wastes

to be discharged to the Dalton Utilities POTW in a manner that would result in a

condition of pollution.

238.    Defendants' conduct evidences their reckless disregard for Dalton

Utilities' property and the surrounding environment.

**COUNT VII**
**VIOLATION OF GEORGIA WATER QUALITY CONTROL ACT –**
**O.C.G.A. § 12-5-20, *ET SEQ.***
**(All Defendants)**

239.    Dalton Utilities realleges and incorporates by reference paragraphs 1

through 238 as if fully set forth herein.

240.    Pursuant to O.C.G.A. § 12-5-51(a), "[a]ny person who intentionally or

negligently causes or permits any sewage, industrial wastes, or other wastes, oil,

scum, floating debris, or other substance or substances to be spilled, discharged, or

deposited in the waters of the state, resulting in a condition of pollution as defined

by this article, shall be liable in damages to the state and any political subdivision

thereof for any and all costs, expenses, and injuries occasioned by such spills,

discharges, or deposits."

241.    Pursuant to O.C.G.A. § 12-5-22(8), "pollution" means "the manmade

or man-induced alteration of the chemical, physical, biological, and radiological

integrity of water."

242.   The presence of PFAS in the waters of the state on and surrounding the Dalton Utilities LAS is "pollution" within the meaning of O.C.G.A. § 12-5-22(8).

243.   Defendants are persons within the meaning of O.C.G.A. § 12-5-51.

244.   Defendants intentionally or negligently caused or permitted PFAS to be discharged or deposited into waters of the state by causing wastewater containing PFAS to be discharged to the Dalton Utilities POTW.

245.   Defendants caused these discharges with knowledge that Dalton Utilities' POTW was incapable of treating or removing PFAS and that PFAS presented significant environmental risks because of its persistence, mobility, and potential to bioaccumulate.

246.   Pursuant to O.C.G.A. § 12-5-51(a), "[t]he amount of the damages assessed pursuant to this Code section shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits. . . . Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

247.   Dalton Utilities is a political subdivision of the State of Georgia.

248.   As a result of Defendants' actions, Dalton Utilities has incurred and will continue to incur damages to remediate Defendants' PFAS contamination and

otherwise remove Defendants' PFAS from wastewater and, more generally, from the POTW.

### COUNT VIII
### NEGLIGENT DESIGN
### (3M, DuPont, Daikin, Invista)

249.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 248 as if fully set forth herein.

250.   3M, DuPont, and Daikin designed, manufactured, sold, licensed, and/or distributed PFAS and PFAS-containing products to the Carpet Manufacturing Defendants for use in the Shaw Plants and/or Aladdin Plants.

251.   Invista formulated, sold, licensed, and/or distributed PFAS-containing products to the Carpet Manufacturing Defendants for use in the Shaw Plants and/or Aladdin Plants.

252.   3M, DuPont, and Daikin owed Dalton Utilities a duty to use ordinary care in designing its products, including but not limited to its PFAS and PFAS-containing products.

253.   Invista owed Dalton Utilities to use ordinary care in formulating its products, including but not limited to its PFAS-containing products.

254.   3M, DuPont, and Daikin knew or should have known that the PFAS and PFAS-containing products they designed, manufactured, sold, licensed, and/or distributed were harmful to the environment, and that, once introduced into the

environment, the PFAS in their products would spread and resist conventional wastewater treatment processes.

255.   Invista knew or should have known that the PFAS-containing products that they formulated, sold, licensed, and/or distributed were harmful to the environment, and that, once introduced into the environment, the PFAS in their products would spread and resist conventional wastewater treatment processes.

256.   3M, DuPont, Daikin, and Invista further knew or should have known that PFAS were released during the normal use and disposal of the Carpet Manufacturing Defendants' wastewater from the Shaw Plants and the Aladdin Plants to Dalton Utilities' POTW.

257.   3M, DuPont, and Invista also knew or should have known that PFAS and PFAS-containing products were released during their own operations of, and disposal of wastewater from, the 3M Lab and the DuPont Lab.

258.   The environmental risks inherent in the manufacture, use, sale, license, and/or disposal of PFAS and PFAS-containing products outweigh any possible utility of the PFAS and PFAS-containing products manufactured by 3M, DuPont, and Daikin, and the PFAS-containing products formulated by Invista.

259.   3M, DuPont, Daikin, and Invista breached their duty to Dalton Utilities by failing to remove or otherwise use reasonable care to address the danger created by their PFAS and PFAS-containing products, and by failing to adopt a reasonable,

safer design that would have reduced the foreseeable risks of harm caused to Dalton Utilities' property.

260. 3M's, DuPont's, Daikin's, and Invista's disclaimers and warnings were inadequate, unreasonable, and knowingly ineffective.

261. Development of a reasonable, alternative design, including, for example and without limitation, shorter chain PFAS, was feasible and would have reduced the foreseeable environmental risks presented by 3M's, DuPont's, Daikin's, and Invista's PFAS-containing products.

262. As a direct, foreseeable, and proximate result of 3M's, DuPont's, and Daikin's defective design of PFAS and PFAS-containing products, and the PFAS-containing products formulated by Invista, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

263. As a direct, foreseeable, and proximate result of 3M's, DuPont's, and Daikin's defective design of PFAS and PFAS-containing products, and the PFAS-containing products formulated by Invista, Dalton Utilities' real property has been damaged by PFAS contamination.

264. The harms caused to Dalton Utilities' property by 3M's, DuPont's, Daikin's, and Invista's negligent design are continuing in nature as PFAS chemicals continue to migrate within and through the LAS.

## COUNT IX
## NEGLIGENT FAILURE TO WARN
### (3M, DuPont, Daikin, Invista)

265.   Dalton Utilities realleges and incorporates by reference paragraphs 1 through 264 as if fully set forth herein.

266.   The PFAS Manufacturing Defendants and Invista designed, manufactured, sold, licensed, and/or distributed PFAS and PFAS-containing products to the Carpet Manufacturing Defendants for use in the Shaw Plants and/or Aladdin Plants.

267.   The PFAS Manufacturing Defendants and Invista knew or should have known that the PFAS and PFAS-containing products they designed, manufactured, sold, licensed, and/or distributed were harmful to the environment, and that, once introduced into the environment, their PFAS would spread and resist natural degradation or normal wastewater treatment processes.

268.   The PFAS Manufacturing Defendants and Invista further knew or should have known that PFAS and PFAS-containing products were released during the normal use and disposal of the Carpet Manufacturing Defendants' wastewater from the Shaw Plants and the Aladdin Plants to Dalton Utilities' POTW.

269.   3M, DuPont, and Invista also knew or should have known that PFAS and PFAS-containing products were released during their own operations of, and disposal of wastewater from, the 3M Lab and the DuPont Lab.

270.   The PFAS Manufacturing Defendants and Invista had a duty to warn Dalton Utilities that their PFAS and PFAS-containing products, when used and disposed of without treatment, would cause environmental harm.

271.   The PFAS Manufacturing Defendants and Invista failed, and continue to fail, to provide any warnings or precautionary instructions sufficient to notify the reasonably foreseeable users of their PFAS and PFAS-containing products of such dangers.

272.   In particular, the PFAS Manufacturing Defendants and Invista failed to describe the known or reasonably foreseeable environmental risks inherent in the normal use and disposal of their PFAS and PFAS-containing products, or to provide any precautionary statements regarding such hazards on the labeling of their products.

273.   The PFAS Manufacturing Defendants' and Invista's failure to provide warnings or precautionary instructions regarding the reasonably foreseeable environmental risks inherent in the use and disposal of their PFAS and PFAS-containing products have rendered their products unreasonably dangerous for their intended or reasonably foreseeable purposes at the time that they left the PFAS Manufacturing Defendants' and Invista's control or possession.

274. The PFAS and PFAS-containing products that the PFAS Manufacturing Defendants and Invista sold to the Carpet Manufacturing Defendants

56

were used and ultimately disposed of in a reasonably foreseeable manner and without any change in the condition(s) of the PFAS and PFAS-containing products that renders them dangerous.

275. As a direct, foreseeable, and proximate result of the PFAS Manufacturing Defendants' and Invista's failure to warn users of PFAS and PFAS-containing products of the inherent dangers of the use and disposal of their products, Dalton Utilities' real property has been damaged by PFAS contamination.

276. As a direct, foreseeable, and proximate result of the PFAS Manufacturing Defendants' and Invista's failure to warn users of PFAS and PFAS-containing products of the inherent dangers of the use and disposal of their products, Dalton Utilities has incurred expenses and costs and will continue to incur expenses and costs.

277. The harms caused to Dalton Utilities' property by the PFAS Manufacturing Defendants' and Invista's failure to warn are continuing in nature as PFAS chemicals continue to migrate within and through the LAS.

## COUNT X
## EXPENSES OF LITIGATION – O.C.G.A. § 13-6-11
### (All Defendants)

278. Dalton Utilities realleges and incorporates by reference paragraphs 1 through 277 as if fully set forth herein.

279.    Defendants knew or reasonably should have known that their sales, marketing, use and disposal of PFAS, products containing PFAS, and wastewater containing PFAS would cause Dalton Utilities to incur significant expense and trouble.

280.    In breaching their duties to Dalton Utilities and by committing the tortious acts described above, Defendants have acted in bad faith and caused Dalton Utilities unnecessary trouble and expense.

281.    Defendants have acted in bad faith, have been stubbornly litigious, and have caused Dalton Utilities unnecessary trouble and expense such that Dalton Utilities is entitled to recover its attorney's fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Dalton Utilities requests that the Court enter a judgment in its favor and against each Defendant as follows:

a)    declaring that Defendants are jointly and severally liable under 42 U.S.C. § 9607(a)(4)(B) for response costs incurred or to be incurred by Dalton Utilities as a result of releases or threatened releases of hazardous substances at or from the Dalton Utilities POTW;

b)    awarding Dalton Utilities an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be

incurred by Dalton Utilities, including such costs incurred to remediate Defendants' PFAS contamination and otherwise remove, contain, or address Defendants' PFAS from wastewater and, more generally, from the POTW;

c)      declaring that Defendants are liable, jointly and severally, for response costs incurred and to be incurred by Dalton Utilities resulting from Defendants' disposals, arrangement for disposals, and/or transport for disposals of hazardous substances at and from the Dalton Utilities POTW;

d)      declaring that the Court's judgment on each Defendant's liability for response costs is binding on any subsequent action or actions to recover further response costs or damages;

e)      awarding Dalton Utilities compensatory damages against Defendants in an amount to be determined at trial by a jury;

f)      awarding Dalton Utilities punitive damages against Defendants in an amount to be determined at trial by a jury;

g)      awarding Dalton Utilities all costs and expenses reasonably incurred in cleaning up and abating PFAS at the POTW;

h)      awarding Dalton Utilities prejudgment interest, costs, and attorneys' and expert fees as allowed by law; and

i)      awarding such other and further relief as the Court deems just and appropriate.

Respectfully submitted, this 1st day of April 2025.

**TROUTMAN PEPPER LOCKE LLP**

/s/ *Lindsey B. Mann*

Lindsey B. Mann (GA Bar No. 431819)
lindsey.mann@troutman.com
E. Fitzgerald Veira (GA Bar No. 726726)
fitzgerald.veira@troutman.com
T. Scott Mills (GA Bar No. 757063)
scott.mills@troutman.com
Anaid Reyes Kipp (GA Bar No. 703283)
anaid.reyes-kipp@troutman.com
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
404-885-3000

Brooks M. Smith (*pro hac vice*)
brooks.smith@troutman.com
1001 Haxall Point, Suite 1500
Richmond, VA 23219
804-697-1200

James Beers (*pro hac vice*)
james.beers@troutman.com
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
202-274-2950

**Counsel for Plaintiff The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities**

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D) of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1.

This 1st day of April, 2025.

/s/ Lindsey B. Mann
Lindsey B. Mann
lindsey.mann@troutman.com
Georgia Bar No. 431819

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 1st day of April, 2025.

/s/ Lindsey B. Mann
Lindsey B. Mann
lindsey.mann@troutman.com
Georgia Bar No. 431819