# EXHIBIT 1



# SEWER USER RULES AND REGULATIONS

**Enacted By:**
**THE WATER, LIGHT & SINKING FUND COMMISSION**
**OF DALTON, GEORGIA**

**3/2018**

## **TABLE OF CONTENTS**

**SECTION 1 – GENRAL PROVISIONS**

1.1    Purpose, Policy, and Application .................................................. 4
1.2    Administration and Enforcement of SURR ................................... 5
1.3    Abbreviations .............................................................................. 5
1.4    Definitions ................................................................................... 6
1.5    Authority to Collect Fees and Surcharges ................................. 14

**SECTION 2 – GENERAL SEWER USE REQUIREMENTS**

2.1    Use of Public Sewers ................................................................ 15
2.2    Private Sewage Disposal ........................................................... 15
2.3    Building Sewers and Connections .............................................. 16
2.4    Prohibited Discharge Standards ................................................ 18
2.5    National Categorical Pretreatment Standards ........................... 20
2.6    State Pretreatment Standards ................................................... 20
2.7    Local Limits ............................................................................... 20
2.8    Dilution ...................................................................................... 21
2.9    Removal Credits ........................................................................ 21

**SECTION 3 – PRETREATMENT OF WASTEWATER**

3.1    Pretreatment Facilities .............................................................. 21
3.2    Designation of Separate Sources of Constituents ..................... 22
3.3    Special Agreements .................................................................. 22
3.4    Hauled Wastewater Disposal .................................................... 23

**SECTION 4 – DISCHARGE PERMITS**

4.1    Wastewater Discharge Permit Requirement .............................. 23
4.2    Wastewater Analysis ................................................................. 24
4.3    Wastewater Discharge Permitting:  Existing Connection ........... 24
4.4    Wastewater Discharge Permitting:  New Connections ............... 24
4.5    Discharge Permit Application ..................................................... 25
4.6    Permit Terms and Conditions .................................................... 27
4.7    Notice of Issuance .................................................................... 28
4.8    Modification of Terms and Conditions ....................................... 29
4.9    Wastewater Discharge Permit Transfer ..................................... 30
4.10   Permit Revocation .................................................................... 30
4.11   Permitting Reclassified Industrial Users ................................... 31
4.12   Wastewater Discharge Permit Reissuance ............................... 31
4.13   Municipal User Permits ............................................................. 31
4.14   Wastewater Hauler Discharge Permit ....................................... 32
4.15   Appeals To Dalton Utilities ....................................................... 33

## SECTION 5 – REPORTING REQUIREMENTS

5.1     Monitoring Programs and Reports by Industrial Users ................................34
5.2     Report on Exceedances ...........................................................................35
5.3     Notification of Discharge of Hazardous Waste ...........................................35
5.4     Slug Discharge Control Plan ....................................................................37
5.5     Unanticipated Discharge .........................................................................37
5.6     Reports on Changed Conditions ...............................................................38
5.7     Recordkeeping .......................................................................................38
5.8     Monitoring, Sampling, and Measuring Facilities and Equipment ...................39
5.9     Sampling and Analysis ............................................................................39
5.10    Signatory and Certification Requirements ..................................................40
5.11    Commercial Laboratories .........................................................................40
5.12    Timing ..................................................................................................41

## SECTION 6 – ENFORCEMENT

6.1     Right of Entry and Confidential Information ...............................................42
6.2     Publication of Users in Significant Noncompliance ....................................44
6.3     Administrative Enforcement Remedies .....................................................45
6.4     Injunctive Relief ....................................................................................48
6.5     Fees and Penalties .................................................................................48
6.6     Criminal Prosecution ..............................................................................48
6.7     Affirmative Defenses to Discharge Violations ...........................................49
6.8     Enforcement Response Plan ....................................................................52

## SECTION 7 – Food Service Facility Wastewater Pretreatment Requirements

7.1     Definitions ............................................................................................53
7.2     General Requirements .............................................................................56
7.3     Grease Trap Design Requirements ............................................................57
7.4     Grease Trap Size Requirements ...............................................................60
7.5     Installation Requirements ........................................................................62
7.6     Grease Trap Maintenance ........................................................................63
7.7     Permit Requirements ..............................................................................64
7.8     Administrative Requirements ...................................................................65
7.9     Monitoring, Inspection, and Entry ............................................................66
7.10    Enforcement ..........................................................................................67

## SECTION 8 – SEVERABILITY

.............................................................................................................69

## SECTION 9 – EFFECTIVE DATE

.............................................................................................................69

DALTON UTILITIES SEWER USE RULES AND REGULATIONS

SEWER USE RULES AND REGULATIONS IMPLEMENTING FEDERAL REGULATIONS 40 CFR PART 403 ENTITLED, "GENERAL PRETREATMENT REGULATIONS FOR EXISTING AND NEW SOURCES OF POLLUTION," REGULATING THE DISCHARGE TO THE PUBLIC SEWER BY NONRESIDENTIAL DISCHARGES, THE PROCEDURES AND REQUIREMENTS FOR THE APPLICATION AND ISSUANCE OF NONDOMESTIC DISCHARGES, PROVIDING FOR PERMIT FEES AND CHARGES, ALLOWING CONTRACTUAL AGREEMENTS, SETTING FORTH THE RESPONSIBILITIES OF NONDOMESTIC DISCHARGES, DALTON UTILITIES, THE CITY OF DALTON AND THE CONTRIBUTING JURISDICTIONS, PROVIDING FOR PENALTIES FOR VIOLATIONS THEREOF, AND PROVIDING AN EFFECTIVE DATE

Be it ordained by the Water, Light and Sinking Fund Commission of Dalton, Georgia:

## SECTION 1 – GENERAL PROVISIONS

### 1.1    Purpose, Policy, and Application

This section sets forth policies for the administration and operation of the Dalton Utilities Publicly Owned Treatment Works (POTW) to assure that the facility is used in the common interest of the public.  Uniform requirements are established herein for direct and indirect discharges of pollutants from non-domestic sources into the POTW owned by Dalton Utilities to enable Dalton Utilities to comply with all State and Federal laws, including the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the General Pretreatment Regulations (40 CFR Part 403), the Georgia Water Quality Control Act (O.C.G.A. § 12-50-20 *et seq.*), and the Georgia Department of Natural Resources Rules (R. 391-3-5 and 391-3-6, as amended).  The objectives of this Sewer Use Rules and Regulations (SURR) are:

1.  To prevent the introduction of pollutants into the POTW that will interfere with its operation;

2.  To prevent the introduction of pollutants into the POTW that will pass through the system, inadequately treated, into receiving waters, or otherwise become incompatible with the system;

3.  To ensure that the quality of the sludge from the wastewater treatment plant is maintained at a level that allows it to be disposed of in accordance with the management plan adopted by the facility;

4.  To protect the POTW personnel who come in contact with wastewater and sludge in the course of their employment and the general public;

5. To improve the opportunity to recycle and reclaim wastewater and sludge from the system; and

6. To enable Dalton Utilities to comply with its Land Application System permit conditions, any sludge use and disposal requirements, and any other Federal, State, and local laws to which the POTW is subject.

These SURR shall apply to all direct and indirect users of Dalton Utilities' POTW, including users located outside of the jurisdiction of the City of Dalton. By discharging wastewater into the Dalton Utilities' POTW, users located outside the City's jurisdiction are required to comply with the terms and conditions established in these SURR, as well as any permits or orders issued hereunder.

**1.2    Administration and Enforcement of SURR**

These SURR authorize the issuance of permits to certain industrial users, food service facilities, and waste hauler companies; provides for monitoring, compliance, and enforcement activities; establishes administrative and judicial review procedures; requires user reporting; and provides authority for the setting of fees for the equitable distribution of costs resulting from the program established herein. Except as otherwise provided herein, Dalton Utilities shall administer, implement, and enforce the provisions of these SURR. Any powers granted to or duties imposed upon Dalton Utilities may be delegated by the Chief Executive Officer to other personnel employed by Dalton Utilities.

**1.3    Abbreviations**

The following abbreviations, when used in these SURR, shall have the designated meanings:

- BOD – Biochemical Oxygen Demand
- CFR – Code of Federal Regulations
- COD – Chemical Oxygen Demand
- EPA – U.S. Environmental Protection Agency
- FSF – food service facility
- gpd – gallons per day
- LAS – Land Application System
- l – liter
- mg/l – milligrams per liter
- O.C.G.A. – Official Code of Georgia Annotated

SURR-5

- POTW – Publicly Owned Treatment Works
- RCRA – Resource Conservation and Recovery Act
- SIC – Standard Industrial Classification
- SURR – Sewer Use Rules and Regulations
- TSS – Total Suspended Solids
- U.S.C. – United States Code

## 1.4    **Definitions**

- Act or "the Act" shall mean the Federal Water Pollution Control Act, also known as the Clean Water Act, as amended, 33 U.S.C. § 1251 *et seq.*, as implemented through the Georgia Water Quality Control Act, O.C.G.A. § 12-5-20 *et seq.*

- Acute Hazardous Waste shall mean wastes designated by the EPA as acutely hazardous if it contains any constituents listed in 40 CFR Part 261 Appendix VIII that studies have shown to be fatal to humans or animals in low doses, or are extremely dangerous for other reasons.

- Approval Authority shall mean the Director of the Environmental Protection Division

- Approved Pretreatment Program shall mean a program administered by a POTW that meets the criteria established in the Act and the Georgia Water Quality Control Act, O.C.G.A. § 12-5-20 *et seq.*

- Authorized Representative of the User
    (1) If the user is a corporation, authorized representative of the user shall mean
        (a) The president, secretary, treasurer, or a vice-president of the corporation in charge of principal business function, or any other person who performs similar policy or decision-making functions for the corporation; or
        (b) The manager of one or more manufacturing, production, or operational facilities employing more than 250 persons or having gross annual sales or expenditures exceeding $25 million (in second-quarter 1980 dollars), if authority to sign documents has been delegated or assigned to the manager in accordance with corporate procedures.
    (2) If the user is a partnership, association, or sole proprietorship, an authorized representative of the user shall mean a general partner or other proprietor, respectively.

(3) If the user is a Federal, State, or local government official, an authorized representative of the user shall mean a Director or highest official appointed or designated to oversee the operation and performance of the activities of the government facility.

(4) The individuals described in paragraphs 1-3 above, may designate another authorized representative if the authorization is in writing, the authorization specifies the individual or position responsible for the overall operation of the facility from which the discharge originates or having overall responsibility for environmental matters for the company, and the written authorization is submitted to Dalton Utilities.

- Best Management Practices or BMPs shall mean schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to implement the prohibitions listed in 40 CFR 403.5(a)(1) and (b). BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw materials storage.

- Biochemical Oxygen Demand (BOD) shall mean the quantity of oxygen, by weight, expressed as a concentration in milligrams per liter (mg/L), utilized in the biochemical oxidation of organic matter under standard laboratory conditions of incubation for 5 days at a temperature of $20^0$ centigrade.

- Building Sewer shall mean the extension from a building drain to the place of disposal in the Dalton Utilities' sewer system.

- Categorical Pretreatment Standard shall mean any regulation containing pollutant discharge limits promulgated by the EPA in accordance with Section 307(b) and (c) of the Act (33 U.S.C. § 1317) that apply to a specific category of users and which appear in 40 CFR Chapter I, Subchapter N, Parts 405-471.

- Chief Executive Officer shall mean the Dalton Utilities' Chief Executive Officer or his/her designee.

- City shall mean the City of Dalton, Georgia or the Dalton City Council.

- Dalton Utilities shall mean the public utility located in the City of Dalton, Georgia 30722, which owns and operates the sewerage system for the City of Dalton.

- <u>Environmental Protection Agency or EPA</u> shall mean U.S. Environmental Protection Agency or, where appropriate, the Regional Water Management Division Director, or other duly authorized official of said agency.

- <u>Environmental Protection Division or EPD</u> shall mean the Georgia Department of Natural Resources Environmental Protection Division.

- <u>Existing Source</u> shall mean any source of discharge, the construction or operation of which commenced prior to the publication by EPA of proposed Categorical Pretreatment Standards, which will be applicable to such source if the standard is thereafter promulgated in accordance with Section 307 of the Act.

- <u>Garbage</u> shall mean solid wastes from the domestic and commercial preparation, cooking, and dispensing of food, and from the handling, storage, and sale of produce.

- <u>Grab Sample</u> shall mean a sample that is taken from a waste stream without regard to the flow in the waste stream and over a period of time not to exceed 15 minutes.

- <u>Hazardous Waste</u> shall mean any waste product that is flammable, reactive, corrosive, or toxic or that poses substantial or potential threats to public health or the environment, may cause or significantly contribute to an increase in mortality, or an increase in serious irreversible or incapacitating reversible illness.

- <u>Indirect Discharge or Discharge</u> shall mean the introduction of pollutants into the POTW from any non-domestic source regulated under Section 307(b), (c), or (d) of the Act.

- <u>Industrial User</u> shall mean any person that is a source of an indirect discharge or proposed indirect discharge.

- <u>Industrial Wastewater</u> shall mean Wastewater (as that term is defined herein) resulting from any process of industry, manufacture, trade, or business, or from the development of any natural resources.

- <u>Industry</u> shall mean any establishment that uses water in production or generates wastewater during any period of production.

- <u>Influent</u> shall mean wastewater, raw or partially treated, flowing into any wastewater treatment device or facility.

- <u>Interference</u> shall mean a discharge, which alone or in conjunction with a discharge or discharges from other sources, inhibits or disrupts the POTW, its treatment processes or operations, or its sludge process, or which causes, in whole or in part, a violation of any

requirements of Dalton Utilities' LAS permit, or which prevents the use or disposal of sludge by Dalton Utilities in accordance with any Federal or State laws, regulations or permits, or any sludge management plans.

- <u>LAS Permit</u> shall mean the Dalton Utilities' Land Application System Permit.

- <u>Medical Waste</u> shall mean isolation wastes, infectious agents, human blood and blood products, pathological wastes, sharps, body parts, contaminated bedding, surgical wastes, potentially contaminated laboratory wastes, and dialysis wastes.

- <u>New Source</u> shall mean:

(1) Any building, structure, facility or installation from which there is or may be a discharge of pollutants, the construction of which commenced after the publication of proposed Categorical Pretreatment Standards under Section 307(c) of the Federal Act which will be applicable to such source if such standards are thereafter promulgated, provided that:

(a) no other source is located at that site,

(b) the source replaces the process or production equipment that causes the discharge of pollutants at an Existing Source, or

(c) the wastewater generating processes of the source are substantially independent of an Existing Source at that site. In determining whether these are substantially independent, factors, such as the extent to which the new facility is integrated with the Existing Source, and the extent to which the new facility is engaged in the same general type of activity as the Existing Source, should be considered.

(2) Construction on a site at which an Existing Source is located results in a modification rather than a new source if the construction does not create a new building, structure, facility, or installation meeting the criteria of paragraphs (1)(b) and (1)(c) of this definition but otherwise alters, replaces, or adds to existing process or production equipment.

(3) Construction or operation of a new source as defined under this definition has commenced if the owner or operator has:

(a) begun, or caused to begin, as part of a continuous on-site construction program:

(i) any placement, assembly, or installation of facilities or equipment; or

(ii) significant site preparation work including, without limitation, clearing, excavation, or removal of existing buildings, structures, or facilities which is

necessary for the placement, assembly, or installation of new source facilities or equipment; or

(b) entered into a binding contractual obligation for the purchase of facilities or equipment that are intended to be used in its operation within a reasonable time, but not including options to purchase or contracts that can be terminated or modified without substantial loss and contracts for feasibility, engineering, and design studies.

- <u>Non-contact Cooling Water</u> shall mean water used for cooling that does not come into direct contact with any raw material, intermediate product, waste product, or finished product.

- <u>Pass Through</u> shall mean a discharge that exits at any point from the Wastewater Treatment Plants into waters of the State of Georgia containing quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, are a cause of a violation of any requirement of Dalton Utilities' LAS permit including an increase in the magnitude or duration of a violation.

- <u>Person</u> shall mean any individual, partnership, co-partnership, firm, company, corporation, association, joint stock company, trust, estate, governmental entity, or any other legal entity; or their legal representatives, agent, or assigns. This definition includes all Federal, State, and local governmental entities.

- <u>pH</u> shall mean a measure of the acidity or alkalinity of a solution, expressed in standard units.

- <u>Pollutant</u> shall mean dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, Medical Wastes, chemical wastes, biological materials, radioactive materials, heat, wrecked or discharged equipment, rock, sand, dirt, municipal, agricultural and industrial wastes, and certain characteristics of wastewater (e.g., pH, temperature, suspended solids, turbidity, color, toxicity, or odor).

- <u>Pretreatment</u> shall mean the reduction of the amount of Pollutants, the elimination of Pollutants, or the alteration of the nature of Pollutant properties in wastewater to a less harmful state prior to, or in lieu of, introducing such Pollutants into the POTW. The reduction or alteration may be obtained by physical, chemical, or biological processes, by process changes, or by other means, except by diluting the concentration of the Pollutants unless allowed by an applicable pretreatment standard or requirement.

- <u>Pretreatment Permit</u> shall mean any permit issued by Dalton Utilities to regulate the discharge of pollutants from any Industrial User into the POTW.

- <u>Pretreatment Permit Application</u> shall mean an application filed by any person with Dalton Utilities for a pretreatment permit.

- <u>Pretreatment Requirements</u> shall mean any substantive or procedural requirements related to Pretreatment imposed on an Industrial User, other than a Pretreatment Standard.

- <u>Pretreatment Standard or Standards</u> shall mean prohibited discharge standards, Categorical Pretreatment Standards, and local limits.

- <u>Prohibited Discharge Standards or Prohibited Discharges</u> shall mean absolute prohibitions against the discharge of certain substances that appear in Section 2.4 of this SURR.

- <u>Public Sewer</u> shall mean a sewer owned and operated by Dalton Utilities or other public agency that is a tributary to the treatment plant.

- <u>Publicly Owned Treatment Works (POTW)</u> shall mean any device and system owned or operated by Dalton Utilities used in the collection, conveyance, storage, treatment, recycling, and reclamation of sewage, Wastewater, Industrial Wastewater, other waste or Pollutants.  POTW shall include the mechanized activated sludge plants, any sewers, intercepting sewers, clarifiers, outfall sewers, sewage collection systems, individual systems, pumping, power, and other equipment and their appurtenances and any extensions, improvements, remodeling, additions, or alterations thereof; any elements essential to provide a reliable recycled supply, such as standby treatment units and clear well facilities; any works, including land used as an integral part of the treatment process or for the ultimate disposal of residue resulting from such treatment; and any other method or system used for preventing, abating, reducing, storing, treating, separating, or disposing of sewage, Wastewater, Industrial Wastewater, other waste, or Pollutants, including wastewater in combined sewer water and sanitary sewer systems.  For the purposes of these SURR, the term POTW shall also include any sewers that convey wastewaters to the POTW from Persons outside the City of Dalton who are, by contract or agreement with Dalton Utilities, users of Dalton Utilities' POTW.

- <u>Resource Conservation and Recovery Act (RCRA)</u> shall mean the Federal law passed in 1976 giving the EPA the authority to control hazardous waste from "cradle-to-grave".

This includes the generation, transportation, treatment, storage, and disposal of hazardous waste.

- <u>Septic Tank</u> shall mean a tank in which anaerobic bacteria disintegrate(s) the solid matter of continuously flowing sewage.

- <u>Septic Tank Waste</u> shall mean any sewage from holding tanks such as vessels, chemical toilets, campers, trailers, and septic tanks.

- <u>Sewage or Domestic Wastewater</u> shall mean water-carried human wastes and gray water (household showers, dishwashing operations, etc.).

- <u>Sewerage System</u> shall mean the sewer system owned and operated by Dalton Utilities which consists of three POTWs that discharge into the Loopers Bend Land Application System.

- <u>Significant Industrial User</u> shall mean:

  (1) Industrial Users subject to Categorical Pretreatment Standards under 40 CFR 403.6 and 40 CFR chapter I, subchapter N, or

  (2) any other Industrial User that:

      (a) discharges an average of 25,000 gpd or more of Industrial Process Wastewater into the POTW (excluding sanitary, noncontact cooling, and boiler blowdown wastewater).

      (b) contributes a process wastestream which makes up five percent (5%) or more of the average dry weather hydraulic or organic capacity of the POTW or,

      (c) is designated as significant by Dalton Utilities on the basis that the Industrial User has a reasonable potential for violating any Pretreatment Standard or Requirement or otherwise adversely affecting the operation of the POTW, in accordance with 40 CFR Section 403.8(f)(6) or Ga. Comp. R. & Regs. r. 391-3-6-.10, as hereby incorporated.

      (d) See also Section 3.3 for Special Agreements.  Upon a finding that an Industrial User has no reasonable potential for violating any Pretreatment Standard or Requirement or otherwise adversely affecting the operation of the POTW, Dalton Utilities may determine that such Industrial User is not a Significant Industrial User in accordance with 40 CFR Section 403.8(f)(6) or Ga. Comp. R. & Regs. r. 391-3-6-.09, as hereby incorporated.

(3)  Non-Significant Exemptions apply to Industrial Users meeting the criteria in (1) above when Dalton Utilities determines that the Industrial User never discharges more than one-hundred (100) gallons per day of total categorical wastewater (excluding sanitary, non-contact cooling, and boiler blowdown wastewater, unless specifically included in the pretreatment standard) and the following conditions are met:

- <u>SIU</u> shall mean Significant Industrial User.

- <u>Sludge</u> shall mean any solid, residue, and precipitate separated from or created by the unit processes of the treatment plant.

- <u>Slug Discharge Control Plan</u> shall mean a formal document used to prevent, control, mitigate, and manage slug loads to the wastewater collection system.  Plans must also include procedures for notifying the POTW in the event of an unintentional discharge.

- <u>Slug Load</u> shall mean any discharge at a flow rate or concentration that could cause a violation of the general or specific discharge prohibitions in Section 2.4 of these SURR.

- <u>Standard Industrial Classification (SIC) Code</u> shall mean classification pursuant to the Standard Industrial Classification Manual issued by the United States Office of Management and Budget.

- <u>State Act</u> shall mean the Georgia Water Quality Control Act, O.C.G.A. § 12-5-20 *et seq*., and the regulations promulgated pursuant to that act.

- <u>Storm Water</u> shall mean any flow occurring during or following any form of natural precipitation, and resulting from such precipitation, including snowmelt.

- <u>Suspended Solids (TSS)</u> shall mean the total suspended matter that floats on the surface of, or is suspended in, water, wastewater, or other liquid, and which is removable by laboratory filtering.

- <u>Upset</u> shall mean an exceptional incident in which there is unintentional and temporary noncompliance with applicable Categorical Pretreatment Standards because of factors beyond the reasonable control of the Industrial User.  An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

- <u>User</u> shall mean any Person who causes or permits the discharge of wastewater into the POTW, including Persons who contribute such wastewater from mobile sources.

- <u>Wastewater</u> shall mean liquid and water-carried industrial wastes, Pollutants, Sewage and Septic Tank Wastes from residential dwellings, commercial building, industrial and manufacturing facilities, and institutions, whether treated or untreated, which are contributed to the POTW.

- <u>Wastewater Discharge Permit</u> shall mean the document or documents issued to an Industrial User by Dalton Utilities in accordance with the terms of these SURR.

- <u>Wastewater Hauler or Waste Hauler</u> shall mean any Person, partnership, unit of government, or corporation engaged in transporting Wastewater as a commercial venture or as a public service.

- <u>Wastewater Treatment Plant(s) or Treatment Plant(s)</u> shall mean those portions of the POTW that are designed to provide treatment of municipal Sewage and industrial waste.

## 1.5 **Authority to Collect Fees and Surcharges**

Dalton Utilities has the authority to collect fees and surcharges necessary to implement these SURR. Dalton Utilities shall publish a complete list of all fees and surcharges required under the terms of these SURR as well as the numeric limits at which surcharging will begin when both fees and limits are established. This list shall be available for review or copying at Dalton Utilities upon request. As updated from time to time and as necessary, the list will be mailed to all Industrial Users.

## SECTION 2 – GENERAL SEWER USE REQUIREMENTS

### 2.1 **Use of Public Sewers**

2.1.1 <u>Unsanitary, Offensive Deposits on Property</u>. It shall be unlawful for any person to place, deposit, or permit to be deposited any human excrement, garbage, or other noxious waste on public or private property within the City of Dalton in such a manner as determined to be a public nuisance, or in any area under the jurisdiction of said City, in violation of these SURR.

2.1.2 <u>Private Disposal Prohibited Unless Expressly Permitted</u>. Except as hereinafter provided, it shall be unlawful to construct or maintain any privy, privy vault, septic tank, cesspool, or other facility intended or used for the disposal of sewage.

2.1.3 <u>Sewer Connection Required If Available</u>. Dalton Utilities shall require the owners of all houses, buildings, or properties used for human occupancy, employment,

recreation, or other purposes, situated within the City and abutting on any street, alley or right-of-way in which there is now located, or may in the future be located, a public sanitary sewer of Dalton Utilities, to install at their expense suitable toilet facilities therein and to connect such facilities directly with the proper public sewer within ninety (90) days from notice to do so, provided that said public sewer is within one hundred (100) feet of the property line.

2.1.4   <u>Residential Dischargers</u>.  Dalton Utilities may at its discretion require residential dischargers to obtain a sewer connection in accordance with Section 2.3 of these SURR.

2.1.5   <u>Sewer Service to Adjacent, Unincorporated Areas</u>.  Any User of the POTW who is located in an unincorporated area adjacent to the City will be subject to the provisions and requirements of these SURR.

**2.2   <u>Private Sewage Disposal</u>**

2.2.1   <u>Applications, Approval</u>.  When a public sanitary sewer is not available in accordance with these SURR, building sewers shall be connected to private onsite sewage management systems subject to the Health Department's approval.

    2.2.1.1   Approval to install and operate private sewage lift stations that discharge sewage from private property into the POTW must be obtained from Dalton Utilities.  Final approval shall be granted only after Dalton Utilities reviews and approves the plans and specifications.  The owner shall operate and maintain the private sewage lift station at no expense to Dalton Utilities and according to established standards of a Private Pump Agreement.  Dalton Utilities shall have the right to inspect at reasonable times with prior notice the private sewage lift stations and require improvements necessary to satisfy the requirements set forth in these SURR.

2.2.2   <u>Requirement of other Authorities</u>.  No requirement contained in these SURR shall be construed to relieve the applicant of any additional requirements that may be imposed by other authorities having legal jurisdiction.

2.2.3   <u>Sewer Availability</u>.  At such time as public sewer becomes available to property served by a private sewage disposal system, a direct connection shall be made to the public sewer in compliance with the regulations, and any septic tank, cesspools, and similar private sewage disposal facilities shall be cleaned of sludge, and filled with clean bank-run gravel or dirt and abandoned as a sewage treatment or disposal system.

## 2.3   <u>Building Sewers and Connections</u>

2.3.1   <u>Approval Required</u>.  Except as otherwise provided in Section 2.1.4 of these SURR regarding residential sewer connections, no person shall uncover, make any connections with, use, alter, or disturb any public sewer, or appurtenances thereto, without first obtaining written approval from Dalton Utilities.  No connection shall be made except at a "Y" or connection point approved by Dalton Utilities; if no connection is available, then one may be provided by Dalton Utilities after payment of the full construction cost by the applicant.

2.3.2   <u>Classes of Connection</u>.   There shall be three (3) classes of building sewer connections: (1) residential service, (2) commercial service, and (3) industrial service to establishments producing industrial wastes.  The connection application shall be supplemented by any plans, specifications, or other information required by Dalton Utilities, and shall be accompanied by the connection fees required by Dalton Utilities.

2.3.3   <u>Responsibility for Costs</u>.  All costs and expenses incident to the installation and connection of the building sewer shall be borne by the owner.  The owner shall indemnify Dalton Utilities for any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.

2.3.4   <u>Multiple Connections Through One Building Sewer</u>.  A separate and independent building sewer shall be provided for every building, unless one building stands at the rear of another, or in an interior lot, and no private sewer is available or can be constructed to the rear building through an adjoining alley, court, yard, or driveway.  In such a case, the building sewer from the front building may be extended to the rear building and the whole considered as one building sewer.

2.3.5    <u>Use of Old Building Sewers</u>.  Old building sewers may be used in connection with new buildings only when they are found, upon examination and after independent testing approved by Dalton Utilities, to meet all requirements of this Ordinance. Testing will be performed by a qualified independent firm.  The proposed user will pay the testing charges.

2.3.6    <u>Compliance With Other Regulations; Joints to Be Tight</u>.  The size, slope, alignment, materials of construction, and methods used in excavating and placing the pipe, jointing, testing, and backfilling the trench for building sewers, shall all conform to the building code, plumbing code, and all other applicable requirements of Dalton Utilities.  In cases of conflict or in the absence of guiding provisions, materials, and procedures set forth in A.S.T.M. and Water Pollution Control Federation Manual of Practice No. 9 shall govern.  All joints of the building sewer shall be tight and waterproof.

2.3.7    <u>Elevation; Artificial Lifting</u>.  Whenever possible, the building sewer shall be brought to the building at an elevation below the basement floor.  In all buildings in which any building drain is too low to permit gravity flow to the public sewer, sanitary sewage carried by such building drain shall be lifted by a means approved by Dalton Utilities in writing, and discharged to the building sewer.

2.3.8    <u>Connecting Unpolluted Wastes</u>.  No person shall make any connection of roof downspouts, exterior foundation drains, areaway drains, or other sources of surface runoff, groundwater, roof runoff, subsurface drainage, uncontaminated cooling water, or unpolluted industrial process waters to a building sewer or building drain which is connected, directly or indirectly, to a public sanitary sewer.

2.3.9    <u>Connection of Building Sewer to Public Sewer</u>.  The connection of a building sewer into the public sewer shall conform to the requirements of the building and plumbing codes and other applicable rules and regulations of Dalton Utilities, or in amplifications of the A.S.T.M. and Water Pollution Control Federation Manual of Practice No. 9.  All such connections shall be made airtight and watertight. Deviation from the prescribed procedures and materials must be approved by Dalton Utilities in writing before installation.  A clean out shall be installed at the owner's property line.

2.3.10    <u>Notice, Inspection, Supervision of Building Sewer Construction</u>.  The applicant for the building sewer connection shall notify Dalton Utilities when the building sewer

is ready for inspection and connection to the public sewer.  The connection shall be made under the supervision of Dalton Utilities.

2.3.11   <u>Protection of Excavations; Restoration of Public Property</u>.  All excavations for building sewer installation shall be adequately guarded with barricades and lights to protect the public from hazard.  Streets, sidewalks, parkways, and other public property disturbed in the course of the work shall be restored in a manner satisfactory to Dalton Utilities.   Construction shall comply with applicable provision of PL 91-596, the Occupational Safety and Health Act of 1970.  Prior to excavation, blockage, disruption, or any disturbance of any public street, road highway, byway, sidewalk or other public right-of-way, notification must be made to and approval obtained by appropriate officials at least seventy-two (72) hours in advance of such excavation, blockage, disruption or disturbance.

## 2.4    **Prohibited Discharge Standards**

2.4.1   <u>General Prohibitions</u>.  No User shall contribute or cause to be contributed directly or indirectly into the POTW any Pollutant or Wastewater that causes Pass Through or Interference.  These general prohibitions and the specific prohibitions in paragraph 2.4.2 below apply to all Users of the POTW whether they are subject to Categorical Pretreatment Standards or any other Federal, state, or local Pretreatment Standards or Requirements.

2.4.2   <u>Specific Prohibitions</u>.  No User shall discharge or permit the discharge or infiltration into the POTW of any of the following:

2.4.2.1   Pollutants that create a fire or explosion hazard in the POTW, including, but not limited to, waste streams with a closed-cup flashpoint of less than $150°F$ $(65°C)$ using the test methods specified in 40 CFR Part 261.21 as hereby incorporated

2.4.2.2   Wastewater having a property capable of causing hazard, damage, or any other condition deleterious to structures, equipment, personnel, treatment processes or operation of the POTW.   No Industrial User shall discharge Wastewater to the POTW that falls below 6 or above 9 standard units pH;

2.4.2.3   Solid or viscous substances or substances that will become solid or viscous within the treatment system in amounts that will cause obstruction of the flow in the POTW resulting in Interference;

2.4.2.4   Pollutants, including oxygen-demanding Pollutants (BOD, etc.), released

in a discharge at a flow rate and/or Pollutant concentration which either singly or by interaction with other Pollutants will cause Interference with the POTW;

2.4.2.5    Wastewater  in excess of 150°F, as measured at the User's point of discharge, or 104°F, as measured at the inlet to the treatment plant, unless alternate temperature limits have been approved.

2.4.2.6    Petroleum oil, non-biodegradable cutting oil, or product of mineral oil origin, in amounts that will cause Interference or Pass Through;

2.4.2.7    Pollutants that result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause health and safety problems;

2.4.2.8    Trucked or hauled pollutants, except at discharge points designated by Dalton Utilities in accordance with Section 3.4 of these SURR;

2.4.2.9    Wastewater containing any radioactive wastes or isotopes except in compliance with applicable State or Federal regulations;

2.4.2.10   Storm Water, surface water, ground water, artesian well water, roof runoff, subsurface drainage, swimming pool drainage, condensate, deionized water, non contact cooling water, and unpolluted wastewater, unless specifically authorized by Dalton Utilities;

2.4.2.11   Sludges, screenings, or other residues from the Pretreatment of industrial wastes or from the treatment or Pretreatment of municipal wastes;

Pollutants, substances, or Wastewater prohibited by this section shall not be processed or stored in such a manner that they could be discharged to the POTW.

## 2.5    National Categorical Pretreatment Standards

The Categorical Pretreatment Standards found at 40 CFR Chapter I, Subchapter N, Parts 405-471, as amended from time to time, are hereby incorporated.

## 2.6    State Pretreatment Standards

Industrial Users are required to comply with any applicable State Pretreatment Standards and Requirements adopted by the State, as amended from time to time.

## 2.7    Local Limits

2.7.1    Pollutant limits will be established for each SIU in an Industrial User Discharge Permit to protect the POTW against Pass Through and Interference.  The local limits

established for each Industrial User Discharge Permit will be based on, among other things, an allocation to that SIU of a portion of the maximum allowable industrial loading (MAIL) to the POTW. The MAIL will be established based on the maximum allowable headworks loading (MAHL) minus the uncontrollable loadings to the POTW, a safety factor, and a growth allowance. No user shall discharge Wastewater containing pollutants in excess of the limits established in the Industrial User Discharge Permit.

2.7.2   All Pretreatment permits issued by Dalton Utilities under these SURR shall specify Individual User discharge limits. The User discharge limits may be mass-based or concentration based limitations depending on the ability of the User to provide detailed flow and analytical information about their discharge.

2.7.3   Permits issued to Significant Industrial Users will be required to comply with existing Categorical Pretreatment Standards including but not limited to those set forth at 40 CFR Part 403 (General Pretreatment Regulations for Existing and New Sources of Pollution) and any other categorical standards applicable for a particular industrial category.

In addition to the above limitations, Dalton Utilities reserves the right to establish, by ordinance or in permits, any limitations or requirements on discharges to the POTW deemed necessary to comply with the objectives presented in Section 1 of these SURR or the general and specific prohibitions in Section 2.4 of these SURR.

## 2.8   **Dilution**

Except where expressly authorized to do so by an applicable Pretreatment Standard, Permit, or Requirement, no User shall increase the use of process water, or in any way attempt to dilute a discharge, as a partial or complete substitute for adequate treatment to achieve compliance with a discharge limitation. Dalton Utilities may impose mass limitations on Users who are using dilution to meet applicable Pretreatment Standards or requirements or in other cases when the imposition of mass limitations is appropriate.

## 2.9   **Removal Credits**

Notwithstanding any other provision of these SURR, Dalton Utilities shall have the authority to grant removal credits pursuant to 40 CFR Part 403.7 as hereby incorporated, upon approval by the Approval Authority.

**SECTION 3 – PRETREATMENT OF WASTEWATER**

**3.1    Pretreatment Facilities**

Users shall provide wastewater treatment as necessary to comply with these SURR and shall achieve compliance with all Categorical Pretreatment Standards, local limits, and the prohibitions set out in Section 2.4 of this SURR within the time limitations specified by EPA, the State, or Dalton Utilities, whichever is more stringent.  Any facilities necessary for compliance shall be provided, operated, and maintained at the User's expense.  Upon request by Dalton Utilities, detailed plans describing such facilities and operating procedures shall be submitted to Dalton Utilities for review, and shall be deemed acceptable to Dalton Utilities before such facilities are constructed.  The review of such plans and operating procedures shall in no way relieve the User from the responsibility of modifying such facilities as necessary to produce a discharge acceptable to Dalton Utilities under the provisions of these SURR.

**3.2    Designation of Separate Sources of Constituents**

3.2.1    Firm with multiple buildings.  Where a business or industrial firm is operating as an integrated manufacturing complex, involving more than one building and having separate sewer connections within the same contributory area, such firm may be considered as one unit with multiple sewers.

3.2.2    A block and lot with multiple buildings.  Where a parcel of real property consisting of one block and lot is occupied by multiple buildings having tenants with unrelated manufacturing processes, each building shall be considered a separate source of constituents.

3.2.3    Multi-tenant industrial buildings.  Where a parcel of real property consisting of one block and lot, or lots, is occupied by a multi-tenanted industrial building connected to the POTW by one or more sewers and the tenants in said building discharge Wastewater into the drainage system, each tenant shall be considered a separate source of constituents and the constituent concentration shall be determined at sampling locations selected by Dalton Utilities for each source.

3.2.4    Industrial park or industrial building complex.  Where a parcel of real property consists of more than one block and lot, and one or more buildings on said parcel occupy a single block, each such building or buildings may be considered a block

and lot with multiple buildings and the constituent concentration discharged from said building or buildings to the POTW shall be determined as prescribed under subsection (B) of this section.

3.2.5    <u>Tenant activities</u>.   Any tenant of such real property as described in subsections (3.2.1), (3.2.2), (3.2.3), and (3.2.4) of this section shall comply with all of the rules and regulations.

## 3.3    <u>Special Agreements</u>

3.3.1    Nothing contained in these SURR shall be construed as preventing any special agreement between Dalton Utilities and any User of the POTW whereby a Wastewater of unusual strength or character may be accepted into the POTW subject to agreement between the two (2) parties.

3.3.2    In no case (except for the formal grant of removal credits) will special agreements waive compliance with any Pretreatment Standard.

3.3.3    Grease, oil, and sand interceptors shall be provided when, in the opinion of Dalton Utilities, they are necessary for the proper handling of Wastewater containing excessive amounts of grease and oil, or sand; except that such interceptors shall not be required for residential Users. Interception units shall be of type and capacity approved by Dalton Utilities and shall be so located to be easily accessible for cleaning and inspection.  Such interceptors shall be inspected regularly and cleaned, as needed, by the User at their expense.

3.3.4    Users with the potential to discharge flammable substances may be required to install and maintain an approved combustible gas detection meter.

## 3.4    <u>Hauled Wastewater Disposal</u>

3.4.1    Nothing contained in these SURR shall be construed as preventing any special agreement between Dalton Utilities and any User of the POTW whereby a Wastewater of unusual strength or character may be accepted into the POTW subject to agreement between the two (2) parties.

3.4.2    Dalton Utilities may require generators of hauled wastewater to obtain Wastewater Discharge Permits or Wastewater Hauler Discharge Permits.  Dalton Utilities also may prohibit the disposal of hauled waste that does not meet the requirements of these SURR.

**SECTION 4 – DISCHARGE PERMITS**

**4.1     Wastewater Discharge Permit Requirement**

4.1.1     No Significant Industrial User shall discharge Wastewater into the POTW without first obtaining a Wastewater Discharge Permit from Dalton Utilities, except that any Significant Industrial User who was discharging Wastewater into the POTW prior to the effective date of this SURR that has filed a timely application pursuant to Section 4.5 of these SURR may continue to discharge until the permit has been issued by Dalton Utilities.

4.1.2     Dalton Utilities may require other Industrial Users to obtain Wastewater Discharge Permits necessary to carry out the purposes of these SURR.

4.1.3     Any violation of the terms and conditions of a Wastewater Discharge Permit shall be deemed a violation of these SURR and subject the Wastewater Discharge permittee to the enforcement provisions set forth in Section 6 of these SURR.  Obtaining a Wastewater Discharge Permit does not relieve a permittee of its obligations to comply with all Federal and State Pretreatment Standards or Requirements or with any other requirements of Federal, State, and local law and regulation.

4.1.4     Dalton Utilities may deny or condition new or increased contributions of Pollutants, or changes in the nature of Pollutants, to the POTW by Industrial Users where such contributions do not meet applicable Pretreatment Standards and Requirements or where such contributions may cause a violation of the policy goals set forth in Section 1.1 of these SURR.

**4.2     Wastewater Analysis**

Upon reason to suspect elevated levels of Pollutants in an Industrial User's discharge, Dalton Utilities may request that an Industrial User, at its own expense, submit information on the nature and characteristics of its Wastewater within thirty (30) days of Dalton Utilities' request.

**4.3     Wastewater Discharge Permitting:  Existing Connection**

Any User required to obtain a Wastewater Discharge Permit who was discharging Wastewater into the POTW prior to the effective date of these SURR and who wishes to continue such discharges in the future, shall apply to Dalton Utilities for a Wastewater Discharge Permit in accordance with Section 4.5 of these SURR and any applicable schedule prepared by Dalton Utilities, and shall not cause or allow discharges to the POTW to

continue after one hundred and eighty (180) days of the effective date of this ordinance except as provided in Section 4.1.

**4.4** **Wastewater Discharge Permitting:  New Connections**

Any User required to obtain a Wastewater Discharge Permit who proposes to begin or commence discharging into the POTW must obtain such permit prior to the beginning or recommencing of such discharge.  An application for an Industrial Wastewater Discharge Permit, in accordance with Section 4.5 of these SURR, must be filed at least ninety (90) days prior to the date upon which any discharge will begin or recommence.

**4.5** **Discharge Permit Application**

4.5.1    Industrial Users seeking a Wastewater Discharge Permit shall complete and file with Dalton Utilities an application in the form prescribed by Dalton Utilities, and accompanied by any applicable fees established by Dalton Utilities.  The applicant shall be required to submit, where applicable, in units and terms appropriate for evaluation, information including, but not limited to, the following:

4.5.1.1    Name, address and telephone number of an authorized representative of the applicant;

4.5.1.2    Volume of Wastewater to be discharged;

4.5.1.3    List of all industrial wastewaters produced or, if operations have not yet begun, anticipated to be produced at the premises, including the daily volume, maximum rate of discharge, and Wastewater constituents and characteristics, as determined by a representative analysis;

4.5.1.4    Time and duration of discharge;

4.5.1.5    Average and hourly peak Wastewater flow rates, including daily, monthly and seasonal variations, if any, for the total plant Wastewater discharge;

4.5.1.6    Conceptual site and plumbing plans;

4.5.1.7    A general description of activities, facilities and plant processes on the premises, including all Industrial Wastewaters that are or could be discharged into the POTW;

4.5.1.8    Each product produced by type;

4.5.1.9    Number of employees;

4.5.1.10    Line diagram and basic information, including capacity, of existing or proposed spill containment areas and installation;

4.5.1.11  Copies of the most recent Tier One or Tier Two form submitted by the User, if any, to the State pursuant to Section 312 of the Emergency Planning and Community Right to Know Act. Users shall maintain copies of the most recent material safety data sheets for those chemicals that are included in those forms so that they may be available for review and inspection by Dalton Utilities;

4.5.1.12  List of raw materials that are used in the manufacturing process, and that are or could be discharged into the POTW;

4.5.1.13  The SIC number(s) of the applicant's facility according to the <u>Standard Industrial Classification Manual</u>;

4.5.1.14  Applicable Categorical Standards and Requirements, if any;

4.5.1.15  If additional Industrial User operation and maintenance or Pretreatment techniques or installations will be required to meet the applicable Pretreatment Standards, the shortest schedule by which the User will provide such additional Pretreatment. The completion date in this schedule shall not be later than the compliance date established for the applicable Pretreatment Standard. The schedule shall provide for the submission of progress reports to Dalton Utilities;

4.5.1.16  A signature and certification in accordance with Section 5.10 of these SURR and 40 CFR 403.12 (k);

4.5.1.17  Any other relevant information deemed by Dalton Utilities to be necessary to evaluate the permit application;

4.5.1.18  For Industrial Users subject to national pretreatment standards for categorical discharges, the application for a permit shall contain information for a baseline monitoring report as required by 40 CFR 403.12 (b)(1)-(7);

4.5.1.19  Within thirty (30) days of the submittal of an application, Dalton Utilities will evaluate the data furnished by the Industrial User and may require additional information. Within thirty (30) days of the receipt of a complete Wastewater Discharge Permit application, Dalton Utilities will determine whether to issue a Wastewater Discharge Permit. If Dalton Utilities determines to issue a Wastewater Discharge Permit, a draft Wastewater Discharge Permit will be issued within thirty (30) days of such

determination.  A thirty (30) day comment period shall be allowed for Users and thereafter Dalton Utilities shall issue a Wastewater Discharge Permit, if all of the terms and conditions herein are complied with.

**4.6**    <u>**Permit Terms and Conditions**</u>

4.6.1    A Wastewater Discharge Permit must contain:

4.6.1.1    A statement that indicates Wastewater Discharge Permit duration, which in no event shall exceed five (5) years;

4.6.1.2    A statement that the Wastewater Discharge Permit is transferable only upon the authorization of Dalton Utilities;

4.6.1.3    Discharge limits based on applicable Pretreatment Standards and any other limits Dalton Utilities deems necessary to prevent Pass Through and Interference;

4.6.1.4    Self-monitoring, sampling, reporting, notification, and record-keeping requirements as set forth in GA DNR Rule 391-3-6-.09(8)(b).  These requirements shall include, among other things, an identification of Pollutants to be monitored, sampling location, sampling frequency, and sample type based on Federal, State, and local law.  These reports shall be based on sampling and analysis performed in the period covered by the report, and performed in accordance with the procedures prescribed in Section 5.9 of these SURR;

4.6.1.5    A statement of applicable civil and criminal penalties for violation of Pretreatment Standards and Requirements and any applicable compliance schedule.  Such schedule may not extend the time for compliance beyond that required by applicable Federal, State, and local law;

4.6.1.6    A statement that, if required, the Permittee shall maintain a Slug Discharge Control Plan in accordance with Section 5.4 of these SURR; and

4.6.1.7    A statement that the Permittee must notify Dalton Utilities of any change in the raw materials or chemicals information listed on the Permittee's permit application under Sections 4.5.1.11 and 4.5.1.12 of these SURR.

4.6.2    A Wastewater Discharge Permit may contain, but need not be limited to, the

following conditions:

4.6.2.1    Limits on the average and/or maximum rate of discharge, time of discharge, and/or requirements for flow regulation and equalization;

4.6.2.2    Requirements for the installation of Pretreatment technology, pollution control, or construction of appropriate containment devices, designed to reduce, eliminate, or prevent the introduction of Pollutants into the POTW;

4.6.2.3    Requirements for the development and implementation of spill control plans or other special conditions, including management practices necessary to adequately prevent accidental, unanticipated, or non-routine discharges;

4.6.2.4    Development and implementation of waste minimization plans to reduce the amount of Pollutants discharged to the POTW;

4.6.2.5    The unit charges or schedule of User charges and fees for the management of the Wastewater discharged to the POTW;

4.6.2.6    Requirements for installation and maintenance of inspection and sampling facilities and equipment;

4.6.2.7    A statement that compliance with the Wastewater Discharge Permit does not relieve the permittee of responsibility for compliance with all applicable Federal and State Pretreatment Standards, including those which become effective during the term of the Wastewater Discharge Permit; and

4.6.2.8    Other Conditions as deemed appropriate by Dalton Utilities to ensure compliance with these SURR and Federal, State, and local laws and regulations.

4.6.3    <u>Permit Duration</u>.  Wastewater Discharge Permits shall be issued for a specified time period, not to exceed five (5) years.  A permit may be issued for a period less than a year or may be stated to expire on a specified date.

**4.7    Notice of Issuance of Wastewater Discharge Permit**

Dalton Utilities shall provide public notice of the issuance of a wastewater discharge permit.  Any person, including the User, may petition Dalton Utilities to reconsider the terms of a wastewater discharge permit within thirty (30) days of notice of its issuance in accordance with the provisions set forth in Section 4.15 of these SURR.

**4.8    Modification of Terms and Conditions**

Dalton Utilities may modify a Wastewater Discharge Permit for good cause, including, but not limited to, the following reasons:

4.8.1    To incorporate any new or revised Federal, State, or local Pretreatment Standards or Requirements, including any such standard established in a Federal or State permit;

4.8.2    To address alterations or additions to the User's operation, processes, or Wastewater volume or character since the time of Wastewater Discharge Permit issuance;

4.8.3    A change in the POTW that requires either a temporary or permanent reduction or elimination of the authorized Discharge;

4.8.4    Information indicating that the permitted Discharge poses a threat to the POTW, Dalton Utilities personnel, or the receiving waters;

4.8.5    Violation of any terms or conditions of the Wastewater Discharge Permit;

4.8.6    Misrepresentations or failure to fully disclose all relevant facts in the Wastewater Discharge Permit application or in any required reporting;

4.8.7    Revision of or a grant of variance from Categorical Pretreatment Standards pursuant to 40 CFR Part 403.13;

4.8.8    To correct typographical or other errors in the Wastewater Discharge Permit; or

4.8.9    To reflect a transfer of the facility ownership or operation to a new owner or operator;  or

4.8.10   Revision of or a grant of a removal credit pursuant to 40 CFR Section 403.7 as hereby incorporated.

Whenever possible, permittees shall be informed of any proposed changes in permits at least ninety (90) days prior to the effective date of the change.  Permittees shall be allowed a comment period relating to any of the proposed changes in the permit.  This comment period shall be the first forty-five (45) days of the ninety (90) day period prior to the effective date of the change.  Any changes or new conditions in the permit shall include a reasonable time schedule for compliance.

**4.9    Wastewater Discharge Permit Transfer**

Wastewater Discharge Permits may be transferred to a new owner or operator only if the permittee gives at least thirty (30) days advance notice to Dalton Utilities, unless a shorter period of notice is approved on a case-by-case basis, and Dalton Utilities approves the Wastewater Discharge Permit transfer.  The notice to Dalton Utilities must include a written certification by the new owner or operator which:

4.9.2    States that the new owner and/or operator has no immediate intent to change the facility's operations and processes in such a manner as to result in a change to the discharge or with the User's compliance with the Permit;

4.9.3    Identifies the specific date on which the transfer is to occur; and

4.9.4    Acknowledges full responsibility for complying with the existing Wastewater Discharge Permit.

Failure to provide advance notice of a transfer renders the Wastewater Discharge Permit void as of the date of facility transfer until reinstated by Dalton Utilities.

**4.10    Revocation**

4.10.2    Dalton Utilities may revoke a Wastewater Discharge Permit for good cause.  Good cause includes, but is not limited to, the following reasons:

4.10.2.1    Failure to provide prior notification to Dalton Utilities of changed conditions pursuant to Section 5.6 of these SURR:

4.10.2.2    Misrepresentation or failure to fully disclose all relevant facts in the Wastewater Discharge Permit application;

4.10.2.3    Falsifying self-monitoring reports;

4.10.2.4    Tampering with monitoring equipment;

4.10.2.5    Refusing to allow Dalton Utilities timely access to the facility premises and records;

4.10.2.6    Failure to meet compliance schedules;

4.10.2.7    Failure to complete a Wastewater survey or the Wastewater Discharge Permit application;

4.10.2.8    Failure to provide advance notice of the transfer of business ownership of a permitted facility;

4.10.2.9    Failure to meet effluent limitations;

4.10.2.10    Failure to pay noncompliance fees;

4.10.2.11    Failure to pay sewer charges; or

4.10.2.12 Violating any provision of these SURR, any order or Wastewater Discharge Permit issued under these SURR, or any other Pretreatment Standard or Requirement.

4.10.3  Wastewater Discharge Permits shall be voidable upon cessation of operation.  All prior Wastewater Discharge Permits issued to a particular User are void upon the issuance of a new Wastewater Discharge Permit to that User.

4.10.4  Dalton Utilities shall not revoke a Discharge Permit, without first delivering to the permittee written notice of such proposed revocation at least three (3) days prior to such revocation.  The notice shall state the reason or reasons for the revocation.

**4.11  Permitting Reclassified Industrial Users**

Any Industrial User that is reclassified as a Significant Industrial User and discharges industrial waste into the POTW after the effective date of these SURR, and who wishes to continue such discharges in the future, shall, within ninety (90) days after said date, apply to Dalton Utilities for a Wastewater Discharge Permit.  Such Significant Industrial User shall not cause or allow discharges to the system to continue after one hundred and eighty (180) days of the effective date of becoming reclassified as a Significant Industrial User, except in accordance with a permit issued by Dalton Utilities.

**4.12  Wastewater Discharge Permit Reissuance**

Any User with an expiring Wastewater Discharge Permit shall apply for Wastewater Discharge Permit reissuance by submitting a complete permit application, in accordance with Section 4.5 of these SURR, a minimum of ninety (90) days prior to the expiration of the User's existing Wastewater Discharge Permit.  If the User's existing Permit expires after a completed application for reissuance has been submitted to Dalton Utilities in accordance with this section, Dalton Utilities shall allow the User to continue to discharge under the existing Permit until a final decision is made on the User's application for reissuance.

**4.13  Municipal User Permits**

In the event another municipality (such as a city or county) contributes all or a portion of its Wastewater to the POTW, Dalton Utilities may require the municipality to enter into inter-municipal agreements for wastewater treatment.

4.13.2  A municipal User inter-municipal agreement shall include:

4.13.2.1  A description of the quality and volume of the municipality's Wastewater at the point it enters the POTW;

4.13.2.2 An inventory of all Industrial Users contributing to the municipality's Wastewater; and

4.13.2.3 Such other information as may be required by Dalton Utilities.

4.13.3 An inter-municipal agreement shall contain the following conditions:

4.13.3.1 A requirement for the municipal User to adopt both a sewer use ordinance and local limits that are at least as stringent as those described in these SURR;

4.13.3.2 A requirement for the municipal User to submit a revised Industrial User inventory on at least an annual basis;

4.13.3.3 Requirements that the municipal User comply with applicable State law in conducting Pretreatment implementation activities, including Industrial User permit issuance, inspection and sampling, and enforcement as needed;

4.13.3.4 A requirement for the municipal User to provide Dalton Utilities with access to all information that the municipal User obtains as part of its Pretreatment activities;

4.13.3.5 Limits on the nature, quality, and volume of the municipal User's Wastewater at the point where it enters the POTW;

4.13.3.6 Requirements for monitoring the municipal User's discharge; and

4.13.3.7 Such other terms and conditions as may be required by Dalton Utilities.

4.13.4 Violation of the terms and conditions of the inter-municipal agreement subjects the municipal User to the enforcement provisions set forth in Section 6 of these SURR and shall be cause for revocation of the agreement by Dalton Utilities.

## 4.14 **Waste Hauler Discharge Permit**

4.14.2 Wastewater Haulers shall discharge all septage and other permitted wastewaters at the designated Wastewater Hauler dumping stations established by Dalton Utilities.

4.14.3 Wastewater Haulers shall have a valid Wastewater Hauler Discharge Permit before discharging wastewaters into the POTW.

4.14.4 Each Wastewater Hauler vehicle shall be equipped to use the appropriate couplers at the Wastewater Hauler dumping station.

4.14.5 Wastewater from each load received at the POTW for treatment shall comply with Pretreatment Standards and Requirements as well as permit conditions. Dalton Utilities reserves the right to sample individual loads.

4.14.6   Each load delivered to the Wastewater Hauler dumping station must have a Wastewater Hauler manifest properly filled out and the manifest must be delivered to Dalton Utilities at the time of disposal.  Each manifest will be signed by the authorized representative of the Wastewater Hauler Company.

4.14.7   All procedures for discharging, for cleanliness, and for general sanitary operation on Dalton Utilities' property as prescribed by Dalton Utilities shall be strictly adhered to by all Wastewater Haulers delivering wastewaters to the POTW dumping stations.

4.14.8   The source or sources of all wastewaters being hauled to the POTW shall be properly documented.

4.14.9   In addition to the enforcement provisions in Section 6 of these SURR, failure of a Wastewater Hauler to comply with the provisions of this section shall be grounds for revocation of the Hauler's Discharge Permit by Dalton Utilities in accordance with Section 4.10 of these SURR.

**4.15**   **Appeals to Dalton Utilities**

4.15.1   Any Person subject to any provision of these SURR may petition Dalton Utilities to reconsider a decision concerning the issuance, modification, transfer, or revocation of a permit, within thirty (30) days of notice of its issuance, or to reconsider any other action by Dalton Utilities taken pursuant to these SURR, within thirty (30) days of notice of that action.

4.15.2   Failure to submit a timely petition for review shall be deemed to be a waiver of the administrative appeal.

4.15.3   In its petition, the appealing party must indicate the action or permit provisions objected to, the reasons for the objection, and the alternative action or condition, if any, it seeks to place in the permit.

4.15.4   The effectiveness of the action, permit or permit provision shall be stayed pending the appeal.

4.15.5   If Dalton Utilities fails to act within thirty (30) days, a request for reconsideration shall be deemed to be denied.  Decisions not to reconsider a permit or other action, not to issue a permit, or not to modify a permit shall be considered final administrative actions for purposes of judicial review.

4.15.6   Aggrieved parties seeking judicial review of a final administrative decision must do so by filing a complaint with the Superior Court of Whitfield County within sixty (60) days after issuance of that decision.

**SECTION 5 – REPORTING REQUIREMENTS**

**5.1    Monitoring Programs and Reports by Industrial Users**

5.1.1    Dalton Utilities may require Industrial Users to provide such technical or monitoring programs, including the submission of periodic reports, as Dalton Utilities deems necessary; provided, however, that the burden, including costs, of such programs and reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained therefrom.

5.1.2    All permitted Industrial Users must submit self-monitoring reports to Dalton Utilities.   The frequency at which Industrial Users must submit self-monitoring reports will be on a case-by-case basis and will be specified in the individual User's permit.   These reports shall be based on sampling and analysis performed in the period covered by the report and performed in accordance with the procedures prescribed in Section 5.9 of these SURR.

5.1.3    The monitoring program may require the Industrial User to conduct a sampling and analysis program of a frequency and type specified by Dalton Utilities to demonstrate compliance with prescribed wastewater discharge limits. The Industrial User may either:

5.1.3.1    Conduct his own sampling and analysis program, provided he demonstrates to Dalton Utilities that he has the necessary certifications, qualifications, and facilities to perform the work; or

5.1.3.2    Engage a private, certified laboratory, as approved by Georgia EPD in Section 5.11 of these SURR.  Dalton Utilities reserves the right to increase or decrease sampling frequency as deemed necessary to ensure compliance with the SURR.

5.1.4    If sampling performed by an Industrial User indicates a violation, the User shall notify Dalton Utilities within twenty-four (24) hours of becoming aware of the violation.   The notification shall be provided via telephone or email and shall conform to Section 5.2.   The Industrial User shall also repeat the sampling and analysis and submit the results of the repeat analysis to Dalton Utilities within thirty (30) days after becoming aware of the violation.

**5.2    Report on Exceedances**

In the event that an Industrial User experiences an exceedance of any limit established in its Wastewater Discharge Permit, such User must submit a report to Dalton Utilities that: (1) describes the scope and nature of the exceedance event in detail;  (2) explains the cause of the exceedance; (3) describes corrective measures taken or to be taken to prevent future exceedances; and (4) establishes any implementation schedule for the planned corrective measures.  This report must be submitted within seven (7) days of the date on which the User becomes aware of the exceedance.

## 5.3    Notification of the Discharge of Hazardous Waste

5.3.1    Any Industrial User who commences the discharge of hazardous waste shall notify in writing Dalton Utilities, the EPA Regional Waste Management Division, and the Georgia Environmental Protection Division of any discharge into the POTW of a substance which, if otherwise disposed of, would be a hazardous waste under 40 CFR Part 261.  Such notification must include the name of the hazardous waste as set forth in 40 CFR Part 261, the EPA hazardous waste number, and the type of discharge (continuous, batch, or other).  If the User discharges more than one hundred (100) kilograms (220.26 pounds) of such waste per calendar month to the POTW, the notification also shall contain the following information to the extent such information is known and readily available to the User:  an identification of the hazardous constituents contained in the wastes, an estimation of the mass and concentration of such constituents in the waste stream discharge during that calendar month, and an estimation of the mass of constituents in the waste stream expected to be discharged during the following twelve (12) months.  For New Sources, notification must take place at least ninety (90) days before the discharge commences.  For Existing Sources, notification must occur at least one hundred and eighty (180) days after the effective date of this SURR for existing discharges of hazardous wastes or fifteen (15) days before the discharge commences upon initial discharge of hazardous waste.  Any notification under this subsection need be submitted only once for each hazardous waste discharged.  However, notifications of changed conditions must be submitted under Section 5.6 of these SURR.  The notification requirement in this section does not apply to Pollutants already reported by Users subject to Categorical Pretreatment Standards under the self-monitoring requirements of this Section.

5.3.2    Industrial Users are exempt from the requirements of subsection 5.3.1 above during a calendar month in which they discharge no more than fifteen (15) kilograms (33 pounds) of hazardous wastes, unless the wastes are acute hazardous wastes as specified in 40 CFR Parts 261.30(d) and 261.33(e), as hereby incorporated. Discharges of more than fifteen (15) kilograms (33 pounds) of non-acute hazardous wastes in a calendar month, or of any quantity of acute hazardous wastes as specified in 40 CFR Parts 261.30(d) and 261.33(e), as hereby incorporated, requires a one-time notification.  Subsequent months during which the User discharges more than such quantities of any hazardous waste do not require additional notification.

5.3.3    In the case of any new regulations under Section 3001 of RCRA identifying additional characteristics of hazardous waste or listing any additional substance as a hazardous waste, the Industrial User must notify Dalton Utilities, the EPA Regional Waste Management Division Director, and the Georgia Environmental Protection Division of the discharge of such substance within ninety (90) days of the effective date of such regulations.

5.3.4    In the case of any notification made under this section, the Industrial User shall certify that it has a program to reduce the volume and toxicity of hazardous wastes generated to the degree it has determined to be economically practical.

5.3.5    This section does not create a right to discharge any substance not otherwise permitted to be discharged by these SURR, a permit issued under these SURR, or any applicable Federal or State law or regulation.


**5.4    Slug Discharge Control Plan**

As provided in Section 4.6.1.6 of these SURR and as defined in 40 CFR 403.8(f)(2)(v)(D), every Industrial User required to do so must, along with the issuance of its Wastewater Discharge Permit, create a Slug Discharge Control Plan to provide protection from accidental discharge to the POTW of prohibited materials or other substances regulated by these SURR.  Such plans shall be maintained by the User at their offices and be made available for inspection by Dalton Utilities upon request.  Facilities to prevent accidental discharge of prohibited materials shall be provided and maintained at the owner or User's own cost and expense.  Dalton Utilities may require a New Source to have an approved slug discharge control before being allowed to commence discharge.  Review and approval of such plans and operating procedures shall not relieve the Industrial User from

the responsibility to modify its facility as necessary to meet the requirements of these SURR. At a minimum, the slug discharge control plan shall contain the following elements:

5.4.1    Description of discharge practices, including non-routine batch discharges;

5.4.2    Description of stored chemicals;

5.4.3    Procedures for immediately notifying the POTW of slug discharges including any discharge that would violate a prohibition under Section 2.4.2 of these SURR, with procedures for follow-up written notification within five (5) days; and

5.4.4    Procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and measures and equipment for emergency response.

**5.5    Unanticipated Discharge**

5.5.1    Initial Notification. In the case of an accidental or deliberate discharge of compatible or incompatible Pollutants, including any Slug Loadings, that may cause Pass Through or Interference with the POTW or violate regulatory requirements of these SURR, it shall be the responsibility of the Industrial User to immediately notify Dalton Utilities of the incident as soon as they become aware of the discharge. The notification shall include name of the Person providing the notification, location and time of discharge, type of Wastewater, concentration, and volume.

5.5.2    Follow-up Report. Within thirty (30) days of a discharge that triggers the notification of 5.5.1 of this Section, the Industrial User shall submit a follow-up report to Dalton Utilities that explains the cause of the discharge and describes the corrective actions taken since the discharge to prevent similar events in the future.

**5.6    Reports of Changed Conditions**

Each Industrial User shall notify Dalton Utilities of any planned substantial changes to the User's operations or system which might alter the nature, quality, or volume of its Wastewater at least ninety (90) days before the change or immediately after the User has knowledge such change will occur.

5.6.1    Dalton Utilities may require the Industrial User to submit such information as may be deemed necessary to evaluate the changed condition, including the submission of

a Wastewater Discharge Permit application under Section 4.5 of these SURR.

5.6.2   Dalton Utilities may issue a Wastewater Discharge Permit under Section 4.6 of these SURR or modify an existing Wastewater Discharge Permit under Section 4.7 of these SURR in response to changed conditions or anticipated changed conditions.

5.6.3   For purposes of this requirement, substantial changes include, but are not limited to, flow increases of twenty percent (20%) or greater, the discharge of any previously unreported Pollutants, or any other change Dalton Utilities finds necessary for the User to report in order to prevent Pass Through or Interference.

## 5.7    Recordkeeping

Industrial Users subject to the reporting requirements of these SURR shall retain, and make available for inspection and copying all records of information obtained pursuant to any monitoring activities required by these SURR.  Records shall include the date, exact place, method, time of sampling, and the name of the person(s) taking the samples; the dates analyses were performed and who performed the analyses; the analytical techniques or methods used; and the results of such analyses.  These records shall remain available for a period of at least 3 years whether these SURR or a permit requires such monitoring activities. This period shall be automatically extended for the duration of any unresolved litigation concerning the User or Dalton Utilities, or when requested by Dalton Utilities, EPD, or the EPA Regional Administrator.

## 5.8    Monitoring, Sampling, and Measuring Facilities and Equipment

5.8.1   Dalton Utilities may require any Industrial User to construct, at the User's expense, facilities to allow inspection, monitoring, sampling and flow measurement of the waste discharged, together with sampling or metering equipment to be provided, installed and operated at the User's expense.  Such inspection chamber or control manhole shall be situated on the User's premises and shall be constructed and operated to permit accurate sampling and flow measurements of all wastes discharged.  Where conditions do not permit measurement of all discharges from one industrial facility at a single control manhole, multiple control manholes shall be provided.  The control manhole shall be located so as to permit access by Dalton Utilities representatives, provide sufficient space for storage of samples and equipment, and allow for accurate sampling and flow measurement. Such facilities shall be located so that samples may be taken safely and easily and shall not be obstructed by landscaping, parked vehicles, or other activity of the Industrial User.

5.8.2   Where constructed on public or private property, the monitoring facilities shall be constructed in accordance with Dalton Utilities' requirements and all applicable Dalton Utilities construction standards and specifications.  When, in the judgment of Dalton Utilities, an existing User requires a monitoring facility, the User will be so notified in writing.  Construction must be completed within ninety (90) days following written notification, unless a time extension is otherwise granted by Dalton Utilities.

**5.9**   <u>**Sampling and Analysis**</u>

5.9.1   Except as indicated in 5.9.2 below, the Industrial User shall collect Wastewater samples using flow proportional composite techniques.  In the event flow proportional sampling is infeasible, Dalton Utilities may authorize the use of time proportional sampling or a minimum of four (4) grab samples where the User demonstrates that this will provide representative samples of the effluent being discharged.

5.9.2   Samples for oil and grease, temperature, pH, cyanide, phenols, sulfides, and volatile organic compounds must be obtained using grab collection techniques.

5.9.3   The User shall take a minimum of one representative sample to compile that data necessary to comply with the requirements of this section.

5.9.4   Samples shall be taken from identified outfalls immediately downstream from pretreatment facilities if such exist or immediately downstream from the regulated facility if no pretreatment exists.  Where an alternate concentration or mass limit has been calculated, this adjusted limit along with supporting data shall be submitted to Dalton Utilities.

5.9.5   All Pollutant analyses, including sampling techniques, to be submitted as part of a Wastewater Discharge Permit or Permit application shall be performed in accordance with the techniques prescribed in 40 CFR Part 136, unless otherwise specified in an applicable Pretreatment Standard.  If 40 CFR Part 136 does not contain sampling or analytical techniques for the Pollutant in question, sampling and analyses must be performed in accordance with procedures approved by EPA.

**5.10**  **Signatory and Certification Requirements**

All Wastewater Discharge Permit applications and User reports must be signed in ink by an Authorized Representative of the User and contain the following certification statement in accordance with 40 CFR Part 403.12 (k):

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violation.*

**5.11**  **Commercial Laboratories**

5.11.1  Accreditation. All Industrial Users required to collect and submit self-monitoring samples to Dalton Utilities must use a properly accredited commercial third-party lab.

5.11.2  Laws for Commercial Laboratories. Georgia State Law (O.C.G.A. § 12-2-9) requires all commercial environmental laboratories submitting data to the EPD for regulatory purposes to be approved or accredited as specified in EPD's rules and regulations (Chapter 391-3-26).

5.11.3  Basis for Accrediting Laboratories. The International Organization for Standardization (ISO) 17025 standard is the accepted basis for accrediting commercial laboratories.

5.11.4  Approved Accreditation Authorities. The following authorities are approved for issuing commercial environmental laboratory certifications:

5.11.4.1  International Organization for Standardization (ISO)

5.11.4.2  National Environmental Laboratory Accreditation Conference/Program (NELAC or NELAP)

5.11.4.3  American Association of for Laboratory Accreditation (A2LA)

5.11.4.4  American Industrial Hygiene Association (AIHA)

      5.11.4.5 Canadian Association for Environmental Analytical Laboratories (CAEAL)

      5.11.4.6 NSF International (formerly National Sanitation Foundation)

      5.11.4.7 Quality Associates International (QAI)

**5.12**   **Timing**

Written reports will be deemed to have been submitted on the date postmarked. For reports that are not mailed, postage prepaid, into a mail facility serviced by the United States Postal Service, the date of receipt of the report shall govern.

## SECTION 6 – ENFORCEMENT

**6.1**   **Right of Entry and Confidential Information**

    6.1.1   Right of Entry.

        6.1.1.1   Authorized representatives of Dalton Utilities bearing proper credentials and identification shall be permitted to immediately enter all Users' premises at reasonable hours to determine whether the User is complying with all standard requirements of these SURR and any Wastewater Discharge Permit or order issued hereunder. Users shall allow authorized representatives of Dalton Utilities ready access to all parts of the premises for the purposes of inspection, observation, copying, measurement or conducting surveys, sampling in accordance with these SURR, examining reports and records required by this SURR or by Dalton Utilities in accordance with these SURR, and any other duties necessary to monitor and enforce compliance with these SURR.

6.1.1.2    Entry shall normally be made during daylight or operating hours. However, the right is reserved for Dalton Utilities to enter the User's premises at any hour of any day an authorized representative of Dalton Utilities deems necessary as a result of abnormal or emergency circumstances. While performing necessary work on the User's premises, the authorized representative of Dalton Utilities shall observe all reasonable safety rules applicable to the premises established by the User. The User shall be held harmless for injury or death to Dalton Utilities employees, and Dalton Utilities shall indemnify the User against loss or damage to its property and against liability claims and demands for personal injury or property damage asserted against the User as a result of the entry, except to the extent such damages may be caused by willful acts, negligence, or the failure of the User to maintain safe conditions.

6.1.1.3    Unreasonable delays in allowing authorized representatives of Dalton Utilities access to the User's premises shall be a violation of these SURR.

6.1.2    Search Warrants. If an authorized representative of Dalton Utilities has been refused access to a building, structure, or property, or any part thereof, and Dalton Utilities or County is able to demonstrate probable cause to believe that there may be a violation of these SURR, or that there is a need to inspect and/or sample as part of a routine inspection and sampling program of Dalton Utilities designed to verify compliance with these SURR or any permit or order issued hereunder, or to protect the overall public health, safety, and welfare of the community, then Dalton Utilities may seek issuance of a search warrant from the State Court of Whitfield County.

6.1.3    Confidential Information. Information and data on a User obtained from reports, questionnaires, permit applications, permits and monitoring programs, and inspection and sampling activities by Dalton Utilities shall be available to the public without restriction unless the User specifically requests and is able to demonstrate to the satisfaction of Dalton Utilities that the release of such information would divulge information, processes, or methods of production entitled to protection as trade secrets under Federal or State law. In addition, Dalton Utilities shall be subject to any confidentiality requirements established under the laws of the State of Georgia and outlined in 40 CFR 403.14.

6.1.3.1    Wastewater constituents and characteristics and other "effluent data" as defined by 40 CFR Part 2.302, as hereby incorporated, will not be recognized as confidential information and will be available to the public without restriction.

6.1.3.2    When requested and demonstrated by the User furnishing a report that such information should be held confidential, the portions of a report that might disclose trade secrets or secret processes shall not be made available for inspection by the public but shall be made available immediately upon request to governmental agencies for uses related to these SURR, the LAS program, and in enforcement proceedings involving the Person furnishing the report.

6.1.3.3    At its own option, an Industrial User that successfully claims the Confidential Business Information privilege may submit two versions of the relevant document. One version shall contain all necessary information and will not be made available to the public, but may be made available to other governmental agencies. The other version will have Confidential Business Information redacted and will be made available to the public.

## 6.2    Publication of Users in Significant Noncompliance

Dalton Utilities shall publish annually, in the largest daily newspaper published in the City of Dalton a list of the Users which, during the previous twelve (12) months, were in significant noncompliance with applicable Pretreatment Standards and Requirements. The term significant noncompliance shall mean:

6.2.1    Chronic Violations of Wastewater discharge limits, defined here as those in which 66% or more of the Wastewater measurements taken for the same pollutant parameter during a six-month period exceed (by any magnitude) a numeric pretreatment standard or requirement, including instantaneous limits, as defined by 40 CFR 403.3(1);

6.2.2    Technical Review Criteria (TRC) violations, defined here as those in which thirty-three percent (33%) or more of all the measurements for the same pollutant parameter taken during a six-month period equals or exceeds the product of the numeric pretreatment standard or requirement, including instantaneous limits, as defined by 40 CFR 403.3(1) multiplied by the applicable TRC (TRC = 1.4 for BOD, TSS, fats, oil, and grease, and 1.2 for all other pollutants except pH);

6.2.3    Any other violation of a pretreatment standard or requirement as defined by 40 CFR 403.3(1) (daily maximum, long-term average, instantaneous limit, or narrative standard) that Dalton Utilities determines has caused, alone or in combination with other discharges, Interference or Pass Through, including endangering the health of Dalton Utilities POTW personnel or the general public;

6.2.4    Any discharge of Pollutants that has caused imminent endangerment to the public or to the environment, or has resulted in Dalton Utilities' exercise of emergency authority to halt or prevent such a discharge;

6.2.5    Failure to meet, within ninety (90) days of the scheduled date, a compliance schedule milestone for starting construction, completing construction, or attaining final compliance, where such milestone is contained in (1) an agreement with Dalton Utilities, (2) a compliance order issued by Dalton Utilities, or (3) a Wastewater Discharge Permit;

6.2.6    Failure to provide within forty-five (45) days after the due date any reports required by these SURR or orders or permits issued under these SURR, including baseline monitoring reports, reports on compliance with Categorical Pretreatment Standard deadlines, periodic self-monitoring reports, and reports on compliance with compliance schedules;

6.2.7    Failure to accurately report noncompliance; or

6.2.8    Any other violation(s) which may include a violation of BMPs, which Dalton Utilities determines will adversely affect the POTW operations or implementation of the local Pretreatment program.

**6.3    <u>Administrative Enforcement Remedies</u>**

6.3.1    <u>Notification of Violation</u>.  Whenever Dalton Utilities finds that a User has violated or is violating a provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement, Dalton Utilities may serve upon the User a written notice of violation.  Nothing in this section shall limit the authority of Dalton Utilities to take emergency action without first issuing a notice of violation.

6.3.2    <u>Agreements</u>.  Dalton Utilities is hereby empowered to enter into agreements, assurances of voluntary compliance, administrative orders, consent orders, or other similar documents establishing an agreement with the User responsible for noncompliance.  Such agreements include specific action to be taken by the

Industrial User to correct the noncompliance within a time period also specified by the agreement. Agreements shall have the same force and effect as administrative orders issued pursuant to subsections (6.3.4) and (6.3.5) of this section and shall be judicially enforceable.

6.3.3   <u>Show Cause Hearing</u>.  Dalton Utilities may order a User that causes or contributes to a violation of any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement to appear before Dalton Utilities and show cause why a proposed enforcement action should not be taken. Notice shall be served on the User specifying the time and place for the meeting, the proposed enforcement action, the reasons for such action, and a request that the User show cause why this proposed enforcement action should not be taken.  The notice of the meeting shall be served personally or by registered or certified mail (return receipt requested) at least ten (10) calendar days prior to the meeting. Such notice may be served on any authorized representative of the User.  Whether the User appears as noticed, immediate enforcement action may be pursued following the meeting date.

6.3.4   <u>Compliance Orders</u>.  When Dalton Utilities finds that a User has violated or is violating any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement, he may issue an order to the User responsible for the discharge directing that, following a specified time period, sewer service shall be discontinued unless adequate treatment facilities, devices, or other related appurtenances are installed and properly operated. Compliance orders may also contain such other requirements as might be reasonably necessary and appropriate to address the noncompliance, including additional self-monitoring and management practices designed to minimize the amount of Pollutants discharged to the POTW.  Furthermore, Dalton Utilities may continue to require such additional self-monitoring for at least ninety (90) days after consistent compliance has been achieved, after which time the self-monitoring conditions in the Discharge Permit shall control.

6.3.5   <u>Cease and Desist Orders</u>.  When Dalton Utilities finds that a User has violated or is violating any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement, Dalton Utilities may issue an order to the User to cease and desist any and all such violations and direct

the User to:

6.3.5.1    immediately comply will all requirements, and

6.3.5.2    take such appropriate remedial or preventative action as may be needed to properly address a continuing or threatened violation, including halting operations and/or terminating the discharge.

Such User shall be notified of Dalton Utilities' remedial or preventive action and be offered an opportunity to show cause under subsection 6.3.3 of this section why the proposed action should not be taken.

6.3.6    Emergency Suspensions.

6.3.6.1    Dalton Utilities may suspend the discharge of Wastewater by a User whenever such suspension is necessary to stop an actual or threatened discharge that reasonably appears to present or cause an imminent or substantial endangerment to the health or welfare of Persons, interferes with the operation of the Treatment Plant, or which presents or may present an endangerment to the environment.

6.3.6.2    Any User notified of a suspension of its Wastewater Discharge Permit or Wastewater Hauler Discharge Permit shall immediately terminate or eliminate its contribution.  In the event of a User's failure to immediately comply with the suspension order, Dalton Utilities shall take such steps as deemed necessary, including immediate severance of the sewer connection, to prevent or minimize damage to the Treatment Plant, its receiving stream, or endangerment to any individuals.  Dalton Utilities shall allow the User to recommence its discharge when the User has demonstrated to the satisfaction of Dalton Utilities that the period of endangerment has passed, unless enforcement proceedings pursuant to subsections (D) and (E) of this section or Section 6.4 of these SURR are initiated against the User.

6.3.6.3    A User that is responsible, in whole or in part, for any discharge presenting imminent endangerment shall submit a detailed written statement to Dalton Utilities describing the causes of the harmful contribution and the measures taken to prevent any future occurrence prior to the date of any show cause or injunctive relief hearing under subsection 6.3.3 of this section and Section 6.4 of these SURR, respectively.

6.3.7    Termination of Service.  Termination of sewer service is revocation of an Industrial User's privilege to discharge industrial wastewater into the POTW.  Termination may be accomplished by physical severance of the User's connection to the collection system, by issuance of an Order that compels the user to terminate its discharge, or by a court ruling.

**6.4    Injunctive Relief**

Whenever a User has violated or continues to violate any provision of this SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement, Dalton Utilities, through the Utility's attorney, may petition the State Court of Whitfield County for the issuance of a temporary or permanent injunction, as may be appropriate, to restrain the User from violating such provision, order, permit, standard, or requirement or to compel the specific performance of the provision, permit, order, standard, or requirement. Such other action as may be appropriate for legal and/or equitable relief may also be sought by Dalton Utilities.

**6.5    Fees and Penalties**

6.5.1    Any User that has violated or continues to violate any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement may be subject to administrative noncompliance fees for such violation(s) of up to $1,000 per day per violation.

6.5.2    Any User that has violated or continues to violate any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement shall be liable for a maximum civil penalty of $1,000 per violation per day.  In the case of a monthly or other long-term average Pretreatment Standard, penalties shall accrue for each business day during the period of the violation.

6.5.3    Dalton Utilities may recover reasonable attorney's fees, court costs, and other expenses associated with the enforcement activities, including sampling and monitoring expenses and the cost of any actual damages incurred by Dalton Utilities.

6.5.4    In determining the amount of civil liability, the court shall take into account all relevant circumstances, including, but not limited to, the extent of harm caused by the violation, the magnitude and duration, any economic benefit gained through the User's violation, corrective actions by the User, the compliance history of the

Industrial User, and any other factor as justice requires.

**6.6    Criminal Prosecution**

6.6.1    Any User that knowingly or willfully violates any provision of these SURR, any order or permit issued under these SURR, or any other Pretreatment Standard or Requirement shall, upon conviction, be guilty of a misdemeanor punishable by a non-compliance fee of not more than $1,000 per violation per day, or imprisonment for not more than one year, or both.

6.6.2    Any User that knowingly or willfully makes any false statements, representations, or certifications in any application, record, report, plan, or other documentation filed or required to be maintained under any provision of these SURR or Wastewater Discharge Permit or order issued under these SURR, or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required under these SURR shall, upon conviction, be punished by a non-compliance fee of not more than $1,000 per violation per day, or imprisonment for not more than one year, or both.

**6.7    Affirmative Defenses to Discharge Violations**

6.7.1    Upset.

6.7.1.1    An Upset shall constitute an affirmative defense to an action brought for an Industrial User's noncompliance with applicable Categorical Pretreatment Standards if the requirements of paragraph 6.7.1.2, below, are met.

6.7.1.2    An Industrial User who wishes to establish the affirmative defense of Upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

6.7.1.2.1    An Upset occurred and the Industrial User can identify the cause(s) of the Upset;

6.7.1.2.2    The facility was at the time being operated in a prudent and workman-like manner and in compliance with applicable operation and maintenance procedures and the Upset could not have been reasonably anticipated or prevented;

6.7.1.2.3    The User took all appropriate action to mitigate the impact of the Upset; and

6.7.1.2.4  The Industrial User has submitted the following information to Dalton Utilities within twenty-four (24) hours of becoming aware of the Upset:

6.7.1.2.3.1  a description of the discharge and cause of noncompliance;

6.7.1.2.3.2  the period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue;

6.7.1.2.3.3  steps being taken and/or planned to reduce, eliminate, and prevent recurrence of the noncompliance; and

6.7.1.2.3.4  if this information is provided orally, a written submission must be provided within five (5) days.

6.7.1.3  In any enforcement proceeding, the Industrial User seeking to establish the occurrence of an Upset shall have the burden of proof.

6.7.1.4  Industrial Users will have the opportunity for a judicial determination on any claim of Upset only in an enforcement action brought for noncompliance with Categorical Pretreatment Standards.

6.7.1.5  Industrial Users shall control production of all discharges to the extent necessary to maintain compliance with Categorical Pretreatment Standards upon reduction, loss, or failure of its treatment facility until the facility is restored or an alternative method of treatment is provided.  This requirement applies in the situation where, among other things, the primary source of power of the treatment facility is reduced, lost, or fails.

6.7.2  General/Specific Prohibitions.  A User shall have an affirmative defense to an enforcement action brought against it for noncompliance with the general prohibitions in Section 2.4.1 and the specific prohibitions in Section 2.4.2.3-2.4.2.7 of these SURR if it can prove that it did not know or have reason to know that its discharge would cause Pass Through or Interference and that either:

6.7.2.1  a local limit exists for each Pollutant discharged that caused the Pass Through or Interference and the User was in compliance with each limit directly prior to and during the Pass Through or Interference, or

6.7.2.2  no applicable local limit exists, but the discharge, directly prior to and

during the Pass Through or Interference, did not change substantially in nature or constituents from the User's prior discharge activity when Dalton Utilities was regularly in compliance with its LAS permit, and in the case of Interference, with applicable Sludge use or disposal requirements.

This defense does not apply to the specific prohibitions in subsections 2.4.2.1, 2.4.2.2, and 2.4.2.8 of these SURR.

6.7.3    <u>Bypass</u>.

    6.7.3.1    for the purposes of this section,

        6.7.3.1.1    "bypass" means the intentional diversion of waste streams from any portion of an Industrial User's treatment facility, and

        6.7.3.1.2    "severe property damage" means substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources that can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production.

    6.7.3.2    Permissible bypass. An Industrial User may allow a bypass to occur which does not cause Categorical Pretreatment Standards or Requirements to be violated, but only if it is also for essential maintenance to assure efficient operation. These bypasses are not subject to the provision of paragraphs 6.7.3.3 and 6.7.3.4 of this subsection.

    6.7.3.3    Notice.

        6.7.3.3.1    If an industrial User knows in advance of the need for a bypass, it shall submit prior notice to Dalton Utilities, at least ten (10) days before the date of the bypass, if possible.

        6.7.3.3.2    An Industrial User shall submit oral notice to Dalton Utilities of an unanticipated bypass that exceeds applicable Categorical Pretreatment Standards within twenty-four (24) hours from the time it becomes aware of the bypass. A written submission shall also be provided within five (5) days of the time the User becomes aware of the bypass. The written submission shall contain a description of the bypass and its cause, the duration of the bypass, including exact dates and time, and, if the

bypass has not been corrected, the anticipated time it is expected to continue.  The submission shall also contain steps taken or planned to reduce, eliminate, and prevent recurrence of the bypass.  Dalton Utilities may waive the written submission on a case by case basis if the oral report has been received within twenty-four (24) hours.

6.7.3.4  Prohibited Bypass.

6.7.3.4.1  Bypass is prohibited, and Dalton Utilities may take an enforcement action against an Industrial User for a bypass, unless:

6.7.3.4.1.1  The bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

6.7.3.4.1.2  there were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime; and

6.7.3.4.1.3  the Industrial User submitted notices as required under Section 6.7.3.3 of this subsection.

Condition (6.7.3.4.1.2) above is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal period of equipment downtime or preventive maintenance.

6.7.3.4.2  Dalton Utilities may approve an anticipated bypass after considering its adverse effects if Dalton Utilities determines that it will meet the three (3) conditions listed in Section 6.7.3.4.1 of this paragraph.

## 6.8  **Enforcement Response Plan**

6.8.1  The Dalton Utilities Enforcement Response Plan outlines the escalating enforcement procedures required by Dalton Utilities according to 40 CFR Part 403.8 (f)(5).  The Enforcement Response Plan shall contain the following information:

6.8.1.1  Detailed procedures indicating how the Control Authority will investigate

and respond to instances of Industrial User noncompliance.

6.8.1.2    Describe the types of escalating enforcement responses the POTW will take in response to all anticipated types of Industrial User violations.

6.8.1.3    Identify the time periods within which enforcement responses will take place.

6.8.1.4    Identify by job title the official(s) responsible for each type of response.

6.8.1.5    Adequately reflect the POTW's primary responsibility to enforce all applicable pretreatment requirements and standards as detailed in 40 CFR Part 403.8 (f)(1) and (f)(2).

# SECTION 7 – FOOD SERVICE FACILITY WASTEWATER PRETREATMENT REQUIREMENTS

**7.1**    <u>**Definitions**</u>

Unless the context specifically indicates otherwise, the following word, terms or phrases used in this Section shall have the meanings hereinafter designated.  Additional definitions applying to the SURR as a whole can be found in Section 1.4.

- <u>Bakery</u> shall mean any facility that produces or sells only baked goods from an oven such as, but not limited to, bagels, biscuits, bread, cakes, crackers, cookies, cupcakes, doughnuts, muffins, rolls, pastries, pies, and pretzels.

- <u>Building Discharge Line System</u> shall mean a sewer line or lines maintained and controlled by private persons for the purpose of conveying wastewater from the waste producing location to the wastewater collection system.

- <u>Butcher Shop</u> shall mean any facility that processes animals or cuts of meat. Slaughtering, skinning, quartering, chopping, grinding, sawing, filleting, trimming, cubing, and deboning all qualify as forms processing.

- <u>Commercial Bakery</u> shall mean any facility classified as a bakery that wholesales baked goods to another facility for resale.

- <u>Common Grease Trap</u> shall mean any trap to which grease wastes are directed from more than one facility having different operators or type of operations, such as in a food court.

- <u>ERP</u> shall mean Dalton Utilities Enforcement Response Plan as set forth in the SURR, which outlines the enforcement procedures for facilities and individuals that fail to comply with the SURR.

- <u>Food Court</u> shall mean an area predominantly found in a shopping center, shopping mall, or an amusement park and shall include operations where several food preparation establishments having different owners may be sharing seating space and/or plumbing facilities.

- <u>Food Service Facility</u> shall mean any facility which cuts, cooks, bakes, prepares or serves food, or which disposes of food-related wastes.

- <u>Food Service Facility Permit Fee</u> shall mean any fees charged to permitted food service facilities to recoup costs associated with the operation and management of the Fats, Oil, and Grease (FOG) Program.

- <u>Garbage Grinder</u> shall mean a device that shreds or grinds up solid or semisolid waste materials into smaller portions for discharge into the wastewater collection system.

- <u>Generator</u> shall mean a user, by site, who produces wastes from the user's process operations. The generator is responsible for assuring that the produced waste is disposed of in accordance with all federal, state and local disposal regulations.

- <u>Grease</u> shall mean a material composed primarily of fatty matter from animal or vegetable sources or from hydrocarbons of petroleum origins. The terms "oil and grease" or "oil and grease substances" shall be deemed as grease by definition.

  (1) <u>Brown Grease</u> shall mean floatable spent fats, oils, or greases, settled solids, and associated wastewater retained by a grease trap. Brown Grease typically consists of materials that have been adulterated by coming into contact with detergents, and other cleaning solutions used in food service areas.

  (2) <u>Yellow Grease</u> shall mean inedible and unadulterated spent fats, oils, and greases removed from food service operations. Yellow Grease is typically placed in an enclosed container marked "inedible" and located outside of the food service area for recycling purposes.

- <u>Grease Trap</u> shall mean a device so constructed as to separate and trap or hold, oil and grease substances from the wastewater discharged from a facility in order to keep oil and grease substances from entering the wastewater collection system. Under-the-sink

grease interceptors shall NOT be construed as meeting the definition of grease trap in this chapter.

- <u>Inspector</u> shall mean the person or persons designated by Dalton Utilities to inspect the food service facilities and enforce the Grease Trap Ordinance under direction of the Director of Watershed Regulatory and the Laboratory Services Manager.

- <u>Letter of Agreement</u> shall mean an agreement between a food service facility and Dalton Utilities stating that a grease trap is not required by the food service facility, but that the installation of any new equipment will require notification to Dalton Utilities and an updated application to be submitted to Dalton Utilities for re-evaluation of the need for a grease trap.

- <u>Pizzeria</u> shall mean any facility that prepares and/or bakes pizza on site.

- <u>Pollutant</u> shall mean dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, medical wastes, chemical wastes, biological materials, radioactive materials, heat, wrecked or discharge equipment, rock, sand, cellar dirt, municipal, agricultural and industrial wastes, and certain characteristics of wastewater (e.g., pH, temperature, suspended solids, turbidity, color, toxicity, or odor).  For the purposes of this chapter, the definition of Pollutant shall include any settled or floating solids contained in a grease trap.

- <u>POTW</u> shall mean a Publicly Owned Treatment Works or "treatment works" as defined by Section 212 of the Clean Water Act (33 U.S.C. Section 1292) that is owned or operated in this instance by Dalton Utilities. This definition includes any sewers that convey wastewater to Dalton Utilities sewage treatment plants.

- <u>Laboratory Services Manager</u> shall mean an individual employed Dalton Utilities who is charged with the responsibility of administering the provisions of the pretreatment program to ensure compliance by users with applicable laws, rules, regulations, resolutions and ordinances relative to the concentration(s) of substances found in the waste stream of facilities connected to the POTW.

- <u>Director of Watershed Regulatory</u> shall mean the person designated by the CEO of Dalton Utilities as the administrative authority to enforce this chapter.

- <u>Sewage or Domestic Wastewater</u> shall mean water-carried human wastes and gray water (household showers, dishwashing operations, etc.).

- <u>SURR</u> shall mean Dalton Utilities Sewer Use Rules and Regulations which contain all applicable rules, regulations, resolutions and ordinances that govern the discharge into the POTW.

- <u>Under-the-Sink Grease Interceptor</u> shall mean a device placed under or in close proximity to sinks or other facilities likely to discharge grease in an attempt to separate, trap or hold oil and grease substances to prevent their entry into the wastewater collection system. Such "under the sink grease interceptors" are not "grease traps" for purposes of this chapter because they are generally undersized and located too close to the grease discharging source to effectively prevent substantial amounts of grease from entering the wastewater collection system.

- <u>User</u>, for the purposes of this Section, shall mean the owner or operator of a facility meeting or coming under the herein-described food service categories.

- <u>Wastewater</u> shall mean the liquid and water-carried industrial wastes, pollutants, sewage, and septic tank waste from residential dwellings, commercial buildings, industrial and manufacturing facilities and institutions, whether treated or untreated, which are contributed to the POTW. For the purposes of this Section, wastewater may include, but is not limited to, discharges from scullery sinks, pot and pan sinks, dishwashing machines, soup kettles and floor drains located in areas where grease-containing materials may exist.

- <u>Wastewater Hauler</u> shall mean any person, partnership, unit of government, or corporation engaged in transporting wastewater as a commercial venture or public service.

**7.2    General Requirements**

7.2.1    No garbage grinder shall be connected to a grease trap.

7.2.2    Toilets, urinals, and other similar fixtures shall not discharge through the grease trap unless specifically approved, in writing, by the Laboratory Services Manager.

7.2.3    All floor and sink drains in a food service area must be connected to a grease trap.

7.2.4    All waste shall enter a grease trap through the inlet pipe only.

7.2.5    No grease shall be intentionally discharged to the collection system.  All brown grease shall be retained in a grease trap and disposed of properly.  All yellow grease shall be stored in an approved container and disposed of by a rendering company or other approved agency.

7.2.6    Signs that educate and instruct employees on the proper disposal method of grease (brown and yellow) shall be posted by all sinks and drains that enter the collection system.

## 7.3    Grease Trap Design Requirements

7.3.1    Grease traps shall be constructed in accordance with a design approved by the Pretreatment Specialist and shall have a minimum of two compartments with fittings designed for grease retention. Figure 7.3 is an example of a grease trap design meeting all standard requirements. Other grease removal devices or technologies not meeting the grease trap definition in Section 7.1 shall require written approval of the Laboratory Services Manager. Such approval shall be based on demonstrated removal efficiencies of the proposed technology.  Under-the-sink grease interceptors are not permitted as the sole or primary grease retention device.

7.3.2    There shall be a minimum of one manhole-type access point per compartment for inspecting and cleaning of the grease trap. Covers shall be watertight in construction and at or above grade. As shown in Figure 7.3.

7.3.3    There shall also be a manhole-type cover to allow access to the effluent service line from the grease trap for inspection and cleaning.  Covers shall be watertight in construction and at or above grade. As shown in Figure 7.3.

7.3.4    The grease trap must be filled with clean water prior to start up of the system.

7.3.5    Facilities are responsible for supplying and installing all piping and sanitary tees, and clean outs, two clean outs should be installed upstream of the grease trap one for cleaning away from the grease trap, and one for cleaning towards the grease trap. A manhole type access is required downstream of the grease trap and may be used for cleaning in both directions.

7.3.6    The grease trap is to contain gray water only, black water (sanitary) should not be discharged to the grease trap.

7.3.7    In areas where additional weight loads may exist, the grease interceptor shall be designed to have adequate load-bearing capacity.

7.3.8    Each grease trap shall be installed and connected in such a manner that it is, at all times, easily accessible for inspection, cleaning and removal of the intercepted grease. A grease trap may not be installed inside a building without written

authorization from the Laboratory Services Manager.  The location of the grease trap must meet the approval of the Pretreatment Specialist prior to installation.

**Figure 7.3 Grease Trap Design Specifications & Drawings**





7.4 **Grease Trap Size Requirements**

7.4.1 Each individual grease trap shall have a capacity of not less than seven hundred fifty (750) gallons nor exceed a capacity of fifteen hundred (1,500) gallons. If the

size calculated using the criteria in Section C exceeds 1,500 gallons, multiple units must then be installed in series.

7.4.2    Only food service facilities (FSF) that meet the criteria outlined in this Section will be required to install and maintain an approved grease trap(s).  Food service facilities that do not meet the following criteria will be issued a Letter of Agreement.

7.4.2.1    Deep Fryers:  Any FSF that has at least one (1) deep fryer will be required to install and maintain an appropriately sized grease trap.

7.4.2.2    Woks:  Any FSF that has at least one (1) wok will be required to install and maintain an appropriately sized grease trap.

7.4.2.3    Grills:  Any FSF that has greater than two (2) square feet of grilling area will be required to install and maintain an appropriately sized grease trap.

7.4.2.4    Ovens:  Any FSF that has greater than thirty (30) cubic feet of inside oven volume will be required to install and maintain an appropriately sized grease trap.

7.4.2.5    Washes Dishware:  Any FSF that washes dishware that food is served to customers on and has greater than two (2) square feet of grilling surface area will be required to install and maintain an appropriately sized grease trap.

7.4.2.6    Pizzeria:  Any FSF that qualifies as a pizzeria or bakes large quantities of pizza will be required to install and maintain an appropriately sized grease trap.

7.4.2.7    Bakery:  Any FSF that qualifies as a bakery and has greater than thirty (30) cubic feet of inside oven volume will be required to install and maintain an appropriately sized grease trap.

7.4.2.8    Commercial Bakery:   Any FSF that qualifies as a bakery and wholesales baked goods to another facility for resale will qualify as a commercial bakery and will be required to install and maintain an appropriately sized grease trap.

7.4.2.9    Butcher Shop:  Any FSF that qualifies as a butcher shop will be required to install and maintain an appropriately sized grease trap.

7.4.3    The following sizing guidelines will be used for calculating the grease trap volume of a qualifying FSF. The sum of all of the following factors that apply will be equal to the volume of the grease trap to be installed by the FSF:

    7.4.3.1    Deep Fryers

        1 deep fryer = 300 gallons

        Each additional fryer = 150 gallons

    7.4.3.2    Woks

        Each wok = 50 gallons

    7.4.3.3    Grills

        Square Feet of Grilling Area x 25 gallons = Total Gallons

    7.4.3.4    Ovens

        Cubic Feet Oven Volume x 5 gallons = Total Gallons

    7.4.3.5    Dishwashing

        7.4.3.5.1    Each FSF that washes serving dishware will be issued a meal turnover rate factor based on the hours they are open for business.

        7.4.3.5.2    Meal Turnover Rate Factor:

            Open for business less than 4 hours/day = 1

            Open for business less than 9 hours/day = 2

            Open for business less than 23 hours/day = 3

            Open for business 24 hours/day = 4

        7.4.3.5.3    Total Gallons = (seating capacity x turnover rate factor) x 2.5 gallons

    7.4.3.6    Pizzeria

        FSF's that qualify as Pizzeria = 750 gallons

    7.4.3.7    Commercial Bakeries

        FSF's that qualify as Commercial Bakeries = 300 gallons

    7.4.3.8    Butcher Shops

        FSF's that qualify as Butcher Shops = 500 gallons

        Butcher Shops that fully cook meat on site = Additional 500 gallons

    7.4.3.9    Floor Drains

        FSF's that have floor drains plumbed into grease trap = 150 gallons

    7.4.3.10    Mop Sinks

FSF's that have any mop sinks plumbed into grease trap = 50 gallons

7.4.4    When the total gallons calculation is determined, the grease trap size will then be rounded to the nearest available standard size or to the minimum size if the calculation is less than 750 gallons.

**7.5    Installation Requirements**

7.5.1    New Facilities.  On or after the effective date of the ordinance codified in this chapter, all facilities likely to discharge grease, which are newly proposed or constructed, or existing facilities which shall be expanded or renovated to include a food service facility where such facilities did not previously exist, shall be required to install an approved, properly operated and maintained grease trap. The size of the grease trap shall be determined using the sizing guidelines in Section 7.4.

7.5.2    Existing Facilities.  On or after the effective date of the ordinance, or within 3 months of a permit issuance, all existing food service facilities shall be required to install an approved, properly operating and maintained grease trap when any of the following conditions exist:

7.5.2.1    The facilities are found by the Pretreatment Specialist to be contributing grease in quantities sufficient to potentially cause wastewater collection system stoppages or necessitate increased maintenance on the sanitary sewer collection system in order to keep main line stoppages from occurring.

7.5.2.2    The facilities are found by the Pretreatment Specialist to be lacking a minimum standard that the Pretreatment Specialist deems is necessary (i.e., sampling access, etc.).  If it is determined by the facility owner that 3 months is not an adequate amount of time to meet the minimum standards, the owner may submit an alternate schedule in writing to the Pretreatment Coordinator for consideration.

7.5.2.3    Remodeling of the food preparation or kitchen waste plumbing facilities which are subject to a permit issued by the Building Inspectors Office.  The Laboratory Services Manager will determine the compliance date under this subsection.

7.5.2.4    Any requests for extensions to these required installation dates must be made in writing to the Laboratory Services Manager, at least seven

days in advance of the compliance date. The written request shall include the reasons for the user's failure or inability to comply with the compliance date set forth, the additional time needed to complete the remaining work, and the steps to be taken to avoid future delays.

NOTE: Increased maintenance may be required until any necessary modifications have been completed and approved by inspection.

**7.6**    **Grease Trap Maintenance**

7.6.1    <u>Pumping</u>.  All grease traps shall be maintained by the user at the user's expense. Maintenance shall include the complete removal of all contents, including floating materials, wastewater, and bottom sludges and solids.  Decanting or discharging of removed waste back into the interceptor from which the waste was removed or any other grease trap, for the purpose of reducing the volume to be disposed, is prohibited.

7.6.2    <u>Pumping Frequency</u>.  Grease traps must be pumped dry by the most stringent (and most frequent) of the following schedules:

7.6.2.1    A minimum of once every three months, unless authorized by Food Service Facility Discharge Permit;

7.6.2.2    When the grease trap contains more than 25% solids (floatable or settled) on the influent side of the grease trap, or;

7.6.2.3    More frequently as deemed necessary by the Laboratory Services Manager to prevent carryover of grease into the wastewater collection system.

NOTE:  A facility may request a pumping frequency of less than three months in writing to the Laboratory Services Manager if the facility can prove that a lesser pumping frequency is adequate in meeting the second criterion listed above.

7.6.3    <u>Disposal of Grease Trap Pumpage</u>.  All waste removed from each grease trap must be disposed of at a Dalton Utilities treatment facility or another approved facility that is designated to receive such waste in accordance with the provisions of this chapter. In no way shall the pumpage be returned to any private or public portion of the wastewater collection system or the wastewater treatment plants, without prior written approval from Dalton Utilities.

7.6.4 <u>Documentation</u>.  All facilities must retain on-site a copy of a manifest that confirms proper pumping, hauling, and disposal of waste within 30 days of the grease trap being pumped.  This manifest shall be made available to the Pretreatment Specialist during inspections for a period of not less than three (3) years.

7.6.5 <u>Additives</u>.  At no time shall any additive be added to the grease trap to prevent coagulation of grease or be used as a means of maintenance.

## 7.7  **Permit Requirements**

7.7.1 It is unlawful for any grease generator producing grease to discharge waste into the wastewater collection system without authorization from Dalton Utilities. Authorization shall be given in the form of a Letter of Agreement or a Food Service Facility Discharge Permit.

7.7.2 Application for a permit shall be made to the Laboratory Services Manager.  If, after processing the information contained in the Food Service Facility Discharge Permit Application, it is determined by the Laboratory Services Manager that the proposed discharge does not conflict with the provisions of this chapter and the permit fee is paid, a Letter of Agreement shall be issued allowing the discharge of such wastes into the sanitary sewer collection system.  If the Laboratory Services Manager determined that the proposed discharge requires a site specific authorization in accordance with these SURR, a Food Service Facility Discharge Permit shall be issued which sets forth the requirements for the discharge of such wastes into the sanitary sewer collection system.

7.7.3 Each Food Service Facility Discharge Permit shall be issued for a time not longer than three years from the date of the permit.

7.7.4 The user shall apply for permit reissuance a minimum of ninety days prior to the expiration of the user's existing permit.

7.7.5 The terms and conditions of the permit may be subject to modification by the POTW during the term of the permit as limitations or requirements as identified in this chapter are modified or other just causes exist.  The user shall be informed of any proposed changes in the issued permit at least thirty days prior to the effective date of the change(s).  Any changes or new conditions in the permit shall include a reasonable time schedule for compliance.

7.7.6    As a condition precedent to the granting of a permit, the permittee under this section will agree to hold harmless Dalton Utilities and Dalton Utilities' employees from any damages or liabilities arising from the permit holder's operations under this permit.

7.7.7    Fees for Food Service Facility Wastewater Discharge Permits shall be set by the Water Light and Sinking Fund Commission.  The fees shall be established to insure full cost recovery and shall include but not be limited to the cost of field, administrative, engineering, and clerical expenses involved.  The fees shall be not less than twenty-five ($25) dollars per application and one hundred dollars ($100) per year for each permit.  The annual permit fee will appear on the food service facility's monthly water bill as $1/12^{th}$ of the permit fee, to equal the annual fee at the end of a twelve (12) month billing period.

**7.8    <u>Administrative Requirements</u>**

7.8.1    Manifest.  All pumpage from grease traps must be tracked by a manifest which confirms proper pumping, hauling, and disposal of waste.  This manifest shall be retained by the food service facility on-site and by the wastehauler for a period of three (3) years.  The manifest shall contain the following information:

    7.8.1.1    Generator information:

        7.8.1.1.1    Name

        7.8.1.1.2    Address

        7.8.1.1.3    Volume pumped

        7.8.1.1.4    Date and time of pumping

        7.8.1.1.5    Certification that generator is familiar with the nature of waste

        7.8.1.1.6    Signature of generator, verifying generator information

    7.8.1.2    Transporter information:

        7.8.1.2.1    Company name

        7.8.1.2.2    Address

        7.8.1.2.3    Certification that driver is familiar with the nature of waste

        7.8.1.2.4    Driver name and signature, verifying transporter information

    7.8.1.3    Receiving facility information:

        7.8.1.3.1    Facility name

7.8.1.3.2    Address

7.8.1.3.3    Date and time of receiving signature, verifying receipt of waste

NOTE:  If a Dalton Utilities permitted wastewater hauler is being utilized, a Dalton Utilities Non-Hazardous Waste Manifest is required for proper disposal.

7.8.2    A maintenance log indicating each pumping event for the previous twelve months shall be maintained on site by each food service facility required to install and maintain a grease trap.  This log shall include the date, time, amount pumped, hauler, disposal site, and manifest number (if applicable), and shall be kept in a conspicuous location for inspection.  Said log shall be made immediately available to the inspector upon request.

## 7.9    Monitoring, Inspection, and Entry

7.9.1    When required for the purposes of this chapter, the user shall provide, operate, and maintain, at user's expense, safe and accessible monitoring facilities (such as a suitable manhole) at all times to allow observation, inspection, sampling, and flow measurement of the building sewer or internal drainage systems.  There shall be ample room in or near such monitoring facility to allow accurate sampling and preparation of samples for analysis.  When the physical location and hydraulic conditions are suitable, a manhole or similar facility existing on the wastewater collection system may be utilized as the user's manhole when agreed to by both the user and the director.

7.9.2    Authorized personnel of Dalton Utilities, bearing proper credentials and identification, shall have the right to enter upon all properties subject to this chapter, at any reasonable time and without prior notification, for the purpose of inspection, observation, measurement, sampling, testing, or record review, in accordance with this chapter.

## 7.10    Enforcement

7.10.1    When a grease trap is identified by the inspector as in need of maintenance or pumping as outlined in section 7.6 of the Sewer Use Rules & Regulations, the facility operator/manager will be issued a citation stating what corrective actions should be taken and a timeline for completing these actions.  If the corrective actions are not completed during the allotted time a noncompliance fee and

additional penalties may be assessed as outlined in the Enforcement Response Plan ("ERP").

7.10.1.1 The timelines and associated noncompliance fees for failure to complete the corrective actions are as follows:

7.10.1.1.1 Seven (7) days will be allowed for the pumping of a grease trap that is found to be in noncompliance with this chapter. If the work is not completed during the allotted time a noncompliance fee and/or other penalties will be assessed as outlined in the ERP until the grease trap is pumped and is inspected by the inspector to ensure it was properly cleaned. No extensions will be granted for the pumping of a grease trap.

7.10.2 When a new installation or renovation of an existing grease trap is required by the inspector in order to comply with section 7.5 of this ordinance, the facility operator/manager will be issued a citation stating what corrective actions should be taken and a timeline for completing these actions. If the corrective actions are not completed during the allotted time, noncompliance fees and additional penalties may be assessed as outlined in the ERP.

7.10.2.1 The timelines and associated noncompliance fees for failure to complete the corrective actions are as follows:

7.10.2.1.1 Three (3) months will be allowed for the installation of a new grease trap or renovation/upgrading of an existing grease trap. An extension of up to one (1) month may be applied for by sending a written correspondence to the Laboratory Services Manager stating the reason an extension should be granted. If a reasonable cause can be shown as to why the work cannot be completed during the allotted time, an extension may be granted. Failure to complete the work during the allotted time will result in noncompliance fees and/or other enforcement actions as outlined in the ERP. Food service facilities may also be subject to a show cause hearing with the CEO of Dalton Utilities where further noncompliance fees and penalties

may be assessed until the work is completed to the satisfaction of Dalton Utilities.

7.10.2.1.2    Three (3) months will be allowed for the addition of access points or upgrading existing access points. An extension of up to one (1) month may be applied for by sending written correspondence to the Laboratory Services Manager stating the reason an extension should be granted. If a reasonable cause can be shown as to why the work cannot be completed during the allotted time an extension may be granted. Failure to complete the work during the allotted time will result in noncompliance fees and/or other enforcement actions as outlined in the ERP. Food service facilities may also be subject to a show cause hearing with the CEO of Dalton Utilities where further noncompliance fees and penalties may be assessed until the work is completed to the satisfaction of Dalton Utilities.

7.10.3    Any grease generating facility that is found to be in noncompliance with this chapter or is contributing grease to the wastewater collection system that directly or indirectly leads to an overflow in the section of the collection system in which they discharge, will be responsible for all or part of the noncompliance fees and costs incurred by Dalton Utilities to alleviate the overflow and for any increased maintenance required and fines imposed on Dalton Utilities by the State.

7.10.4    Failure to abide by all provisions set forth in this chapter is subject to penalties and noncompliance fees as set forth and outlined in the ERP.

## SECTION 8 – SEVERABILITY

If any court of competent jurisdiction invalidates any provision of these SURR, the remaining provisions shall not be affected and shall continue in full force and effect.

## SECTION 9 – EFFECTIVE DATE

These SURR shall be in full force and effect immediately following its passage, approval, and publication by law.

# CERTIFICATION

The undersigned, acting on behalf of the Board of Water, Light and Sinking Fund Commissioners of the City of Dalton, Georgia ("Board"), said Board being a part of the City of Dalton, Georgia, a municipal corporation of the State of Georgia, and doing business as Dalton Utilities, does hereby attest and certify that the attached copy of the Dalton Utilities Sewer Use Rules and Regulations were duly adopted by resolution of the Board on the date set forth thereon and are a true, correct and accurate copy of the same.

This _31st_ day of _MARCH_ 2025

The Board of Water, Light and Sinking
Fund Commissioners of the City of Dalton, Georgia
d/b/a Dalton Utilities

By: _____
    John Thomas
    Chief Executive Officer