# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

|  |  |
|---|---|
| THE CITY OF DALTON, GEORGIA, *acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a* Dalton Utilities,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY, *et. al.*,<br><br>*Defendants*. | .<br><br>CIVIL ACTION<br>NO. 4:24-cv-00293-WMR |

## <u>ORDER</u>

This case comes before the Court on the respective Motions to Dismiss filed by EIDP, Inc. and The Chemours Company [Doc. 91], Daikin America, Inc. [Doc. 93], INV Performance Surfaces, LLC [Doc. 94],  Shaw Industries Group, Inc. and Shaw Industries, Inc. [Doc. 95],  Aladdin Manufacturing Corporation [Doc. 96], and 3M Company [Doc. 97]. Upon consideration of the parties' respective arguments, the applicable law, and all appropriate matters of record, the Court GRANTS IN PART and DENIES IN PART Defendant Daiken America, Inc.'s Motion to Dismiss [Doc. 93], and DENIES the remaining Motions to Dismiss [Docs. 91, 94, 95, 96, and 97] for the reasons set forth below.

1

## I.  BACKGROUND

<u>PFAS Production</u>

This case concerns the wastewater treatment of "forever chemicals." Produced since the 1940s, the per- and polyfluoroalkyl ("PFAS") chemicals are an exceptionally strong carbon-fluorine bond, with eight fluorinated carbon atoms. PFAS refers to a multitude of chemical compounds, but the ones relevant herein Court are: perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), perfluorohexanesulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide-dimer acid (HFPO-DA, also known as "GenX chemicals"), and perfluorobutanesulfonic acid ("PFBS"). The PFAS class of chemicals found various commercial uses. [Doc. 85 at 2–6, 10–13].

<u>Government Regulation of PFAS</u>

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to respond to serious environmental and health risks posed by industrial pollution. *See Burlington Northern and Santa Fe. Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009). The goal of this legislation was to timely clean up hazardous waste sites and ensure that the costs of cleanup are borne by those responsible for contamination. *Id.* (citing *Consolidated Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (C.A.2 2005). Beginning in the 1960's through 1980's, internal experts at DuPont and 3M began to warn of the danger of PFOA and

PFAS wastewater disposal. [Doc. 85 at 14–17]. By 2002, the United Staes Environmental Protection Agency ("EPA") added PFOA and PFOS to the Toxic Substance Control Act, 15 U.S.C. § 2607(e) ("TSCA"). [*Id.* at 18].

In early 2024 (perhaps decades too late), the EPA finalized a new National Primary Drinking Water Regulation for a Maximum Contaminant Levels ("MCLs") for six PFAS compounds: PFOS, PFOA, PFHxS, HFPOA-DA, and mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS. [Doc. 85 at 5–6]. The regulation was effective on June 25, 2024. [*Id.*]. In May 2024, EPA also finalized a regulation designating PFOA and PFOS as hazardous substances under Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 ("CERCLA"); the regulation was effective on July 8, 2024. [*Id.*].

City of Dalton

Dalton is a city in Northwest Georgia which is often referred to as the capital of the carpet industry. Dalton owns and operates a wastewater treatment system for household, commercial and industrial users (including carpet manufacturers) in the Dalton, Georgia area. [Doc. 85 at 2]. Dalton's wastewater treatment plant processes wastewater before it is added to the Riverbend Land Application System for processing and disposal ("POTW"). [*Id.* at 2–3]. Dalton's treatment operations are governed by a Land Application System Permit (the "LAS Permit") issued by Georgia's Environmental Protection Department ("EPD"). [*Id.* at 3, 31]. The LAS

Dalton's POTW is also governed by a General Stormwater Permit – National Pollutant Discharge Elimination System Permit issued by the EPD through its delegated authority from EPA under the Clean Water Act. [*Id.* at 31–32]. The LAS Permit requires Dalton to pretreat and monitor wastewater for specific constituents.[1] [*Id.* at 32]. After pretreatment, LAS Permit requires Dalton to monitor for additional constituents.[2] [*Id.*]. The LAS Permit does not specifically reference or have requirements for PFAS. [*Id.*]. The LAS Permit does have a provision that applies to groundwater, which states:

> Groundwater leaving land application system boundaries must not exceed maximum contaminant levels for drinking water. If groundwater samples indicate contamination, the permittee will be required to develop a plan which will ensure that the primary maximum contaminant levels for drinking water are not exceeded. The plan will be implemented by the permittee immediately upon [EPD] approval.

[*Id.* at 33].

In 2009, Dalton became aware that PFAS was in wastewater entering the POTW. [Doc. 85 at 33]. However, because the EPA did not adopt any MCLs governing PFAS until June 2024, Dalton's permits did not implicate PFAS in any way prior to June 2024. [*Id.*].

---

[1] The specific constituents to monitor are biochemical oxygen demand, total suspended solids, pH, chemical oxygen demand, total Kjeldahl nitrogen, ammonia nitrogen, nitrate plus nitrite, total phosphorous and ortho-phosphate. [Doc. 85 at 32].

[2] Additionally monitoring after pre-treatment includes biochemical oxygen demand, total suspended solids, pH, Nitrate-Nitrogen, and fecal coliform bacteria. [Doc. 85 at 32].

Upon the EPA's request, Dalton conducted sampling at various locations within the POTW.[3] [*Id.* at 33–34]. The sampling data demonstrated elevated levels of PFAS at the POTW, and the data was shared with the EPA and EPD. [*Id.* at 34]. While elevated, the levels did not violate the permit conditions or other regulatory requirements. [*Id.*].

After 2009, additional sampling at the POTW on the LAS and surrounding waters including the Conasauga River, also showed elevated PFAS levels. [Doc. 85 at 34]. Once the MCLs for PFAS went into effect in June of 2024, surface water and groundwater sampling at the POTW around the LAS boundaries showed levels far exceeding the MCLs for PFAS and, for the first time, Dalton was subject to compliance with obligations related to PFAS in the incoming wastewater, as well as the PFAS already disposed of in the POTW. [*Id.* at 34–35]. Experts believe that once applied, PFAS has resided, and will continue to reside, at the LAS for many years as it migrates within and through the LAS at the POTW. [*Id.* at 35]. It is alleged that PFAS migration off of the LAS will continue for the foreseeable future. [*Id.*]. The LAS permit does not allow groundwater at the LAS boundary to exceed MCLs for drinking water. [*Id.* at 5–6]. This situation requires Dalton to make significant and costly upgrades to the POTW to remedy the existing PFAS contamination and

---

[3]  This included pump stations, spray heads on the LAS, surface waters on LAS, soil, sludge, and compost. [Doc. 85 at 34].

prevent future contamination. [*Id.*]. Georgia law also requires Dalton to issue and enforce Sewer User Rules and Regulations ("SURR"). [*Id.* at 33]. SURR prohibits users from discharging waste to the Dalton POTW that inhibits or disrupts the POTW or causes a violation of Dalton's LAS Permit. [*Id.*].

After 2024 (when Dalton was allegedly first aware of elevated PFAS at POTW), Dalton engaged technical consultants to investigate the POTW and potential remedial options. [Doc. 85 at 35]. Such Consultants are designing and executing a pilot study for treating PFAS in wastewater, assessing the viability of installing PFAS treatment in existing wastewater treatment plants and converting to a direct discharge system, as well as engineering measures at the LAS for PFAS collection and treatment. [*Id.* at 35–36].

Faced with the recovery and clean-up costs associated with the PFAS contamination, the City of Dalton (hereinafter "Dalton") filed this lawsuit asserting claims against two categories of Defendants:

- <u>PFAS Chemical Defendants</u> – 3M Company ("3M"), EIDP, Inc., f/k/a/ E.I. DuPont de Nemours and Company ("EIDP"), The Chemours Company ("Chemours," collectively with EIDP "DuPont"), Daikin America, Inc. ("Daikin"), and INV Performance Surfaces, LLC ("Invista").

- Carpet Manufacturing Defendants – Aladdin Manufacturing Corporation ("Aladdin"), and Shaw Industries Group, Inc. (Shaw Industries, Inc. and Shaw Industries Group, Inc. together, "Shaw").

[Doc. 85 at 1–2].

All Defendants are alleged to have liability for CERCLA Cost Recovery [Doc. 85 at 36–39] and state law negligence, nuisance, trespass, and punitive damages/attorney's fees claims, as well as liability for violations of the Georgia Water Quality Control Act ("GWQCA"). [*Id.* at 39–51, 57–58]. Plaintiff also asserts negligent design and failure to warn claims against the PFAS Chemical Company Defendants. [*Id.* at 52–56]. In response to the complaint, each Defendant has individually moved to dismiss for failure to state a claim.[4]

## II. FACTUAL ALLEGATIONS

### A. PFAS Chemical Defendants

Broadly, Dalton alleges that all the PFAS Chemical Defendants sold PFAS and PFAS containing products to carpet and flooring manufacturers and either caused or arranged for these products to be disposed at the POTW. [Doc. 85 at 3]. 3M estimated that up to 25% of its PFAS and PFAS-containing products were lost to wastewater

---

[4] Because this case is before the Court on motions to dismiss, the following facts are drawn from Plaintiff's Amended Complaint [Doc. 85], and all well-pleaded facts therein are accepted as true. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). Additionally, all document citations herein shall refer to the PDF page number(s) and not the page number(s) reflected on the particular document.

during the Carpet Manufacturing Defendants' normal operations, depending on specific application method used. [*Id.* at 21]. The PFAS Chemical Defendants allegedly did not disclose to Dalton the environmental risks associated with the use of PFAS. [*Id.* at 3].

Dalton alleges that the PFAS Chemical Defendants exercised control of the operations of the Carpet Manufacturing Defendants by having licensing agreements that controlled specific methodology the Carpet Manufacturing Defendants used and arranged for the disposal of the PFAS laden wastewater at Dalton's POTW. [Doc. 85 at 3–4]. According to Dalton, some of the PFAS Chemical Defendants even owned the equipment the Carpet Manufacturing Defendants used to apply their chemicals [*Id.* at 4]. Dalton further alleges that the PFAS Chemical Defendants had superior knowledge of the dangers and environmental risks associated with the use of PFAS chemicals and that such knowledge was not shared with Dalton. [*Id.* at 5]. Accordingly, Dalton claims that the PFAS Chemical Defendants are responsible for the PFAS found in the influent, effluent, biosolids, soils, ground and surface water at and surrounding the LAS, as well as in areas further downstream of the LAS. [*Id.* at 5].

1.  3M Company

3M was the first company that developed and produced PFAS chemical products on a commercial scale. [Doc. 85 at 12]. 3M allegedly knew, as early as the 1960's,

that PFAS was mobile and could contaminate groundwater. [*Id.* at 14]. By the late 1970's, 3M was aware PFAS was resistant to treatment or removal through the conventional wastewater treatment process. [*Id.*]. Yet, 3M allegedly did not disclose these environmental risks, but rather, took active steps to conceal them.[5] [*Id.*].  In May of 2000, 3M publicly announced it would phase out PFOS and PFOA manufacturing and find substitutes after data sent to the EPA showed that such chemicals tended to accumulate in human and animal tissues and could potentially pose a long-term risk to human health and the environment. [*Id.* at 18]. In 2006, 3M had failed to limit PFOA and PFAS chemicals and was fined over one million dollars for violations of the TSCA, including violations specifically related to PFAS. [*Id.*].

3M sold PFAS and PFAS-containing products to two Dalton-area production plants owned by the Carpet Manufacturing Defendants. [Doc. 85 at 20]. To better serve its customers, 3M owned and operated a laboratory (the "3M Lab") that replicated the manufacturing process and produced carpet. [*Id.* at 24]. 3M did this

---

[5]  In 1975, two academic researchers allegedly contacted 3M about finding PFAS compounds in human blood at blood banks around the country. [Doc. 85 at 14–15]. 3M responded by asking the researchers to not speculate about whether 3M was the PFAS source. [*Id.* at 15]. Later in the year, 3M confirmed that its PFOS was the compound found in that blood, but 3M did not alert researchers, the public, or regulators until nearly 20 years later. [*Id.*]. In 1988, an internal 3M document allegedly confirmed that 3M had perpetuated the myth that fluorochemical products were "biodegradable" and that such situation, when discovered, would cause the company great embarrassment, including product withdrawal. [*Id.*]. In March 1999, a 3M toxicologist disclosed 3M's failure to alert about PFAS environmental risk to the EPA. [*Id.*]. The toxicologist asserted that while 3M kept this information from the public, it continued to sell these products and encouraged those working on them to not write down their thoughts or compose emails that could be viewed in the legal discovery process. [*Id.* at 15–16].

by studying PFAS application standards of the Carpet Manufacturing Defendants' plant operations and addressing any problems that they were having with the application of PFAS and PFAS-containing products. [*Id*.]. In operating its lab, 3M is alleged to have generated PFAS laden wastewater which was discharged into Dalton's POTW. [*Id.* at 25]. It is alleged that 3M began discharging PFAS in the wastewater from the lab in 1989, perhaps even earlier. [*Id*.].

Additionally, in 1999, 3M allegedly disclosed to carpet manufacturers the environmental risks associated with PFOS chemicals that the Carpet Manufacturing Defendants had been using in their manufacturing processes, and it offered to conduct industrial hygiene surveys of the carpet manufacturers' production facilities to assess employee exposure to PFAS. [Doc. 85 at 25]. 3M also told the Carpet Manufacturing Defendants that it was working to reduce the presence of PFOS in 3M's wastewater due to environmental risks associated with the product. [*Id.* at 26]. 3M had a licensing agreement with the Carpet Manufacturing Defendants which governed the Carpet Manufacturing Defendants' manufacturing process and gave audit or inspection rights to 3M. Additionally, 3M allegedly owned, installed and maintained the equipment used to apply its PFAS-containing products. According to Dalton, 3M provided advice, instruction, and guidance to the Carpet Manufacturing Defendants regarding their operations, including the disposal of wastewater. [*Id.* at 27–29]. 3M's environmental engineering and pollution control

10

department employees also allegedly provided advice and instruction directly to Dalton about wastewater treatment regarding 3M's products. [*Id.* at 29]. However, 3M did not disclose to Dalton the presence or environmental risk of PFA or its PFAS-containing products. [*Id.* at 29–30].

**2. DuPont**

DuPont began developing its own version of PFAS during the 1950s. [Doc. 85 at 13]. By the early 1960's, DuPont had identified the environmental risks PFOA posed when disposed of in untreated PFAS-containing waste.[6] [*Id.* at 16]. By the 1980's, DuPont was aware that PFOA could enter the environment during the manufacture, use, and conventional disposal of PFOA and PFOA-containing products and materials.[7] [*Id.* at 17]. In an attempt to phase out the "long chain" or "C-8" PFAS, DuPont began to develop GenX chemicals, a "short chain" or "C-6" PFAS. [*Id.* at 13, 19].

---

[6] In 1966, a DuPont memorandum memorialized that researchers determined that without pretreatment, disposal of solid wastes containing PFOA would result in small amounts of PFAS being leached into groundwater. [Doc. 85 at 16]. In 1975, another DuPont internal memorandum acknowledged that underground water supplies near waste disposal facilities had contaminants of small amounts of PFOA. [*Id.*]. DuPont decided not to dispose of its waste at a local landfill where a large quantity of underground water was present. [*Id.* at 16–17].

[7] An internal memorandum in 1986 acknowledged that DuPont's management was concerned about PFAS exposure to employees, surrounding communities, and those downstream of the DuPont manufacturing plant. [Doc. 85 at 17]. DuPont determined the potential liability from C8 exposure was large and should limit the release of C8 to the environment. [*Id.*]. The same memorandum determined that biological waste treatment was not worth considering for PFAS compounds because there was no micro-organism to detoxify a perfluoro-carbon chain. [*Id.*].

DuPont sold PFAS and PFAS-containing products to the Carpet Manufacturing Defendants. [Doc. 85 at 20]. DuPont was the owner and operator of its own lab in Dalton, Georgia (the "DuPont Lab"). [*Id.* at 23]. At the DuPont Lab, DuPont replicated the manufacturing processes used by the Carpet Manufacturing Defendants and produced carpet at the lab, including the application of its PFAS and PFAS-conatining products [*Id.*]. During the DuPont Lab's ordinary course of operations, DuPont generated wastewater and arranged for its disposal into Dalton's POTW. [*Id.* at 24]. It is alleged that the PFAS laden wastewater has been discharged from the DuPont Lab since at least 1987. [*Id.*].

DuPont is also alleged to have had control over the Carpet Manufacturing Defendants' plant operations under a licensing agreement that imposed obligations on the Carpet Manufacturing Defendants' use of the PFAS and PFAS-containing products. [Doc. 85 at 27]. DuPont had contractual rights to govern the Carpet Manufacturing Defendants' manufacturing processes, audit or inspect products and operations, and assign its own employees to manage relationships with various technical employees or sales representatives. [*Id.* at 27–28]. DuPont owned, installed, and maintained the equipment the Carpet Manufacturing Defendants used to apply its PFAS-containing products to their carpet products. [*Id.* at 29]. Further, DuPont's wastewater and water treatment group allegedly gave advice and instructions to its customers, including the Carpet Manufacturing Defendants, about

issues related to wastewater disposal. [*Id.* at 29–30]. DuPont's water pollution control experts gave advice and instructions to Dalton about wastewater treatment for DuPont's products. [*Id.* at 30]. Yet, DuPont allegedly did not disclose to Dalton the presence or the environmental risks of DuPont's PFAS-containing products. [*Id.*].

**3.** <u>Invista</u>

In 2004, DuPont "spun off" a segment of its textiles business, which became Invista. [Doc. 85 at 13, 19]. Like DuPont, Invista sold DuPont-branded PFAS products to the Carpet Manufacturing Defendants for industrial use that generated PFAS-filled wastewater that was discharged into the POTW. [*Id.* at 19–20]. In 2008, Invista began supplying PFAS products made by DuPont, Chemours, and Daikin to certain Carpet Manufacturing Defendants, and it also purchased PFAS from other sources and blended them into formulated chemical solutions which Invista then sold to the Carpet Manufacturing Defendants. [*Id.* at 20].

Invista is alleged to have taken steps to facilitate the adoption and continued use of PFAS and PFAS-containing products by the carpet manufacturing industry. [Doc. 85 at 13]. Specifically, when Invista acquired DuPont's textile operations, it acquired the DuPont Lab and continued to operate it in the same manner to research and develop test carpet fibers with PFAS and PFAS-containing products. [*Id.* at 24]. Invista Lab's wastewater is discharged into Dalton's POTW. [*Id.*].

Invista allegedly advised the Carpet Manufacturing Defendants regarding the manufacturing processes used to apply PFAS and PFAS-containing products to their products, knowing that the Carpet Manufacturing Defendants' PFAS-laden wastewater would be discharged into Dalton's POTW. [Doc. 85 at 26–27]. Invista entered into a licensing agreement with the Carpet Manufacturing Defendants which governed their use of the PFAS and PFAS-containing products and manufacturing processes, as well as providing Invista with rights to audit and inspect products and operations. [*Id.* at 27–28]. Further, Invista continued to employ former DuPont employees to manage its relationship with the Carpet Manufacturing Defendants. [*Id.*]. Invista's representatives allegedly provided advice, instruction, and guidance about the Carpet Manufacturing Defendants' operations and disposal of the waste from its products. [*Id.* at 29]. Invista owned and maintained equipment the Carpet Manufacturing Defendants used to apply PFAS-containing products to carpets. [*Id.*].

**4.** Daikin

Daikin's parent company began making PFAS in the 1940s, and Daikin continued these operations. [Doc. 85 at 13]. When 3M started to phase out PFAS and PFOA production, Daikin continued to produce and expanded its market share of PFAS-containing products that contained PFOA. [*Id.* at 18]. However, Daikin stopped manufacturing and using PFOA and related substances in late 2015. [*Id.* at 19]. Daikin sold PFAS and PFAS-containing products to the Carpet Manufacturing

14

Defendants. [*Id.* at 20]. Daikin's representatives allegedly studied the Carpet Manufacturing Defendants' plant operations, how their products were made, how PFAS and PFAS-containing products were applied, and more. [*Id.* at 28–29]. Daikin allegedly possessed superior knowledge about PFAS wastewater treatment and advised Carpet Manufacturing Defendants regarding the potential impact of Daikin's products on their wastewater processes. [*Id.* at 30]. However, unike the allegations against 3M, DuPont, and Invista, there are no allegations of fact showing that Daiken operated it own lab or had any authority or control over the Carpet Manufacturing Defendants' waste disposal process.

### B. Carpet Manufacturing Defendants

**1.** <u>Shaw</u>

Shaw opened its carpet and flooring manufacturing facilities in Dalton, Georgia area in 1967 and continues its operations today. [Doc. 85 at 19]. Shaw purchased PFAS and PFAS-containing products from 3M, DuPont, Daikin, and Invista. [*Id.* at 20]. At its plants, Shaw applies PFAS and PFAS-containing products to its carpet and flooring. [*Id.*]. The manufacturing process it uses generates wastewater, which is discharged into Dalton's POTW. The discharge of wastewater from the Shaw plants to the POTW has been ongoing since the 1970s, and sampling data shows that Shaw's wastewater contained PFAS, including PFOA and PFOS.[8] [*Id.* at 20–22].

---

[8] The sampling data was from the years 2009, 2010, 2011, 2012, 2013, and 2016. [Doc. 85 at 22].

**2.** Aladdin

Beginning in the 1950s and continuing today, Aladdin operates carpet and flooring manufacturing facilities in Dalton, Georgia area. [Doc. 85 at 20]. Aladdin purchased PFAS and PFAS-containing products from 3M, DuPont, Daikin, and Invista. [*Id.*]. At its production plants, Aladdin applies PFAS and PFAS-containing products to carpet and flooring. Its manufacturing process produces wastewater, which is discharged into Dalton's POTW. The discharge of wastewater from the Aladdin plants to the POTW has been ongoing since 1954, and sampling data shows that Aladdin's wastewater contained PFAS, including PFOA and PFOS.[9] [*Id.* at 20–23].

## III.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that the facts of the complaint must demonstrate all of the required elements of the asserted claims. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). These facts, which are accepted as true at the pleadings stage, must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662,

---

[9]  This sampling data was from the years 2009, 2010, 2011, 2013, 2014, and 2016. [Doc. 85 at 23].

16

678 (2009). Conclusory allegations and legal conclusions "masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that "naked assertions devoid of further factual enhancement" are insufficient) (citation omitted). "[A] plaintiff armed with nothing more than conclusions" cannot "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79. Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

## IV.  DISCUSSION AND CONCLUSIONS OF LAW

### A. Dalton's CERCLA Cost Recovery Claim

The elements necessary for a cost recovery claim requires a plaintiff to establish: 1) that the site is a CERCLA "facility"; 2) that there was a release or threatened release of a hazardous substance; 3) which caused the plaintiff to incur response costs consistent with the National Contingency Plan; and 4) that the defendant is a statutorily liable person or entity. *Blasland, Bouck & Lee, Inc., v. City of North Miami*, 283 F.3d 1286, 1302 (11th Cir. 2002). To be considered a "facility", a site needs to meet the qualifications under 42 U.S.C. § 9601(9).[10] *See Redwing Carriers,*

---

[10] "The term 'facility' means A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into  sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel. 42 U.S.C. § 9601(9).

*Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996). The national contingency plan defines how "hazardous substances" are determined and designated for treatment. 42 U.S.C. § 9605(a).  Strict liability is imposed for environmental contamination upon:

1) [T]he owner and operator of a vessel or a facility,

2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance…"

42 U.S.C. § 9607(a).

The PFAS Chemical Company Defendants dispute any liability based on their alleged designation as an "arranger" for the disposal of the PFAS at issue in this case. Liability as an "arranger" under 42 U.S.C. § 9607(a)(3) may be imposed if an entity entered "into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S.

599, 610 (2009). However, "an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of the product later, and unknown to the seller, disposed of the product in a way that led to contamination." *Id.* For other cases in between these two extremes, courts must determine if an entity is an arranger through a fact intensive inquiry to determine if the transaction falls under CERCLA as Congress intended. *Id.* CERCLA does not define "arrange," but the Supreme Court has given the phrase its ordinary meaning, allowing an entity to qualify when it takes intentional steps to dispose of a hazardous material. *Id.* at 611. "Knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.* at 612. For a manufacturer to be liable, "evidence must indicate the manufacturer is the party responsible for 'otherwise arranging' for the disposal of the hazardous substance." *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir. 1990).

Courts have pointed to several factors to evaluate if a transaction amounts to an arrangement to dispose; none of the factors, however, are necessarily dispositive because "arranger liability determinations are to be made based on the facts of each individual case." *Concrete Sales & Servs., Inc., v. Blue Bird Body Co.*, 211 F.3d 1333, 1336–37 (11th Cir. 2000) (citing *S. Fla. Water Management Dist. v. Montalvo*, 84 F.3d 402, 406–07 (11th Cir 1996). The relevant factors include:

19

> 1) Whether a sale involved the transfer of a 'useful' or 'waste' product; 2) whether the party intended to dispose of a substance at the time of the transaction; 3) whether the party made the 'crucial decision' to place hazardous substances in the hands of a particular facility; 4) whether the party had knowledge of the disposal; and 5) whether the party owned the hazardous substances.

*Id.* (citations omitted). In light of the intent requirement, courts have long recognized a manufacturer's so-called "useful product" defense to CERCLA claims. *Team Enterprises, LLC v. W. Inv. Real Est. Trust*, 647 F.3d 901, 908 (9th Cir. 2011). "The defense prevents a seller of [a] useful product from being subject to arranger liability, even if product itself is a hazardous substance requiring future disposal." *Id.* And, intent cannot be inferred from a mere failure to warn about a product's inherent risk. *Id.* at 609. Otherwise, this would expand the scope of CERCLA liability; the intent requirement must show that a company entered into the transaction with the specific purpose of disposing of the hazardous substance. *Id.* Foreseeability alone does not support arranger liability. *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 570 (6th Cir. 2021).

In reviewing Dalton's allegations of CERCLA liability, the Court finds the following cases to be instructive. In *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599 (2009), a chemical distribution company purchased pesticides and other chemical products from Shell Oil Company. *Id.* at 602. Shell delivered the hazardous chemical to the distribution company's place of business, which was located on property owned by Burlington. *Id.* at 602–03. When the distribution company

transferred the chemical products to bulk storage tanks on the property, and later to bobtail trucks, nurse tanks, and pull rigs for further distribution, transfer leaks could and did occur due to faulty connections, overflows, or accidental knock-overs. *Id.* at 603–04. Because the spills were so common, Shell encouraged distribution companies to use safe handling methods, providing them with detailed safety manuals, initiating a discount program for distributors that improved handling and safety, and even requiring distributors to obtain inspections by a qualified engineer and provide self-certification of compliance. *Id.* at 604. The Supreme Court held that Shell's knowledge of the occurrence of spills alone was not sufficient to establish "arranger" liability—Shell must have entered into the sale of chemicals with the intention that at least a portion of their products would be disposed of or spilled during the transfer process by at least one of the methods in 42 U.S.C. § 6903(3).[11] *Id.* at 612. While Shell was aware of minor, accidental spills during the transfer process, evidence did not support the inference Shell intended for the spills to occur. Rather, it was just the opposite. Shell took several steps to encourage a reduction of such spills. *Id.* at 612–13.

---

[11] The term "disposal" includes discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that solid waste or hazardous waste is emitted into the air or discharged into any waters. 42 U.S.C. § 6903(3); *see also Burlington N. and Santa Fe. Ry. Co. v. U.S.*, 556 U.S. 599, 611 (2009).

By contrast, other cases are illustrative to show the intent necessary to establish arranger liability. In *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp.2d 623 (S.D. Tex. 2007), the owner of a methanol pipeline sought CERCLA recovery costs for environmental damage from a methanol release from its pipeline. *Id.* at 628. The defendants had allegedly damaged the pipeline when working near its location, but intentionally covered it up by backfilling soil over the damage. The defendants moved to dismiss for failure to state a claim, but the district court determined that enough was alleged to allow the case to go forward. *Id.* at 635. The defendants were alleged to have known that damaged methanol pipeline was subject to accelerated corrosion, which could lead to a leak. *Id.* at 636. These allegations were enough to infer the possibility of arranger liability under federal pleading standards. *Id.*

In *U.S. v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373 (8th Cir. 1989), the EPA and the State of Iowa sought to recover costs incurred at a pesticide formulation facility. *Id.* at 1375.  The plaintiffs sought to recover costs from eight manufacturers which had hired the facility to formulate their technical grade pesticides into commercial grade pesticides. It was alleged that it was a common practice in the pesticide industry for manufacturers of active pesticide ingredients to contract with formulators to produce commercial grade product which may then be sold. *Id.* The complaint alleged that, although the facility performed the actual mixing or formulating, the defendants actually owned the technical grade pesticide, the work

in process, and the commercial grade pesticide while it was in the facility's possession. The complaint also alleged that the generation of toxic wastes through spills, the cleaning of equipment, and the mixing and grinding operations, and the production of batches that do not meet specifications (and would have to be disposed) was an "inherent" part of the formulation process. *Id.* at 1375–76. The manufacturer defendants argued that they had contracted with the facility for the processing of a valuable product, not the disposal of waste, and that the facility controlled the processes used in formulating the defendants' pesticide for commercial use, as well as any disposal of the resulting wastes. *Id*. at 1376. The Eighth Circuit held that CERCLA liability may apply to the manufacturer defendants because they remained the owners of the chemicals and, as such, still retained control over the work in progress—including the disposal of waste.

And, in *U.S. v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F2d. 726 (8th Cir. 1986), the government filed a CERCLA action against the defendants after they arranged for waste-filled drums to be disposed at an off-site location and the hazardous substances within those drums began leaking into the soil. *Id*. at 729–30. The Eighth Circuit held that the arranger liability may attach because the defendants had the authority and control over the disposal process and had arranged for the disposal of the hazardous substances. *Id*. at 742, 744.

**1.** CERCLA claim against Daikin

Daikin contends that the CERCLA claim against it must be dismissed because it is not a "covered person" under 42 U.S.C. 9607(a)(1)–(4). [Doc. 93-1 at 13–15]. More specifically, Daikin argues that it cannot be considered an "arranger" [*Id.* at 15–16] just because of the allegations that it had knowledge of the hazardous nature of PFAS and that PFAS would be later be discharged in wastewater. Daikin further argues that the allegations of Daiken's control over the Carpet Manufacturer Defendants' wastewater disposal process have no factual basis. [*Id.* at 18–19]. In response, Dalton contends that it has alleged enough to show that Daikin possessed the authority and had control over their customers' wastewater disposal [Doc. 120 at 38, 48–49], but it points only to the licensing agreements that 3M, DuPont, and Invista entered into with Carpet Manufacturing Defendants to support this contention. [*Id.* at 49–50]. Daikin's mere act of advising the Carpet Manufacture Defendant of the dangers of PFAS waste disposal do not suggest that it had any authority or control over the disposal process. The Court agrees with Daikin's arguments.

First, Daikin's products containing PFAS were "useful" products that "serve[d] a particular, intended purpose" of giving carpet and flooring materials certain desired properties. The amended complaint does not allege that Daikin retained any ownership or control interests in the PFAS products after they were sold as useful

products to the Carpet Manufacturing Defendants for their sole use during their manufacturing process.  Second, Dalton has not alleged any facts to suggest that Daikin intended to dispose of the PFAS when it sold its product to the Carpet Manufacturing Defendants. Daikin did not have any labs at the carpet manufacturing facilities or have any contracts, agreements, or permits with the Carper Manufacturers to suggest that it had any intent, involvement, or authority to control the Carpet Manufacturing Defendants' use and disposal of their contaminated wastewater. Only 3M, DuPont, and Invista were alleged to have labs, contracts or licensing agreements (permits) which would indicate their involvement in the disposal of PFAS. [Doc. 85 at 28–30]. Third, Dalton has not alleged that Daikin actually discharged any PFAS-contaminated wastewater itself or participated in any "crucial decision" with others to place the PFAS-contaminated wastewater in Dalton's POTW. Finally, Dalton has not alleged facts to show that Daikin had knowledge of the specific manner of disposal or took any affirmative action to cause that disposal, thus failing to allege the necessary intent.

As Dalton has failed to allege sufficient facts to show that Daikin could have liability as an "arranger" under 42 U.S.C. § 9607(a)(3), the Court DISMISSES the CERCLA claim against Daikin.

**2.** CERCLA claim against 3M, DuPont, and Invista

The Court reaches a different conclusion as to the remaining Chemical Company Defendants—3M, DuPont, and Invista. The Court finds that Dalton has alleged sufficient facts to allow the CERCLA claims against them to proceed, at least at this stage of the proceedings. Specifically, Dalton has set forth factual allegations regarding their control over the PFAS handling and wastewater disposal process used by the Carpet Manufacturing Defendants. And, perhaps more importantly, there are factual allegations that these Chemical Company Defendants directly discharged some of the toxic chemicals that made their way to the POTW from wastewater created during the operation of their own labs. These allegations may prove not to be true, but that is a matter to be fleshed out during discovery. Accordingly, the Court DENIES their respective motions to dismiss as to this claim.

**3.** CERCLA claim against the Carpet Manufacturing Defendants

The Carpet Manufacturing Defendants contend that the CERCLA claims against them cannot be sustained under the theory of arranger liability. [Docs. 95 and 96]. They argue that the allegations of the amended complaint are insufficient to demonstrate that they intended to dispose of hazardous substances (PFAS) and, alternatively, that they discharged their wastewater into the POTW in compliance with Dalton's permits. [Doc. 96 at 13]. The Court is unpersuaded by their arguments.

The Carpet Manufacturing Defendants may have arranger liability because the allegations show that they arranged to dispose (and allegedly did dispose) of their PFAS-contaminated wastewater at Dalton's POTW. *See New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 679 (S.D. N.Y. 2015). Although the Carpet Manufacturing Defendants contend that they lacked the intent to be an arranger because they had no control over the manner in which Dalton handled the wastewater, a "party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." *United States v. Cello-Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir. 1996). Aladdin asserts the PFAS Chemical Defendants, not Aladdin, "owned or possessed the hazardous substances in that they developed and manufactured the PFAS products and controlled Aladdin's use and application of those products." [Doc. 96 at 20]. However, even if this were true to some degree, other facts still provide a basis for CERCLA liability. Specifically, the allegations show that the Carpet Manufacturing Defendants owned and operated the production plants that discharged the PFAS-contaminated wastewater into Dalton's POTW. [Doc. 85 at 21–22]. The Carpet Manufacturing Defendants allegedly made, or at least participated in, the critical decision to discharge that wastewater in POTW, and sampling data shows that for years it was known that the discharged wastewater contained PFAS [*Id.*]. And, the alleged facts show that the Carpet Manufacturing Defendants still purchased the

27

PFAS they applied to their products, knowing that the chemicals would be discharged in the wastewater. [*Id.* at 20].

Lastly, Shaw contends that the discharge of wastewater containing PFAS was allowed under Dalton's permits because such chemicals were not regulated. That defense, however, does not apply to CERCLA's strict liability—particularly at the motion to dismiss stage where, as here, Dalton has alleged that the Carpet Manufacturing Defendants knew that the toxic chemical was being discharged through the disposal of their wastewater.

For the above reasons, the Court DENIES the Carpet Manufacturing Defendants' motions to dismiss Dalton's CERCLA claim.

## B. Dalton's Negligence Claim

In Count III of its amended complaint, Dalton alleges that all Defendants were negligent for failing to exercise reasonable care in their use, handling, and disposal of the PFAS-containing products. In regard to the PFAS Chemical Company Defendants, in particular, Dalton alleges that they were negligent for failing to use reasonable care in supplying its chemical products to the Carpet Manufacturer Defendants when they knew or should have known that their PFAS-containing products were harmful to the environment and resistant to conventional wastewater treatment processes, and that they knew or should have known that PFAS would be

28

released during the foreseeable disposal of the Carpet Manufacturer Defendants' wastewater.

The elements for a negligence cause of action are: 1) a legal duty to conform to a standard of conduct raised by law to protect others against unreasonable risks of harm; 2) a breach of this standard; 3) a causal connection between the conduct and the injury; and 4) damages flowing from the breach of duty. *Weller v. Blake*, 315 Ga. App. 214, 219 (2012). A legal duty sufficient to support negligence liability may arise from either a statutory enactment or a common law principle. *See Sheaffer v. Marriot Int'l, Inc.*, 349 Ga. App. 338, 340 (2019).

Dalton alleges that all Defendants had a duty not to cause, contribute to, or permit the discharge of PFAS-contaminated wastewater into Dalton's POTW.  In response, Defendants rely upon *Dept. of Labor v. McConnell*, 305 Ga. 812 (2019), to support their arguments that they owed no general legal duty to avoid subjecting others, including Dalton, to the risk of harm associated with the discharge of wastewater. In *McConnell,* the Georgia Supreme Court held that there is not a general legal duty "to all the world not to subject [others] to an unreasonable risk of harm." *Id.* at 816 (citation omitted). However, Defendants' reliance on *McConnell* is misplaced.  Here, Dalton is not an unknown third party, but a foreseeable third party. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1328 (N.D. Ga. 2022); *see also Ogletree v. Navistar Int'l Transp. Corp.,* 194 Ga. App. 41, 47 (1989) (showing the manufacturer's duty extends

29

to a third-party if the harm to that party was reasonably foreseeable); *Dozier Crane & Mach., Inc., v. Gibson*, 284 Ga. App. 496, 499 (2007) (showing a supplier of refurbished equipment owed a duty to third persons to warn of foreseeable dangers associated with the refurbished equipment).

The Court will now address the PFAS Chemical Defendants' and the Carpet Manufacturing Defendants' remaining arguments separately.

**1.** PFAS Chemical Defendants

The PFAS Chemical Defendants argue that they do not owe a duty to Dalton to control the action of third parties (the Carpet Manufacturing Defendants) to prevent them from causing harm to others, including Dalton. In *Thomas v. Food Lion*, 256 Ga. App. 880 (2002), the Georgia Court of Appeals held that there was not a general duty to control the conduct of a third party to prevent them from causing physical harm to others when the defendant had no indication that any harm was going to occur. *Id.* at 882. But here, however, Dalton has alleged that the PFAS Chemical Defendants knew that the Carpet Manufacturer Defendants would be using their PFAS-containing products and that the disposal of PFAS-contaminated wastewater into Dalton's POTW would result from that intended use. [Doc. 85 at 52]. The Court notes that:

> One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which supplier should expect it to be put, is subject to liability for physical

30

harm caused by such use to those whom the supplier should expect to use the chattel or be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Restatement (Second) of Torts § 389 (Am. L. Inst. 1965).

The Court finds that alleged facts of this case are analogous to those presented in *Parris v. 3M Co.*, 595 F. Supp. 3d 1288 (N.D. Ga, decided March 3, 2022). In *Parris*, the defendants there were alleged to have manufactured and supplied PFAS to manufacturers who, in turn, discharged PFAS into specific state water systems. *Id.* at 1330. The plaintiff argued the defendants owed a duty of reasonable care under section 389 of the Second Restatement of Torts as a supplier of a knowingly hazardous product. *Id.* at 1328. In denying the defendants motion to dismiss, the district court accepted the plaintiff's well-pled allegations that the defendants knew of the various factors that would place their hazardous substances at risk of harming others and nonetheless continuously supplied PFAS to manufacturers knowing that the chemicals were unlikely to be made safe in their regular use and would contaminate the downstream waters. *Id.* at 1229–30. Specifically, the complaint alleged that defendants: (1) had known for decades that PFAS was toxic and persistent in humans and other animals; (2) had long been aware that conventional wastewater treatment processes were ineffective and would allow for accumulation of PFAS in surface waters and soils; and 3) notwithstanding these known risks of

31

harm, supplied PFAS to manufacturers without taking necessary precautions to prevent foreseeable PFAS contamination. *Id*. at 1330.  In the present case, Dalton has made essentially the same allegations in its amended complaint. [*See* Doc. 85 at ¶¶ 4, 5, 10, 17–18, 192, 194–198, 209, 225, 254–257, 267–269, 279]. In this Court's view, these allegations plausibly demonstrate that the PFAS Chemical Company Defendants had a duty owed under Georgia law to prevent foreseeable harm to a foreseeable third party—namely, Dalton.

Furthermore, the Court is unpersuaded by the PFAS Chemical Defendants' argument that Dalton fails to sufficiently allege the causation element required for its negligence claim against them.  Specifically, they contend that Plaintiff's injuries were not proximately caused by the PFAS Chemical Defendants' acts or omissions, but, instead, were the result of the Carpet Manufacturing Defendants' intervening negligent wastewater disposal practices. But, Dalton alleged in its amended complaint that the PFAS Chemical Company Defendants knew that their PFAS-containing products were resistant to conventional wastewater treatment processes and, thus, knew or should have known that PFAS would be released during the Carpet Manufacturing Defendants' disposal of their wastewater.  Based on these allegations, the Court cannot say that the anticipated and foreseeable act of discharging the wastewater severs the chain of causation for Dalton's injuries. *See, e.g., Warner v. Arnold*, 133 Ga. App. 174, 177 (1974) (an intervening act does not

32

sever proximate causation if the original wrongdoer "had reasonable ground for apprehending that such … act would be committed"); *see also Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 335 (1984) (when a manufacturer's product is being used by a consumer in a manner that was not intended at the time of the injury, the manufacturer's liability for that injury depends upon the foreseeability of that misuse).

Not only do the allegations show that, at the time the PFAS Chemical Company Defendants supplied their PFS-containing products to the carpet manufacturers, it was foreseeable that the PFAS would be discharged through the wastewater, the allegations also show that some of the PFAS Chemical Company Defendants (3M, DuPont, and Invista) participated in the discharge process or decisions made by the Carpet Manufacturing Defendants and/or had actually discharged such waste from their own labs, which ended up in Dalton's POTW.

For the above reasons, the Court DENIES the PFAS Chemical Company Defendants' motions to dismiss as to the negligence claim in Count III.

**2.** Carpet Manufacturing Defendants

The Carpet Manufacturing Defendants argue they do not owe a duty to Dalton which could be the basis for the claim of negligence. Specifically, they argue that their obligations related to providing wastewater to Dalton are set forth in their contracts and commercial relationships with Dalton (permits), and that any breach

33

of those obligations cannot form the basis of tort liability. For reasons stated below, this argument is a nonstarter.

As an initial matter, the Court notes that the licensing agreements and permits do not specifically require the removal of PFAS from their wastewater. Further, Georgia law has recognized a common law duty "not to negligently or wrongfully injure and damage the property of" another. *AMC Cobb Holdings, LLC v. Plaze, Inc.*, No. 1:18-cv-04865-SDG, 2019 WL 13207581 at *4 (N.D. Ga. Dec. 11, 2019) (quoting *Unger v. Bryant Equip. Sales & Servs., Inc.*, 255 Ga. 53, 54 (1985)). This common law duty arises "independently from any duty under a contract." *E. & M. Const. Co. v. Bob*, 115 Ga. App. 127, 128 (1967); *see also Mauldin v. Sheffer*, 113 Ga. App. 874, 880 (1966); *Monroe v. Guess*, 41 Ga. App. 697, 700 (1930). As the Carpet Manufacturing Defendants owned and operated facilities, allegedly discharged PFAS-contaminated wastewater into Dalton's POTW, and allegedly had knowledge of the environmental risks that PFAS posed, the Court has no trouble concluding that they owed a duty not to negligently cause damage to Dalton's POTW.

The Carpet Manufacturing Defendants raise a consent or assumption of risk[12] argument based upon Dalton's acceptance of their wastewater under the permits each year. Assumption of risk is an affirmative defense which requires a defendant to

---

[12] Under Georgia law, the principles of consent and the assumption of the risk are generally the same. *Roberts v. King*, 102 Ga. App. 518, 521 (1960).

"establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed [itself] to those risks." *Ga. Power Co. v. Brandreth Farms, LLC*, 364 Ga. App. 816, 825–26 (2022) (citations omitted). However, a motion to dismiss for failure to state a claim cannot be granted on the basis of an affirmative defense unless the elements of the affirmative defense are admitted by the plaintiff or otherwise completely disclosed on the face of the plaintiff's pleadings. *Norris v. Atlanta Braves, Inc.*, 920 S.E.2d 717, 722 (2025); *Speedway Motorsports, Inc. v. Pinnacle Bank*, 315 Ga. App. 320, 323 (2012).  Here, that has not happened.

In any event, "knowledge of the risk…means both actual and subjective knowledge on the plaintiff's part." *Vaughn v. Pleasant*, 266 Ga. 862, 864 (1996). The risk needs to be appreciated for the specific, particular risk of harm associated with the activity that proximately caused the injury. *Id.* General, non-specific warnings of the risk will be inadequate for assumption of risk to attach. *See Saltis v. A.B.B. Daimler Benz*, 243 Ga. App. 603, 608 (2000). Here, one cannot conclude that the risks were knowingly assumed by virtue of the permits when the permits were silent about PFAS contaminates. [*See* Doc. 85 at ¶ 152].  After all, the EPD didn't set standards for PFAS until 2024. [*Id*. at 33].  And, Dalton has alleged that it did not initially know that PFAS was a constituent in wastewater disposed of at the POTW, and even after it learned that the wastewater contained PFAS, it lacked superior

knowledge of the specific environmental risks regarding PFAS contamination. [*Id.* at ¶¶ 199, 212, 226]. At this stage of the proceedings, it is premature to conclude that Dalton had the required knowledge of the dangers of PFAS and knowingly assumed the risk of PFAS contamination at its POTW.

After a review of the amended complaint, the Court finds that Dalton has adequately pled enough facts to demonstrate all the elements of negligence against the Defendants. Therefore, the Court DENIES Defendants' respective motions to dismiss as to the negligence claim.

### C. Dalton's Nuisance Claim

Under Georgia law, nuisance is anything that causes hurt, inconvenience, or damage to another person's property. *See Petree v. Dept. of Transp.*, 340 Ga. App. 694, 702 (2017) (quoting *Bishop Eddie Long Ministries v. Dillard*, 272 Ga. App. 894, 901 (2005)); *see also Sumitomo Corp. of Am. v. Deal*, 256 Ga. App. 703, 707 (2002); O.C.G.A. § 41-1-1. Courts in Georgia have held that the discharge or release of harmful pollutants or substances may constitute a nuisance. *See e.g., Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727 (1992) (exudation and leaching of chemicals into the ground constituted a nuisance for which O.C.G.A. § 41-1-1 gives a cause of action); *see also Scarlett & Assocs., Inc. v. Briarcliff Ctr. Partners, LLC*, 2009 WL 3151089, at *16 (N.D. Ga. Sept. 30, 2009) (recognizing that plaintiff could maintain claim for nuisance based on the discharge of tetrachloroethane chemicals

36

from a dry cleaning facility onto areas in and around a shopping center).  To establish a nuisance claim, a plaintiff must show "the existence of the nuisance complained of, that he or she suffered an injury, and that the injury complained of was caused by the alleged nuisance." *Bord v. Hillman*, 335 Ga. App. 18, 21 (2015) (citation omitted). Within the causation element, a plaintiff needs to sufficiently allege the defendant had "control over the cause of the harm." *Ingles Markets, Inc. v. Kempler*, 317 Ga. App. 190, 196 (2012).

    **1.** <u>Nuisance claim against Daikin</u>

In its amended complaint, Dalton alleges that the PFAS Chemical Defendants created a continuous, private nuisance at Dalton's POTW by selling and supplying PFAS and PFAS-containing products to the Carpet Manufacturing Defendants and instructing them regarding their use and application.  However, it is important to note that these allegations, standing alone, do not establish a viable claim for nuisance.  Dalton must also assert facts to show that the cause of the alleged harm— here, the discharge of PFAS-contaminated wastewater into Dalton's POTW—was controlled by the PFAS Chemical Company Defendants. *See Terry v. Catherall*, 337 Ga. App. 902, 905 (2016) ("the essential element of nuisance is control over the cause of the harm); *Ingles Markets, Inc.*, 317 Ga. App. at 196 (same); *see also Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, No. 85-126-3-MAC, 1986 WL 12447 at *6 (M.D. Ga. Mar. 9, 1986) ("as an elementary principle of tort law, a nuisance claim

may only be alleged against one who is in control of the nuisance creating instrumentality").

Here, Dalton has failed to allege sufficient facts to show that Daikin had any involvement or authority to control the Carpet Manufacturing Defendants' disposal of their PFAS-contaminated wastewater. Therefore, the Court DISMISSES the nuisance claim against Daikin.

**2.** Nuisance claim against 3M, DuPont, Invista, and the Carpet Manufacturing Defendants

The Court reaches a different conclusion, however, as to the remaining PFAS Chemical Company Defendants (3M, DuPont, and Invista), as well as the Carpet Manufacturing Defendants.  The Court finds that Dalton has alleged sufficient facts to allow the nuisance claim against these Defendants to proceed.

Again, the alleged harm suffered by Dalton is the discharge of PFAS-contaminated wastewater into its POTW.  In its amended complaint, Dalton has alleged sufficient facts to show that Carpet Manufacturing Defendants discharged their PFAS-contaminated wastewater into the POTW.  And in regard to 3M, DuPont, and Invista, Dalton has asserted factual allegations regarding their involvement in the PFAS handling and wastewater disposal process used by the Carpet Manufacturing Defendants. Furthermore, there are also factual allegations that these Chemical Company Defendants directly discharged some of the toxic chemicals that made their way to the POTW from wastewater created during the operation of their

own labs.  The fact that Defendants may have been discharging their wastewater in accordance with Dalton's permits is of no consequence, as Dalton has alleged that the discharge of PFAS onto its property exceeded the scope of the permits. [*See* Doc. 85 at ¶¶ 152, 199, 212, 226]. As Dalton has alleged sufficient facts to support all of the necessary elements of a nuisance claim against 3M, DuPont, Invista, and the Carpet Manufacturing Defendants, the Court DENIES their respective motions to dismiss as to this claim.

**D. Dalton's Trespass Claim**

Generally, a trespass involves a wrongful act that interferes with an owner's right to exclusively use and enjoy his property. *See Petree*, 340 Ga. App. at 702; *Rinzler v. Folsom*, 209 Ga. 549, 552 (1953)); *see also* O.C.G.A. § 51-9-1. For an act to constitute a trespass, the act must be intentional. *Tyler v. Lincoln*, 272 Ga. 118, 120 (2000). An interference with one's property rights can be created by  a person's unauthorized entry onto another's or by any intentional act by a person which introduces an unauthorized element or substance onto another's property. *See Merlino v. City of Atlanta*, 283 Ga. 186, 190 (2008) (trespass claim allowed to proceed where defendant landowners knowingly plugged drainage pipe under their own property which caused the flooding of the plaintiffs' property).  Lastly, Georgia courts have historically acknowledged that a municipality (like Dalton) has the authority to assert civil trespass claims. *See City of Summerville v. Ga. Power Co.*,

205 Ga. 83 (1949) (showing the city had proper standing for trespass claim against a corporate defendant); *Bright v. City of Washington*, 95 Ga. App. 84, 86 (1957); *East v. Mayor of Wrightsville*, 217 Ga. 846, 848 (1962) ; *Sutton v. City of Cordele*, 230 Ga. 681 (1973).

**1.** Trespass Claim against Daikin

Daikin argues that Dalton fails to state a plausible trespass claim against it because Dalton has not alleged any facts to show that Daiken did any act or directed an action toward Dalton's property that interfered with its property rights, which is an essential element of a trespass claim. *See Miller v. Smith & Smith Land Surveyors, P.C.*, 194 Ga. App. 474, 474 (1990) (no viable trespass claim where there was no allegation that any of the actions complained of were directed toward plaintiff's property).  The Court agrees.

The Court acknowledges that a trespass may occur when a person does an intentional act with knowledge that the consequence of that act will cause an interference with another's property. *See Merlino*, 283 Ga. at 190.  In *Merlino*, the Georgia Supreme Court held that the plaintiffs had asserted a viable trespass claim because the defendants admittedly plugged the pipe with the intent to divert excess water from their property while knowing that it would flood the plaintiffs' property and, thus, they directly infringed upon the plaintiffs' property rights. But here, Daikin's act of selling PFAS chemical products to the Carpet Manufacturing

Defendants was not the direct cause of the alleged interference of Dalton's property rights—i.e., the PFAS-contamination of Dalton's POTW.  Rather, it was the discharge of PFAS-contaminated wastewater that interfered with Dalton's property rights.  As noted earlier, Dalton has failed to allege facts to show that Daikin had any involvement or authority to control the Carpet Manufacturing Defendants' discharge of their PFAS-contaminated wastewater into the POTW. Without any facts to suggest that Daiken committed an intentional act that caused the PFAS-contaminated wastewater to be discharged into Dalton's POTW, the trespass action against Daikin cannot proceed. *See Lanier v. Burnette*, 245 Ga. App. 566, 570 (2000) ("[T]he act of trespass must have been a voluntary, intentional act in that it intended the immediate consequences of the act, causing the trespass or invasion, i.e., an intended act as opposed to a negligent act").  Therefore, the Court DISMISSES the trespass claim against Daikin.

**2.** <u>Trespass claim against 3M, DuPont, Invista, and the Carpet Manufacturing Defendants</u>

As noted earlier, sufficient facts have been alleged in the amended complaint to show that Carpet Manufacturing Defendants intentionally discharged their PFAS-contaminated wastewater into Dalton's POTW.  And in regard to 3M, DuPont, and Invista, Dalton has asserted factual allegations regarding their involvement in the PFAS handling and wastewater disposal process used by the Carpet Manufacturing Defendants. Furthermore, there are also factual allegations that these Chemical

Company Defendants directly discharged some of the toxic chemicals that made their way to Dalton's POTW from wastewater created during the operation of their own labs.  Based on the foregoing, the Court finds that Dalton has alleged sufficient facts to support the necessary elements for a trespass claim.

The Defendants argue, however, that they cannot be liable for trespass because, in sending their wastewater to Dalton's POTW, they were acting with the consent of Dalton in accordance with the discharge permits.  However, these arguments fail because consent is no defense to trespass (or to any other common law tort) if the acts done are not within the scope of the consent. *See Newman Mfg. Co. v. Young*, 109 Ga. App. 763, 763 (1964) ("[C]onsent is no defense if the acts done are not within the scope of the license or not covered by such consent"); *Sheppard v. Yara Eng'g Corp.*, 248 Ga. 147, 149 (1981) (mineral lease holder's removal of topsoil from landowner's premises gave rise to claim for trespass or conversion where mineral lease did not authorize such removal). Here, Dalton has alleged that the discharge of PFAS onto its property exceeded the scope of the permits. [*See* Doc. 85 at ¶¶ 152, 199, 212, 226]. Therefore, Defendants' arguments regarding consent fail.

For the above reasons, the Court DENIES the remaining PFAS Chemical Company Defendants and the Carpet Manufacturing Defendants' respective motions to dismiss as to the trespass claim.

### E. Dalton's GWQCA Claim

The Georgia Water Quality Control Act (GWQCA) regulates the discharge of pollutants into waters throughout Georgia. *See* O.C.G.A. § 12-5-20, *et seq.*; *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast* , 286 Ga. App. 518, 528 (2007). To state a civil cause of action under the GWQCA, a plaintiff must allege that a defendant "intentionally or negligently causes or permits" any pollutant to be "spilled, discharged, or deposited in the waters of the state." O.C.G.A. § 12-5-51(a).[13]  Defendants argue that Dalton has failed to state a claim against them for violation of the GWQCA because they did not "directly and/or intentionally" discharge PFAS into "waters of the state."  Their arguments are without merit.

Liability under the GWQCA is not limited to intentional discharges of pollutants, the GWQCA also imposes liability on any person who "negligently causes" pollutants to be discharged into state waters . *See* O.C.G.A. § 12-5-51(a).  In regard to the PFAS Chemical Defendants, Dalton has alleged that they knew that their PFAS

---

[13] The full text reads "[a]ny person who intentionally or negligently causes or permits any sewage, industrial wastes, or wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, deposited in the waters of the state, resulting in a condition of pollution as defined by this article, shall be liable in damages to the state and any political subdivision thereof for any and all costs, expenses and injuries occasioned by such spills, discharges, or deposits. The amount of the damage assessed pursuant to this Code section shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits. Damages to the state shall be recoverable in a civil action instituted in the name of the Environmental Protection Division of the Department of Natural Resources and shall be paid into the state treasury to the credit of the general fund. Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision." O.C.G.A. § 12-5-51(a).

and PFAS-containing products were resistant to conventional wastewater treatment processes at the time they sold their products to the Carpet Manufacturing Defendants and, thus, they knew or should have known that PFAS would be released during the Carpet Manufacturing Defendants' disposal of their wastewater. As noted earlier, such allegations were sufficient to show the causation element of a negligence claim. *See Warner*, 133 Ga. App. at 177 (an intervening act does not sever proximate causation if the original wrongdoer "had reasonable ground for apprehending that such … act would be committed"). Not only do the allegations show that it was foreseeable that PFAS would be discharged through the wastewater, the allegations also show that some of the PFAS Chemical Company Defendants (3M, DuPont, and Invista) participated in the discharge process or decisions made by the Carpet Manufacturing Defendants and had directly discharged such waste from their own labs, which ended up in Dalton's POTW. [*See* Doc. 85 at ¶¶ 101–111]. Therefore, the Court finds Dalton has sufficiently alleged that Defendants either "intentionally or negligently" caused or permitted PFAS-contaminated wastewater to be discharged in Dalton's POTW.

Defendants also argue that Dalton's factual allegations do not show that Defendants discharged the wastewater directly "in the waters of the state," as allegedly required for liability under O.C.G.A. § 12-5-51(a). Essentially, they contend that the allegations of the amended complaint show only that the PFAS-

44

contaminated wastewater was discharged through the sewer system to Dalton's POTW, where it was treated by Dalton and then sprayed across its own property.[14] However, the term "waters of the state" is defined in the GWQCA as "any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, and all other bodies of surface or subsurface water[.]" O.C.G.A. § 12-5-22(13).    It is axiomatic that toxic chemicals that resist degradation in the environment (such as PFAS) would affect drainage systems, streams, creeks, and subsurface waters when sprayed over a large tract of land.  This Court does not read O.C.G.A. § 12-5-29(a) so narrowly so as to impose liability only on discharges that are *directly* into state waters. *See Parris*, 595 F. Supp.3d at 1334 (district court explaining that it "does not read O.C.G.A. § 12-5-29(a) … so narrowly to cover only *direct* discharges into state waters") (emphasis in original).

Next, the Carpet Manufacturing Defendants contend that their discharges of PFAS-contaminated wastewater into the POTW were authorized under the discharge permits and, therefore, they are not subject to liability under the GWQCA. However, the specific terms of the permits are outside the scope of the pleadings and, thus, are not properly before the Court on Defendants' Rule 12(b)(6) motions.  Nevertheless, according to Dalton, those permits are silent as to PFAS. [*See* Doc. 85 at ¶ 152].

---

[14] The allegations also show that Defendants were aware for years that their wastewater would be sent to Dalton's POTW for this purpose.

Lastly, 3M and Aladdin contend that Dalton has not alleged that it incurred costs and expenses in cleaning up and abating the discharge [*see* Doc. 97-1 at 34; Doc. 96-1 at 22, but their contentions are incorrect.  Dalton had alleged that it has already paid significant costs in hiring consultants to assess and characterize the extent and location of the PFAS contamination in soil, groundwater, and surface water at the POTW and to explore and develop treatment options. [Doc. 85 at ¶¶ 170–173].

In sum, the Court finds that Dalton Utilities has sufficiently alleged that Defendants intentionally or negligently caused PFAS-contaminated wastewater to be discharged to waters of the state.  Accordingly, all of the Defendants' motions to dismiss the GWQCA claim are DENIED.

### E. Dalton's Negligent Design Claim

Dalton alleges that the PFAS Chemical Defendants designed, manufactured, sold, licensed, and/or distributed PFAS and PFAS-containing products (3M, DuPont, and Daikin) or formulated, sold, licensed, and/or distributed PFAS-containing products (Invista) to the Carpet Manufacturing Defendants for use in their manufacturing plants.  Dalton further alleges that the PFAS Chemical Defendants were negligent for failing to use reasonable care in designing or formulating their chemical products when they knew or should have known that their PFAS chemicals were harmful to the environment and resistant to conventional wastewater treatment processes, that the PFAS Chemical Defendants knew or should have known that PFAS would be

released during the normal use and disposal of the wastewater that was discharged into the POTW, and that the discharged PFAS chemicals were the proximate cause of its injuries.

In order to state a viable claim for products liability in Georgia, a plaintiff must allege sufficient facts to show that: (1) the defendant was a manufacturer [or formulator]; (2) the defendant sold a defective product; and (3) the product's defects were the proximate cause of plaintiffs injuries. *See* O.C.G.A. § 51-1-11(b). A design defect is a legal conclusion that is reached by utilizing "a balancing test whereby the risks inherent in a product design are weighed against the utility or benefit derived from the product." *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 734 (1994). "This risk-utility analysis incorporates the concept of 'reasonableness.'" *Id.* And, the concept of "reasonableness" encompasses a variety of factors applicable in different factual scenarios, not one of which is dispositive. *Id.* at 736, n. 6; *see also Raymond v. Amada Co., Ltd.*, 925 F.Supp. 1572, 1578 (N.D. Ga. 1996) ("Consistent with the mandate to weigh the product's risk against its utility, facts impinging upon that risk are not dispositive but are to be balanced with other factors against the benefit derived from the product").

In their motions to dismiss, the PFAS Chemical Defendants argue that the amended complaint fails to plausibly allege that the risk of harm outweighs the utility of their products or that a reasonable alternative product design was available.

47

[Docs. 94-1 at 21–22; 97-1 at 37–38]. 3M also argues that the claim is barred by the statute of repose. [Doc. 97-1 at 32, 35–36].  At this stage of the proceedings, their arguments fall short.

To survive a Rule 12(b)(6) motion, a plaintiff asserting a defective design claim need not prove that the product was indeed defective—i.e., that the risk inherent in the product's design outweighs the utility or benefit derived from the product. Rather, a plaintiff merely must set forth sufficient facts from which the Court can reasonably infer that the design was defective. *See Schmidt v. C.R. Bard, Inc.*, No. 6:14-cv-62, 2014 WL 5149175 at *3 (S.D. Ga. Oct. 14, 2014). After reviewing the amended complaint, the Court finds that Dalton has alleged sufficient facts to suggest that the PFAS Chemical Defendants' products are defective because they are: (i) extremely toxic and harmful to the environment; (ii) resistant to conventional wastewater treatment processes; and (iii) do not degrade and are capable of spreading once released into the environment.  Dalton further alleges that these risks outweigh the products' utility as an application to carpet, flooring, and other textile products to provide water and stain resistance. [Doc. 85 at ¶¶ 4, 6, 13, 15, 42, 44]. Dalton has also alleged that an alternative PFAS design, including shorter chain PFAS compounds, was feasible and would have reduced the foreseeable environmental risks posed by the PFAS products sold by the PFAS Chemical Defendants. [Doc. 85 at ¶ 261]. The Court finds that these factual allegations are

48

sufficient to state a plausible claim that PFAS products at issue were defectively designed or formulated. Ultimately, it will be Dalton's burden to present evidence that these risks outweigh the benefits of that design, *Wheat v. Sofamor, S.N.C.*, 46 F.Supp.2d 1351, 1361 (N.D.Ga.1999), and the determination of whether or not the PFAS products were indeed defective under Georgia's risk-utility analysis is generally a question for the jury. *Bryant v. Hoffman–La Roche, Inc.*, 262 Ga. App. 401, 409 (2003). *See also Schmidt*, 2014 WL 5149175 at *4.

3M's additional argument that the statute of repose under O.C.G.A. § 51-1-11 bars Dalton Utilities' negligent design claim is equally unavailing. The statute of repose for negligence design claims does not apply in cases where cause of action "aris[es] out of conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11(c); *see also Ford Motor Co. v. Cosper*, 317 Ga. 356, 358 (2023) (statute of repose does not apply to product liability claims sounding in negligence that arise out of conduct which manifests a willful, reckless, or wanton disregard for life or property). And here, Dalton has alleged sufficient facts to suggest the PFAS Chemical Defendants' breaches of their duties to Dalton constitute negligent, willful and/or reckless conduct. [*See* Doc. 85 at ¶¶ 4–8, 10–12, 17–18, 39 –46, 48–84, 200, 238]. Therefore, at this stage of the proceedings, 3M's argument regarding the application of the statute of repose fails.

For the above reasons, the Court DENIES the PFAS Chemical Company Defendants' motions to dismiss Dalton's negligent design claim.

### F. Dalton's Negligent Failure to Warn Claim

In Count IX of the amended complaint, Dalton asserts a negligent failure to warn claim against the PFAS Chemical Defendants.  (Doc. 85 ¶¶ 265–277].

Under Georgia law, "[t]o state a cause of action for negligent failure to warn, a plaintiff must allege facts sufficient to show that (1) the manufacturer knew or reasonably should have known of a danger arising from use of the product and therefore had a duty to warn; (2) the manufacturer breached the duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Parris*, 595 F. Supp. 3d at 1336 (citation and internal quotation marks omitted).  "The duty to warn may be owed to consumers, reasonably foreseeable users, and[ ] purchasers of the product. This duty has been extended, in some cases, to reasonably foreseeable third parties." *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2016) (citations omitted). "In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Williams v. Taser Int'l, Inc.*, No. 1:06-CV-0051-RWS, 2006 WL 8433374, at *6 (N.D. Ga. Oct.

10, 2006) (citations and quotation marks omitted); *see also Parris*, 595 F. Supp. 3d at 1336.

DuPont argues that it fulfilled its duty to warn by warning the Carpet Manufacturing Defendants, which it describes as "sophisticated corporate actors and learned intermediaries." [Doc. 92 at 3, 22]. The "learned intermediary" doctrine provides that when a "product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." *Parris*, 595 F. Supp. 3d at 1338. However, based on the factual allegations of the amended complaint, the Court cannot conclude at this juncture that, by warning the Carpet Manufacturing Defendants, 3M somehow satisfied their duty to warn Dalton of the foreseeable injuries the PFAS and PFAS-containing products would cause. As noted earlier, Dalton has alleged that 3M and some of the other PFAS Chemical Company Defendants participated in the discharge process or decisions made by the Carpet Manufacturing Defendants and/or had discharged such waste from their own labs, which ended up in Dalton's POTW. [*See* Doc. 85 at ¶¶ 101–111]. Additionally, Dalton alleges that "3M's, DuPont's, Daikin's, and Invista's disclaimers and warnings [given to the Carpet Manufacturing Defendants] were inadequate, unreasonable, and knowingly ineffective." [*Id*. at ¶ 260). This, in the context of all the other facts alleged in the amended complaint, is sufficient at the pleading stage. *See Mims v. Wright Med. Tech., Inc.*, No. 1:11-CV-213-TWT, 2012

WL 1681810, at \*5 (N.D. Ga. May 11, 2012) ("Whether adequate efforts were made to communicate a warning to the ultimate user and whether the warning if communicated was adequate are uniformly held questions for the jury") (quoting *Watson v. Uniden Corp. of America*, 775 F.2d 1514, 1516 (11th Cir. 1985)).

For the foregoing, the Court DENIES the motion to dismiss Dalton' negligent failure to warn claim in Count IX.

### G. Dalton's Punitive Damages and Attorney Fees Claims

Dalton asserts two derivative claims against all Defendants: a wantonness and punitive damages claim (Count VI) [Doc. 85 at ¶¶ 231–238] and an expenses of litigation claim under O.C.G.A. § 13-6-11(Count X) [*Id.* at ¶¶ 278–281]. Defendants' arguments seeking dismissal of these claims are unavailing.

Because the Court there are tort claims against Defendants that survive dismissal, Dalton's claims for punitive damages and attorney's fees also survive.[15] Moreover, the Court cannot say at this preliminary stage whether Defendants' conduct falls outside the scope of O.C.G.A. § 13-6-11, which awards litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." In general, the jury should be allowed to

---

[15] Additionally, the issue of whether a "tort was sufficiently aggravating to authorize punitive damages is generally a jury question, and a jury may award punitive damages even where the clear and convincing evidence only creates an inference of the defendant's conscious indifference to the consequences of [its] acts." *Tookes v. Murray*, 297 Ga. App. 765, 768 (2009) (citation omitted).

decide whether a party has displayed such conduct in the course of the litigation. *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (2005). Accordingly, the Court DENIES Defendants' motions to dismiss as to Dalton's claims for punitive damages and attorney's fees.

## H. Defendants' Remaining Arguments Are All Without Merit

### 1. Statute of Limitations

Under Georgia law, "[a]ll actions for trespass upon or damage to realty shall be brought within four years after the right of action accrues." O.C.G.A. § 9-3-30(a). "The true test to determine when a cause of action accrues is to ascertain the time when the plaintiff could first have maintained [its] action to a successful result." *Colormatch Exteriors, Inc. v. Hickey*, 275 Ga. 249, 251 (2002) (citation and quotation marks omitted). "A cause of action in negligence accrues and the statute of limitation begins to run when there is a negligent act coupled with a proximately resulting injury." *Travis Pruitt & Assocs., P.C. v. Bowling*, 238 Ga. App. 225, 226 (1999) (citation omitted). Thus, "the four-year statute of limitation in O.C.G.A. § 9-3-30 does not bar an action for property damage where the instrumentality causing the damage may have existed for many years, provided the damages sought to be recovered accrued within four years of the filing of the complaint." *Id*.

Although Dalton concedes that it knew in 2009 that it was receiving PFAS-laden wastewater [Doc. 85 at ¶ 158], the amended complaint makes clear that Dalton did

53

not incur damages until 2024, when the EPA introduced new regulations governing PFAS that imposed new permitting duties on Dalton that did not exist before. [*Id*. at ¶¶ 13–14, 152–54, 166–69]. Thus, the presence of PFAS at the POTW did not damage Dalton before 2024 because Dalton had no obligation to address PFAS. And, before the new regulations were in place, the presence of PFAS at the POTW was not impacting Dalton's use and enjoyment of its property. Therefore, any action to remedy PFAS contamination before 2024 would arguably have been premature. *See, e.g., Iberville Par. Waterworks Dist. No. 3 v. Novartis Crop Prot., Inc.*, 45 F. Supp. 2d 934, 941–42 (S.D. Ala. 1999), aff'd sub nom. *Iberville Par. Waterworks v. Novartis Crop Corp.*, 204 F.3d 1122 (11th Cir. 1999) ("Because both [plaintiffs] are in compliance with the SDWA drinking water standards, it cannot be said that either has suffered any actual invasion of a legally protected interest. Both water systems seek recompense for an injury that has not, and may never, occur"); *Rose v. Union Oil Co. of California*, No. C 97-3808 FMS, 1999 WL 51819, at *6 (N.D. Cal. Feb. 1, 1999) (entering summary judgment against plaintiffs on claim that soil and water contamination on their property was a "nuisance" where the evidence demonstrated "that no remediation w[ould] be required" for the contamination on the property and, thus, plaintiffs had not been damaged or deprived of any uses of their property).

Because Dalton's damages seemly accrued in 2024 when the EPA introduced new regulations governing PFAS, its claims are arguably timely.[16]

**2.** Economic Loss Rule

3M argues that Dalton Utilities' common law claims fail under the economic loss rule. [Doc. 97-1 at 27–28]. Under Georgia law, "[t]he 'economic loss rule' generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.*, 279 Ga. 77, 78 (2005). However, a "plaintiff can recover in tort" for the "economic losses resulting from … damage to his property." *Id.*; *see also McGaffin v. Cementos Argos S.A.*, No. 4:16-CV-104, 2017 WL 9251720, at *1 (S.D. Ga. Apr. 6, 2017) (finding that cost of removing "an unreasonable risk" from plaintiff's property "is compensable at tort, the economic loss rule notwithstanding") (citation omitted). Therefore, the Court concludes preliminarily that the economic loss rule is inapplicable here.

---

[16] Dalton Utilities' claims are not time barred for the independent reason that they are continuing in nature. Under Georgia law, "each continuing, injurious act gives rise to a new cause of action." *Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1582 (N.D. Ga. 1995). In the context of environmental contamination, courts applying Georgia law have repeatedly found that contamination that spreads long after it is initially discharged qualifies as a continuing tort. *See*, *e.g.*, *AMC Cobb Holdings, LLC*, No. 1:18-cv-04865-SDG, 2019 WL 13207581, at *6–7 (N.D. Ga. Dec. 11, 2019); *Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727, 729–30 (1992); *Golden Pantry Food Stores, Inc. v. Lay Bros., Inc.*, 266 Ga. App. 645, 650 (2004); *Hudgins & Co. v. J & M Tank Lines,* 215 Ga. App. 308, 309 (1994).

**3.** Standing

3M argues that the amended complaint does not adequately establish Dalton's standing because it fails to satisfy the "traceability requirement." [Doc. 97-1 at 19–20]. Traceability requires showing that the plaintiff's injury "was likely caused by the defendant." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021). Dalton has plausibly alleged that 3M sold products to the Carpet Manufacturing Defendants and had some control over the process that resulted in PFAS contamination. Dalton also plausibly alleged 3M's research lab caused PFAS contamination with its own wastewater. The Court denies 3M's motion to dismiss on this ground.

**4.** Shotgun Pleading

3M also argues that Dalton's amended complaint is a "shotgun pleading" [Doc. 97-1 at 20]. Federal rules require that a complaint include "a short and plain statement of the claim showing that pleader is entitled to relief." Fed. R. Civ. P. 8. Here, each Defendant was given adequate notice about the claims alleged and the grounds thereof. Therefore, the Court does not view this as a shotgun pleading, even though the pleadings are not short,  and DENIES the motion on this ground.

## V. CONCLUSION

For the above reasons, it is hereby **ORDERED** that Defendant Daiken America, Inc.'s Motion to Dismiss [Doc. 93] is **GRANTED IN PART** as to Plaintiff's

56

CERCLA claim and state law trespass and nuisance claims and **DENIED IN PART** as to all other claims.  It is further **ORDERED** that the remaining Motions to Dismiss filed by Defendant EIDP, Inc. and The Chemours Company [Doc. 91], INV Performance Surfaces, LLC [Doc. 94],  Shaw Industries Group, Inc. and Shaw Industries, Inc. [Doc. 95],  Aladdin Manufacturing Corporation [Doc. 96], and 3M Company [Doc. 97] are **DENIED** as to all claims.  Defendant Aladdin's Motion for Leave to File Supplemental Brief in Support of Motion to Dismiss [Doc. 155] is **DENIED AS MOOT**.

IT IS SO ORDERED, this 18th day of March, 2026.

_____
WILLIAM M. RAY, II
United States District Court Judge
Northern District of Georgia